Kevin G. Clarkson, Esq.
Matthew C. Clarkson, Esq.
Brena, Bell & Clarkson, P.C.
810 N Street, Suite 100
Anchorage, Alaska 99501
(907) 258-2000

Attorneys for Plaintiffs,
 David Thompson, *et. al.*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| DAVID THOMPSON; AARON DOWNING; JIM CRAWFORD; and DISTRICT 18 of the ALASKA REPUBLICAN PARTY,<br><br>        Plaintiffs,<br><br>    v.<br><br>PAUL DAUPHINAIS, in His Official Capacity as the Executive Director of the Alaska Public Offices Commission; and MARK FISH, IRENE CATALONE, RON KING, KENNETH KIRK, and VANCE SANDERS, in Their Official Capacities as Members of the Alaska Public Offices Commission,<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Case No. 3:15-cv-00218 HRH |

## MEMORANDUM IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

Introduction ........................................................................................ 1

Facts .................................................................................................... 3

    I.    Alaska's Statutes .................................................................. 3

            A.    Annual Individual Limit for Contributions
                  to Candidates ...................................................... 5

            B.    Annual Limit on Individual Contributions
                  to Groups that Are Not Political Parties ............................. 9

            C.    "First Come First Serve" Annual
                  Aggregate Cap on Nonresident,
                  Individual Contributions to Candidates ............................ 11

            D.    "First Come First Serve" Annual
                  Aggregate Cap on Party/Party
                  Subdivision Contributions to Candidates ......................... 12

    II.    Plaintiffs ............................................................................ 14

Argument ............................................................................................ 16

    I.    Prior Litigation Regarding Alaska's
        Campaign Finance Laws .................................................... 16

    II.    Preliminary Injunction Standard ....................................... 17

    III.    The Challenged Laws Unconstitutionally
        Burden Free Speech and Association or
        Equal Protection ................................................................ 19

            A.    Plaintiffs Demonstrate Likely Merits Success ................. 27

                  1.    The $500 Limits to Candidates and
                            Groups Fail Strict Scrutiny ................................... 27

2.    The $500 Annual Limit on Individual
      Contributions to Candidates Fails
      Even Intermediate Scrutiny...................................................29

      (a)   Alaska's $500 Annual Limit Bears
            the *Randall* "Danger Signs"........................................29

      (b)   Alaska's $500 Limit Does Not Focus
            Narrowly on the State's Only Legitimate
            Interest in Preventing Quid Pro Quo
            Corruption or its Appearance.......................................30

      (c)   Alaska's $500 Limit Is Not Closely Drawn ................32

            (i)    The Limit Significantly Restricts
                   the Amount of Funding Available
                   for Challengers to Run Competitive
                   Campaigns ...............................................32

            (ii)   Political Party Contribution Limits ......................36

            (iii)  Volunteer Services or Costs Treated
                   as Contributions.........................................38

            (iv)   The Limit Is Not Indexed for Inflation................39

            (v)    Alaska Has No Special Justification
                   that Can Support the Low Individual
                   Contribution Limit.......................................39

      (d)   Summary .......................................................40

3.    The $500 Limit on Individual Contributions
      to Groups Fails Both Strict and Intermediate
      Scrutiny ..............................................................41

Case 3:15-cv-00218-TMB   Document 5   Filed 11/11/15   Page 3 of 60

4.    The Aggregate Cap on Nonresident
      Contributions Violates Free Speech
      and Association, as Well as Equal
      Protection ............................................................... 44

5.    The Aggregation of Party Subdivisions
      and Units Is Unconstitutional ................................................ 46

B.    Plaintiffs Will Suffer Irreparable Harm ........................................... 46

C.    The Balance of Hardships Favors the Plaintiffs ............................... 47

D.    The Public Interest Favors an Injunction .......................................... 48

Conclusion ..................................................................................................... 48

Case 3:15-cv-00218-TMB   Document 5   Filed 11/11/15   Page 4 of 60

**TABLE OF AUTHORITIES**

**Page**

*ACLU v. Alvarez*,
    679 F.3d 583 (7th Cir. 2012).........................................................................18

*ACLU of Nevada v. Heller*,
    378 F.3d 979 (9th Cir. 2004).........................................................................48

*Alaska Right to Life Comm. v. Miles*,
    441 F.3d 773 (9th Cir. 2006).........................................................................17

*Alliance for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011).......................................................................18

*Arizona Free Ent. Club's Freedom Club PAC v. Bennett*,
    __ U.S. __, 131 S. Ct. 2806 (2011)...........................................................18, 21

*Ashcroft v. ACLU*,
    542 U.S. 656 (2004)......................................................................................19

*Bose Corp. v. Consumers Union of United States, Inc.*,
    466 U.S. 485 (1984)......................................................................................24

*Brown v. California Dep't. of Transp.*,
    321 F.3d 1217 (9th Cir. 2003).......................................................................48

*Buckley v. Valeo*,
    424 U.S. 1 (1976)....................................................................................*passim*

*California Democratic Party v. Jones*,
    530 U.S. 567 (2000)......................................................................................43

*Carroll v. Commissioners of Princess Anne*,
    393 U.S. 175 (1968)......................................................................................48

*Citizens for Clean Gov't v. City of San Diego*,
    474 F.3d 647 (9th Cir. 2007).........................................................................19

**Page**

*Citizens United v. FEC,*
   558 U.S. 310 (2010) ............................................................................................. *passim*

*City of Cleburne v. Cleburne Living Ctr.,*
   473 U.S. 432 (1985) ............................................................................................. 26, 45

*Colorado Republican Federal Campaign Comm. v. FEC,*
   518 U.S. 604 (1996) (*Colorado I*) ...................................................................... 26

*Community House, Inc. v. City of Boise,*
   490 F.3d 1041 (9th Cir. 2007) ........................................................................... 47

*Davis v. FEC,*
   554 U.S. 724 (2008) ........................................................................................... 17, 33

*Elrod v. Burns,*
   427 U.S. 347 (1976) ........................................................................................... 47

*Eu v. San Francisco County Dem. Central Comm.,*
   489 U.S. 214 (1989) ........................................................................................... 27

*FEC v. Beaumont,*
   539 U.S. 146 (2003) ........................................................................................... 20

*FEC v. Colorado Republican Federal Campaign Comm.,*
   533 U.S. 431 (2001) (*Colorado II*) .................................................................. 26

*FEC v. National Conservative PAC,*
   470 U.S. 480 (1985) ........................................................................................... 21

*FEC v. Wisconsin Right to Life, Inc.,*
   551 U.S. 449 (2007) ........................................................................................... 17

*G & V Lounge, Inc. v. Michigan Liquor Control Comm'n,*
   23 F.3d 1071 (6th Cir. 1994) ...............................................................................

*Gonzales v. O Centro Espirita Beneficiente Uniao
   do Vegetal FEC v. Beaumont*,
      546 U.S. 418 (2006) ............................................................................ 18, 22

*Hicklen v. Orbeck*,
      437 U.S. 518 (1978) .................................................................................. 45

*Hyde Partners, LP v. Connolly*,
      839 F.2d 837 (1st Cir. 1988) ...................................................................... 48

*Jacobus v. Alaska*,
      338 F.3d 1095 (9th Cir. 2003) ......................................................... 17, 19, 41

*Joelner v. Village of Washington Park, Illinois*,
      378 F.3d 613 (7th Cir. 2004) ...................................................................... 48

*KH Outdoor, LLC v. City of Trussville*,
      458 F.3d 1261 (11th Cir. 2006) .................................................................. 48

*Klein v. City of San Clemente*,
      584 F.3d 1196 (9th Cir. 2009) ............................................................... 19, 48

*Kramer v. Union Free Sch. Dist. No. 15*,
      395 U.S. 621 (1969) ............................................................................. 26, 45

*L.A. Mem'l Coliseum Comm'n v. National Football League*,
      634 F.2d 1197 (9th Cir. 1980) .................................................................... 18

*Lair v. Bullock*,
      798 F.3d 736 (9th Cir. 2015) .............................................................. *passim*

*Libertarian Party of Alaska, Inc. v. State*,
      101 P.3d 616 (Alaska 2004) ....................................................................... 17

*Lopez v. Brewer*,
      680 F.3d 1068 (9th Cir. 2012) .................................................................... 18

Case 3:15-cv-00218-TMB   Document 5   Filed 11/11/15   Page 7 of 60

*Marks v. United States,*
   430 U.S. 188 (1977) ................................................................................. 38

*Mazurek v. Armstrong,*
   520 U.S. 968 (1997) ................................................................................. 18

*McConnell v. FEC,*
   540 U.S 93 (2003) .................................................................................... 42

*McCormick v. United States,*
   500 U.S. 257 (1991) ................................................................................. 21

*McCutcheon v. FEC,*
   __ U.S. __, 134 S. Ct. 1434 (2014) ................................................... *passim*

*Montana Right to Life Ass'n v. Eddleman,*
   343 F.3d 1085 (9th Cir. 2003) ..................................................... 23, 32, 36

*NAACP, Western Region v. City of Richmond,*
   743 F.2d 1346 (9th Cir. 1984) ................................................................. 47

*Nixon v. Shrink Missouri Government PAC,*
   528 U.S. 377 (2000) ................................................................. 23, 28, 29, 39

*Paramount Land Co. LP v. California Pistachio Comm'n,*
   491 F.3d 1003 (9th Cir. 2007) ................................................................. 47

*Randall v. Sorrell,*
   548 U.S. 230 (2006) .......................................................................... *passim*

*Sammartano v. First Judicial District Court,*
*in and for County of Carson City,*
   303 F.3d 959 (9th Cir. 2002) .............................................................. 47, 48

*Shapiro v. Thompson,*
   394 U.S. 618 (1969) .......................................................................... 26, 45

*Shell Offshore, Inc. v. Greenpeace, Inc.,*
   709 F.3d 1281 (9th Cir. 2013)............................................................................. 18

*Shuttlesworth v. City of Birmingham,*
   394 U.S. 147 (1969)............................................................................................. 47

*Skinner v. Oklahoma,*
   316 U.S. 535 (1942)....................................................................................... 26, 45

*State v. ACLU,*
   978 P.2d 597 (Alaska 1999)................................................................................ 17

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.,*
   240 F.3d 832 (9th Cir 2001)................................................................................ 17

*Taylor-Failor v. County of Hawaii,*
   90 F. Supp. 3d 1095 (D. Hawai'i 2015)............................................................. 17

*Thalheimer v. City of San Diego,*
   645 F.3d 1109 (9th Cir. 2011)....................................................................... 19, 25

*Winter v. Natural Res. Def. Council, Inc.,*
   555 U.S. 7 (2008)................................................................................................. 18

*Wisconsin Right to Life, Inc. v. Barland,*
   751 F.3d 804 (7th Cir. 2014)............................................................................... 27

*Wisconsin Right to Life,* Inc. v. FEC,
   546 U.S. 410 (2006)............................................................................................. 27

*Yahoo!, Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme,*
   433 F.3d 1199 (9th Cir. 2006)............................................................................. 47

*Zobel v. Williams,*
   457 U.S. 55 (1982)......................................................................................... 26, 45

# TABLE OF AUTHORITIES (CONTINUED)

Page

## Constitutions

Alaska Constitution Article 3, § 8 ................................................................................. 8
Alaska Constitution Article 4, §§ 5, 6 ......................................................................... 8
Colorado Constitution Article XXVIII .................................................................. 8, 9, 37

## Legislative

HCS CSSB 191(FIN) am H – Chapter 48, SLA 96 (effective 1997) .................................. 3
HCS CSSB 119(FIN) am H(efd fld) – Chapter 108, SLA 03 ........................................... 3

Ballot Measure 1 (Petition ID code: 03DISC) – "An Act
  Relating to Contribution Limits, Lobbyists, and Disclosure"
  Attorney General's File Number: 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 ................................................................. 3

## Miscellaneous

*http://www.ncsl.org/research/elections-and-campaigns/*
campaign-contribution-limits-overview.aspx#individual ................................................. 37

## Statutes

Alaska Statute 11.56.100 ............................................................................................. 31
Alaska Statute 11.56.110 ............................................................................................. 31
Alaska Statute 15.13.020 ............................................................................................... 4
Alaska Statute 15.13.030 ............................................................................................... 4
Alaska Statute 15.13.045 ............................................................................................... 4
Alaska Statute 15.13.070 .................................................................................... *passim*
Alaska Statute 15.13.072 ....................................................................... 2, 5, 14, 44
Alaska Statute 15.13.074 .......................................................................................... 5, 6
Alaska Statute 15.13.112 ................................................................................. 4, 31, 32
Alaska Statute 15.13.380 ............................................................................................... 4
Alaska Statute 15.13.390 .......................................................................................... 4, 15
Alaska Statute 15.13.400 .................................................................................... *passim*
Connecticut General Statute § 9-611, 9-613 and 9-615 ................................................. 8
Florida Statute § 106.08 ............................................................................................. 37
Illinois Statute 10 ILCS 5/9-8.5 .................................................................................. 37
Kansas—K.S.A. § 25-4153 ............................................................................................ 9

# TABLE OF AUTHORITIES (CONTINUED)

Maine—21 A.M.R.S.A § 1015 ............................................................................. 8
Michigan Statute §§ 169.246, 169.252, 169.254 ..................................... 9, 37
Montana—M.C.A. § 13-35-227 and 13-37-216 ........................................ 8, 9
Ohio Statute O.R.C. §§ 3517.102, 3517.104, 3599.03 ................................ 37
Tennessee Code § 2-10-302 ............................................................................. 37
Wisconsin Statute §11.01 ............................................................................ 9, 37

# INTRODUCTION

This is a civil rights action brought under 42 U.S.C. § 1983 for declaratory and injunctive relief based upon violations of the First and Fourteenth Amendments to the United States Constitution. The action concerns the constitutionality of certain Alaska election and campaign finance laws. Specifically, Plaintiffs challenge the constitutionality of:

- The $500 annual limit on individual contributions to a candidate that is not prorated for inflation—AS 15.13.070(b)(1) and any regulations promulgated thereunder. The limit impermissibly burdens free speech and association because it does not promote and it is not appropriately tailored to promote the State's only permissible interest in preventing *quid pro quo* corruption or its appearance, it is too low, it is annual in nature, and it is not adjusted for inflation.

- The $500 annual limit on individual contributions to a group that is not a political party, which is not prorated for inflation and which is discriminatorily and unjustifiably only ten percent of the amount that an individual can contribute on an annual basis to a political party—AS 15.13.070(b)(1); AS 15.13.070(b)(2) and any regulations promulgated thereunder. The limit impermissibly burdens free speech and association because it does not promote and it is not appropriately tailored to promote the State's only permissible interest in preventing *quid pro quo* corruption or its appearance, it is too low, it is annual in nature, and it is not adjusted for inflation.

- The annual aggregate limits on what a candidate may solicit or accept from nonresidents of Alaska, which have the effect of placing an aggregate cap, and in many instances a complete ban, on contributions by nonresidents to a candidate, and that prohibit many nonresidents of Alaska from making any contribution in any amount to candidates for public office in Alaska—AS 15.13.072(a)(2) and (e) and any regulations promulgated thereunder. The limit violates free speech and association because it is an aggregate, because it does not promote and it is not appropriately tailored to further the State's only permissible interest in preventing *quid pro quo* corruption or its appearance and because it operates as a discriminatory limit or prohibition on nonresidents in their ability to donate to candidates for public office in Alaska without adequate government justification or tailoring.

- The annual aggregate limit on what each separate subdivision or unit of a political party combined together may contribute to a candidate for public office, which laws have the effect of substantially limiting or completely prohibiting some political party

subdivisions or units in what they may contribute to a candidate—AS 15.13.070(d); AS 15.13.400(15) and any regulations promulgated thereunder. The limit violates free speech and association because it is an aggregate, and because it does not promote and it is not appropriately tailored to further the State's only permissible interest in preventing *quid pro quo* corruption or its appearance.

Plaintiffs' contributions to the political campaigns or to the political groups of their choosing constitute free speech and association that is protected under the First and Fourteenth Amendments to the United States Constitution. The only government interest that can justify restricting campaign contributions is one in preventing *quid pro quo* corruption or its appearance. Although this interest is not only sufficiently important but is in fact compelling, it will not sustain the laws challenged in this case. The challenged laws fail strict scrutiny because they are not the least restrictive means to further the government's interest.[1] In any event, the laws fail intermediate scrutiny because they are not closely drawn to address the government interest while avoiding unnecessary abridgement of free speech and association. The aggregate cap placed on nonresident contributions fails free speech and

---

[1]  Plaintiffs acknowledge that although First Amendment law regarding campaign finance has been changing drastically in the past decade, the United States Supreme Court has not yet overruled the distinction between campaign expenditures and contributions drawn in *Buckley v. Valeo*, 424 U.S. 1, 15 (1976)—applying strict scrutiny to the former and intermediate scrutiny to the latter. Plaintiffs also acknowledge that the Ninth Circuit, based upon its reading of the United States Supreme Court's recent decisions, continues to apply a form of intermediate scrutiny to contribution limits. *Lair v. Bullock*, 798 F.3d 736 (9th Cir.) *reh'g en banc denied* 787 F.3d 989 (9th Cir. 2015). Nonetheless, because the United States Supreme Court continues to indicate that it may reevaluate the *Buckley* distinction—having done so as recently as 2014 in *McCutcheon v. FEC*, __ U.S. __, 134 S. Ct. 1434, 1445-46 (2014)— Plaintiffs raise the argument that strict scrutiny should apply to Alaska's campaign contribution limits, and press the argument herein in order to preserve it for later consideration.

Memorandum in Support of Motion for Preliminary Injunction                    Page 2 of 49
*Thompson, et al. v. Dauphinais, et al.*                                              November 11, 2015
Case 3:15-cv-00218-TMB   Document 5   Filed 11/11/15   Page 13 of 60

association analysis and violates equal protection. The aggregation of political party subdivisions and units for contributions to candidates violates free speech and association.

Plaintiffs should be granted a preliminary injunction enjoining enforcement of the challenged laws. As demonstrated below, Plaintiffs are likely to succeed on the merits of their claims, they will suffer irreparable harm in the form of a loss of constitutional rights if the challenged laws are not enjoined, the balance of hardships tips in Plaintiffs' favor, and an injunction during the pendency of this case is in the public interest. Pursuant to Fed. R. Civ. P. 65(a)(2), the Court should consolidate the hearing on the motion for preliminary injunction with the trial on the merits.

## FACTS

### I. ALASKA'S STATUTES

Alaska has enacted a series of campaign finance laws that are codified in the Alaska Statutes at AS 15.13, *et. seq*. As pertinent to this action, those statutes create a set of rules establishing the types and amounts of contributions that individuals, groups, and parties may make to candidates running for election to public office, to political groups, and to political parties in the State of Alaska. As pertinent to this action, those statutes were enacted by the Alaska Legislature effective 1997,[2] amended by the Alaska Legislature in 2003,[3] and then amended again by initiative in 2006.[4] As originally enacted and as amended over the years,

---

[2] *See* HCS CSSB 191(FIN) am H – Chapter 48, SLA 96 (effective 1997).
[3] *See* HCS CSSB 119(FIN) am H(efd fld) – Chapter 108, SLA 03.
[4] *See* Ballot Measure 1 (Petition ID code: 03DISC) – "An Act Relating to Contribution Limits, Lobbyists, and Disclosure," Attorney General's File Number: 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, placed on the ballot for the August 22, 2006, statewide primary election.

Memorandum in Support of Motion for Preliminary Injunction     Page 3 of 49
Thompson, et al. v. Dauphinais, et al.                                    November 11, 2015
Case 2:15-cv-00218-TMB   Document 5   Filed 11/11/15   Page 14 of 60

the statutes have set varying levels and types of limits and restrictions on campaign and political contributions.

The statutes create the Alaska Public Offices Commission and empower that agency to enforce the State's campaign finance laws and to adopt regulations necessary to implement the laws.[5]  APOC is comprised of five Commissioners.[6]  The commissioners elect from among themselves a chairperson.[7]  The Commission also employs an Executive Director, who is not a voting member of the Commission.[8]  APOC has the power to investigate violations of the campaign finance laws and to hold hearings, levy fines, and assess civil penalties on individuals for violations of the campaign finance laws.[9]  Defendants Mark Fish, Irene Catalone, Ron King, Kenneth Kirk, and Vance Sanders are APOC Commissioners. Kenneth Kirk is an APOC Commissioner and he serves as the APOC Chairperson. Defendant Paul Dauphinais is the APOC Executive Director.

As pertinent to this case, the statutes establish (1) a limit on the amount of contributions that individuals may make to candidates for public office in Alaska; (2) a limit on the amount of contributions that individuals may make to a group that is not a political party; (3) an aggregate limit on what a candidate for public office in Alaska may solicit or accept from nonresidents of Alaska; and (4) an aggregate limit on what each separate subdivision or unit of a political party combined together may contribute to a candidate for

---

[5]  *See* AS 15.13.020; AS 15.13.030(9); AS 15.13.045.
[6]  AS 15.13.020(b), (c).
[7]  AS 15.13.020(g).
[8]  AS 15.13.020(i).
[9]  AS 15.13.045; AS 15.13.380; AS 15.13.390.

Memorandum in Support of Motion for Preliminary Injunction          Page 4 of 49
*Thompson v. Dauphinais, et al.*                                    November 11, 2015
Case 3:15-cv-00218-TMB   Document 5   Filed 11/11/15   Page 15 of 60

public office. Each of these limits are annual limits that apply during the eighteen-month election cycle preceding the date of the general election.[10] And, none of the limits are, ever have been, or ever will be, under existing law, indexed for inflation.[11] No contribution may be made before the eighteen-month election cycle preceding the date of the general election. Because the limits are annual in nature, they do not operate on an election-by-election basis— thus no contributor can give a donation to a candidate for both the primary and general elections in the calendar year of the general election.

### A. Annual Individual Limit for Contributions to Candidates.

Alaska Statute 15.13.070(a)(1) limits to no more than $500 per year the contributions that individuals may make to a candidate for public office in Alaska.[12] The annual nature of the $500 limit effectively means that an individual can contribute $1,000 to a candidate in an eighteen-month election cycle that commences with May 1 of the calendar year before the year of the general election and ends at the general election, provided that the candidate who the individual wishes to support has registered as a candidate for office during the calendar year prior to the general election.[13] If however, a candidate does not register as a candidate until the calendar year of the general election or if the individual waits until the year of the general election, then that individual's contributions to that candidate are limited to $500 for

---

[10] AS 15.13.070(b)(1); AS 15.13.070(d); AS 15.13.072(a); AS 15.13.072(e).
[11] *Id.* Nothing within the Alaska campaign finance laws or APOC's regulations adjusts the contribution limit for inflation.
[12] AS 15.13.070(a)(1).
[13] *See* AS 15.13.074(c).

Memorandum in Support of Motion for Preliminary Injunction          Page 5 of 49
*Thompson, et al. v. Dauphinais, et al.*          November 11, 2015
Case 3:15-cv-00218-TMB   Document 5   Filed 11/11/15   Page 16 of 60

the entire primary and general-election cycle.[14] If a candidate does not register during the year preceding the general election or if an individual does not make a contribution during that year, then the individual may not make a contribution to the candidate for both the primary and general election and is limited to one $500 donation for the entire election cycle.[15]

Thus, if a candidate does not register to run for office until the year of the general election, then the amount of money that the candidate may receive from his/her contributors is reduced by 50 percent in comparison to what a candidate who registered the prior year can receive from contributors. Conversely, the maximum amount that a contributor can donate to a candidate who registers in the year of the general election is only 50 percent of the maximum amount that a contributor can donate to a candidate who registers the prior year. Because the limit is based on the calendar year rather than by election, it automatically gives an advantage to candidates who enter the race early. Disproportionately, it is incumbents who enter races early rather than challengers.[16] The annual nature of the limit, therefore, tends to place candidates who enter the race late, primarily challengers, at a significant disadvantage in comparison to incumbents.[17]

This annual contribution limit was first put into effect in 1997, was raised to $1,000 from 2003-2005, but then was lowered again to $500 by ballot initiative in 2006.[18] The $500

---

[14] *See* AS 15.13.074(c).
[15] *Id.*
[16] Michael Pauley Aff. ¶ 7.
[17] *Id.*
[18] *See supra* nn.2, 3, 4.

Memorandum in Support of Motion for Preliminary Injunction      Page 6 of 49
*Thompson, et al. v. Dauphinais, et al.*    November 11, 2015

Case 3:15-cv-00218-TMB   Document 5    Filed 11/11/15    Page 17 of 60

limit that was first put into place in 1996 and then reinstated in 2006 has never been, and is not provided to ever be, adjusted for inflation. Because this limit is not adjusted for inflation, it has lost value each of the eighteen years since 1997 and each of the nine years since 2006. With annual inflation and total inflation over eighteen years since 1997, this limit, which had a value of $500 in 1997, has a present day value of only $337.26 in 2015 dollars.[19]  With annual inflation and total inflation over nine years since 2006, this limit, which had a value of $500 in 2006, has a present-day value of only $419 in 2015 dollars.[20]  Absent inflation adjustment, the present-day value of the money that an individual may contribute to a candidate will continue to diminish in value each year.[21]

The United States Supreme Court issued its seminal campaign finance decision in *Buckley* in 1976.[22]  When this $500 annual limit is adjusted to reflect its value in 1976, it represents only $119.57 or a mere 11.95 percent of the federal $1,000 per-election limit on individual contributions that was approved in *Buckley*.[23]  Moreover, when the annual nature of the current Alaska limit is taken into consideration, it loses even more value in comparison to the per-election limit in *Buckley*. If an individual donates to a candidate who did not register in the year preceding the general election, then that individual's $500 maximum contribution amounts to only $250 per election for the primary and general-election cycle— when this $250 per election limit is adjusted to reflect its value in 1976, it represents only

---

[19]  Michael Pauley Aff. ¶ 4.
[20]  *Id.*
[21]  *Id.*
[22]  *Buckley*, 424 U.S. at 1.
[23]  *Buckley*, 424 U.S. at 15, 23; Michael Pauley Aff. ¶ 4.

Memorandum in Support of Motion for Preliminary Injunction                    Page 7 of 49
Thompson v. Dauphinais  November 11, 2015
Case 3:15-cv-00218-TMB  Document 5   Filed 11/11/15   Page 18 of 60

$59.78 or a mere 5.9 percent (a little more than one-twentieth) of the $1,000 per-election limit on individual contributions that was approved in *Buckley*.[24]

Considered as a whole, Alaska's contribution limits are one of the two lowest, if not the lowest, in the nation. With respect to statewide gubernatorial races, Alaska's $500-per-year contribution limit is the lowest in the nation.[25] Only one state, Montana, has a statewide contribution limit for offices other than governor—offices for which Alaska has no comparable election—that is lower than Alaska's.[26] Only four states—Colorado, Connecticut, Maine, and Montana—have contribution limits for legislative offices that are lower than Alaska's, and some of these nonetheless have more contribution value than Alaska's because they are per-election rather than annual limits.[27] Only five other states—Colorado, Kansas, Michigan, Montana, and Wisconsin—have contribution limits that are equal or comparable to Alaska's, and some of these (1) nonetheless have more contribution value than Alaska's because they are per election rather than annual limits; or (2) are

---

[24] *Buckley*, 424 U.S. at 15, 23; Michael Pauley Aff. ¶ 4.

[25] *See* Michael Pauley Aff. ¶ 6 and Ex. A to Pauley's Affidavit.

[26] *See* M.C.A. § 13-35-227 and 13-37-216 ($320 for statewide races other than governor and lieutenant governor). In addition to Governor and Lieutenant Governor, Montana conducts statewide elections for a Secretary of State, an Attorney General, a State Auditor, a Superintendent of Public Instruction, Supreme Court Justices, and the Clerk of the Supreme Court. See http://mt.gov/govt/elected_officials.mcpx. Alaska's only statewide-elected offices are Governor and Lieutenant Governor (who are elected as a single ticket). *See* Alaska Const. art. 3, § 8. Supreme Court Justices are not elected but stand for retention in statewide elections. Alaska Const. art. 4, §§ 5, 6. *See also* Michael Pauley Aff. ¶ 6.

[27] *See* Colorado—Colorado Const. art. XXVIII ($200 per election for legislative candidate); Connecticut—Ct. Gen. Stat. § 9-611, 9-613 and 9-615 ($250 per election for House candidate, or $500 per-election cycle); Maine—21 A.M.R.S.A § 1015 ($375 per election for legislative candidates, or $750 per-election cycle); Montana—M.C.A. § 13-35-227 and 13-37-216 ($170 per election for legislative candidates, or $340 per-election cycle). *See also* Michael Pauley Aff. ¶ 6.

Memorandum in Support of Motion for Preliminary Injunction                Page 8 of 49
*Thompson, et al. v. Dauphinais, et al.*                                        November 11, 2015
Case 3:15-cv-00218-TMB   Document 5   Filed 11/11/15   Page 19 of 60

comparable only with respect to legislative, House, or municipal elections, and permit significantly greater contributions for statewide races.[28] All of the states that have a legislative or municipal office contribution limit equal, comparable, or lower than Alaska nonetheless have a higher contribution limit for gubernatorial and statewide races.[29]

## B. Annual Limit on Individual Contributions to Groups that Are Not Political Parties.

Alaska Statute 15.13.070(b)(1) limits to no more than $500 per year what an individual may contribute to a group that is not a political party. This annual contribution limit was first put into effect in 1997, was raised to $1,000 from 2003-2005, but then was lowered again to $500 by ballot initiative in 2006.[30] The $500 annual contribution limit first put into place in 1997 and then reinstated in 2006 has never been, and is not provided to ever be, adjusted for inflation.[31] Because this limit is not adjusted for inflation, it has lost value

---

[28] *See* Colorado—Colorado Const. art. XXVIII ($550 per election for statewide races, or $1,100 per election cycle); Kansas—K.S.A. § 25-4153 ($500 per election House candidate, or $1,000 per-election cycle); Michigan—M.C.L. § 169.246, 169.252, and 169.254 ($500 per election House candidate, or $1,000 per-election cycle); Wisconsin—Wis. Stat. § 11.01 ($500 per election Assembly candidate, or $1,000 per-election cycle). *See also* Michael Pauley Aff. ¶ 6.

[29] *See* Colorado—Colorado Const. art. XXVIII ($550 per election for statewide races, or $1,100 per election cycle); Connecticut—Ct. Gen. Stat. § 9-611, 9-613 and 9-615 ($1,000 senate, $2,000 statewide, $3,500 gubernatorial per election, or $2,000, $4,000, and $7,000 per-election cycle); Kansas—K.S.A. § 25-4153 ($1,000 senate, $2,000 statewide per election, or $2,000, $4,000 per-election cycle); Maine—21 A.M.R.S.A § 1015 ($1,575 gubernatorial per election, or $3,150 per-election cycle); Michigan—M.C.L. § 169.246, 169.252, and 169.254 ($1,000 senate, $3,400 statewide per election, or $2,000, $6,800 per-election cycle); Montana—M.C.A. § 13-35-227 and 13-37-216 ($650 gubernatorial per election, or $1,300 per-election cycle); Wisconsin—Wis. Stat. § 11.01 ($1,000 senate, $10,000 statewide per election, or $2,000, $20,000 per-election cycle). *See also* Michael Pauley Aff. ¶ 6.

[30] *See supra* nn.1, 2, 3.

[31] *See* AS 15.13.070(b)(1).

Memorandum in Support of Motion for Preliminary Injunction                    Page 9 of 49
*Thompson et al. v. Dauphinais et al.*                                           November 11, 2015
Case 3:15-cv-00218-TMB   Document 5   Filed 11/11/15   Page 20 of 60

each of the eighteen years since 1997 and each of the nine years since 2006. With annual inflation and total inflation over eighteen years since 1997, this limit, which had a value of $500 in 1997, has a present-day value of only $337.26 in 2015 dollars.[32] With annual inflation and total inflation over nine years, this limit, which had a value of $500 in 2006, has by comparison to 2006 a present-day value of only $419 in 2015 dollars. Absent adjustment for inflation, the present-day value of this contribution limit will continue to diminish each year.[33] When this $500 annual limit is adjusted to reflect its value in 1976, it represents only $119.57 or a mere 11.95 percent of the $1,000 per-election limit on individual contributions to candidates that was approved in *Buckley*[34]—when the annual nature of the Alaska limit is contrasted with the per-election limit at issue in *Buckley,* it represents again only $59.78 per election in 1976 dollars (slightly more than one-twentieth of the limit at issue in *Buckley*).

By contrast to the limited amount that an individual may contribute to a group that is not a political party, an individual may contribute up to $5,000 per year to a political party.[35] The amount that an individual can contribute to a group that is not a political party is thus only one-tenth or ten percent of the amount that an individual can contribute to a political party. Individuals who contribute to groups that are not political parties are similarly situated to individuals who contribute to political parties—both parties and groups use their funds to donate to and support the candidates of their choosing. Individuals who donate to parties and

---

[32] Michael Pauley Aff. ¶ 4.
[33] *Id.*
[34] *Buckley*, 424 U.S. at 15, 23; Michael Pauley Aff. ¶ 4. *Buckley* did not involve a limit on what individuals could contribute to groups that were not political parties.
[35] *See* AS 15.13.070(b)(2).

Memorandum in Support of Motion for Preliminary Injunction                    Page 10 of 49
*Thompson, et al. v. Dauphinais, et al.*                                      November 11, 2015
Case 3:15-cv-00218-TMB   Document 5   Filed 11/11/15   Page 21 of 60

groups each indirectly support the candidates who the party or group independently chooses to support, albeit lacking control over the party's or group's decisions about which candidates to support with contributions. But, groups are more limited in what they can contribute to candidates than are parties—groups can donate only $1,000 per year while parties can donate anywhere from $5,000 to $100,000, depending upon the office the candidate is seeking.[36]

C. "First Come First Serve" Annual Aggregate Cap on Nonresident, Individual Contributions to Candidates.

Alaska Statute 15.13.072(a)(2) and (e) place an annual "first come first serve" aggregate limit on the contributions that a candidate may solicit, accept, and/or receive from nonresidents of Alaska. The annual aggregate limits that candidates can solicit, accept, and/or receive from nonresidents of Alaska vary by office, and, as applicable to this action, is $3,000 if the candidate is seeking the office of representative or some municipal or other office. This aggregate cap operates as a "first come first serve" limitation because once a candidate for House has collected more than $2,500 in a year from nonresidents of Alaska, the contribution limit for other nonresidents is reduced below $500. As that year's contributions total beyond $2,500, the limit for other individual nonresidents continues to lower until the aggregate is finally reached, at which point all other nonresidents are precluded from contributing even once cent to the candidate that year. Thus, once the candidate's campaign reaches the aggregate limit for nonresident contributions, the limit operates as a complete ban on further nonresident contributions to the candidate.

---

[36] *See* AS 15.13.070(c); AS 15.13.070(d)(1)-(4).

Memorandum in Support of Motion for Preliminary Injunction            Page 11 of 49
*Thompson, et al. v. Dauphinais, et al.*                              November 11, 2015
Case 3:15-cv-00218-TMB   Document 5   Filed 11/11/15   Page 22 of 60

The annual aggregate limits applicable to contributions, solicitations, or receipts from nonresidents that were put into place in 1997 are not and never have been adjusted for inflation, and thus the amount that nonresidents may give to candidates in the aggregate has effectively diminished in value each year since 1997 and continues to effectively diminish in value each year. With annual inflation and total inflation over a period of eighteen years, this aggregate limit, which had a value of $3,000 in 1997, has a present-day value of only approximately $2,023.58 in 2015 dollars. Each election year during which campaign contributions can be given and received, candidates reach the aggregate cap applicable to nonresidents of Alaska and then must return contributions made by nonresidents of Alaska. For example, Governor Sean Parnell was required to return substantial contributions from nonresidents of Alaska during his campaign for reelection in 2014.[37]

### D. "First Come First Serve" Annual Aggregate Cap On Party/Party Subdivision Contributions to Candidates.

Alaska Statutes 15.13.070(d) and AS 15.13.400(15) require that all contributions by any and all subdivisions or units of a political party to a candidate for public office in Alaska be aggregated and combined and then subjected to an aggregate cap. For example, each and every subdivision or unit of a political party together may contribute no more than an aggregate of $10,000 per year to a candidate for the State House of Representatives and no more than an aggregate of $5,000 per year to a candidate for municipal office. Within or

---

[37] Michael Pauley Aff. ¶ 10.

Memorandum in Support of Motion for Preliminary Injunction     Page 12 of 49
*Thompson, et al. v. Dauphinais, et al.*     November 11, 2015

Case 3:15-cv-00218-TMB   Document 5   Filed 11/11/15   Page 23 of 60

affiliated with the general Alaska Republican Party there exist many separate independent subdivisions or units.[38]

Once a candidate has reached the annual aggregate limit for combined party contributions for the particular office that the candidate is seeking, all other or additional subdivisions or units within the combined party are prohibited from donating any amount to the candidate. Once the candidate's campaign reaches the combined aggregate limit for party contributions, this limitation operates as a complete prohibition on further contributions to the candidate by any other subdivision or unit of the party, regardless of how independent in structure and financing that subdivision or unit might be from the general party. The annual aggregate limits applicable to contributions from parties and their subdivisions and units were put into place in 1997, are not and never have been adjusted for inflation, and thus the amount that parties and their subdivisions and units may give to candidates in the aggregate has effectively diminished in value each year since 1997, and continues to effectively diminish in value each year. With annual inflation and total inflation over a period of eighteen years, the aggregate limit for party contributions to a candidate for House of Representatives, which had a value of $10,000 in 1997, has a present-day value of only approximately $6,745.26 in 2015 dollars. Each year that the aggregate cap is not indexed for inflation, the value of the aggregate cap effectively decreases. Each year of an election cycle during which campaign contributions can be given and received, candidates reach the aggregate cap applicable to parties, and then every other subdivision or unit of the party is prohibited from contributing to

---

[38] Michael Pauley Aff. ¶ 12.

the candidate once that aggregate cap is reached.[39] This is exactly what happened to District 18 with respect to the Anchorage mayoral race in 2015. District 18 wanted to contribute to Amy Demboski, but when it went to do so, it found that the Republican Party in general had already contributed $4,750 and so District 18 could contribute only $250.[40]

## II. PLAINTIFFS

David Thompson is a resident of the State of Wisconsin. Thompson is Representative Wes Keller's—Alaska House District 10—brother-in-law, and he is interested in supporting Keller's reelection bid. Thompson wants to contribute to Keller, but at this time, is unable to do so because Keller has already received an aggregate total of $3,000 from nonresidents of Alaska during 2015. Thompson sent a donation to Keller's campaign, but his donation was returned because, under AS 15.13.072(e)(3), a candidate for State House may only accept contributions from nonresidents totaling $3,000 per year, and Keller had already received $3,000 from nonresidents. Thompson desires to contribute to Keller again in the year 2016, but runs the risk of having his contribution returned again because he may contribute only on a first-come-first-serve basis.[41]

Aaron Downing, is a resident of the Matanuska-Susitna Valley. Downing has an interest in the outcome of state and municipal elections in Alaska, regularly contributes to candidates for public office, and desires to contribute more than $500 to candidates of his choosing. Downing contributed $500 to the campaign for reelection of Mayor Larry

---

[39] Michael Pauley Aff. ¶ 11-13.
[40] Jim Crawford Aff. ¶ 5.
[41] David Thompson Aff. ¶¶ 2-3.

Memorandum in Support of Motion for Preliminary Injunction      Page 14 of 49
*Thompson, et al. v. Dauphinais, et al.*      November 11, 2015
Case 3:15-cv-00218-TMB   Document 5   Filed 11/11/15   Page 25 of 60

DeVilbiss in 2015, and if the law permitted, would have contributed more than $500. Downing has contributed $500 in 2015 to the campaign of George Rauscher for Alaska State House District 9. If the law permitted, Downing would contribute more than $500 to candidates of his choosing, including Rauscher. At present, however, Downing cannot and does not contribute more than $500 to any candidate, including Rauscher, because if he did, (a) the candidate would return the extra contribution or, if not, then (b) both he and the candidate would be subject to a civil penalty of $50 per day for each day of the violation.[42]

Jim Crawford is a resident of the State of Alaska who is in all ways qualified to maintain this action. Crawford has an interest in the outcome of state and municipal elections in Alaska, regularly contributes to candidates for public office and/or groups that are not political parties in Alaska, and desires to contribute more than $500 to groups of his choosing. Crawford contributed $500 to the campaign for Anchorage Mayor of Amy Demboski in 2015, and if the law permitted, would have contributed more than $500. Crawford contributed $500 in 2015 to the Alaska Miners Association Political Action Committee ("PAC"). If the law permitted, Crawford would contribute more than $500 to groups of his choosing, including, at this time, the PAC. At present, however, Crawford cannot and does not contribute more than $500 to any group of his choosing, including the PAC, because if he did (a) the group would return the extra contribution or, if not, then (b) both he and the PAC would be subject to a civil penalty of $50 per day under AS 15.13.390(a).

---

[42] AS 15.13.390(a); Aaron Downing Aff. ¶ 2.

District 18 of the Alaska Republican Party is a subdivision of the statewide Party that is comprised of Party members residing in House District 18. District 18 is organized separately from the Alaska Republican Party and maintains its own leadership: a Chairperson, Vice Chairperson, Treasurer, and Secretary. Crawford is the District 18 Chairman. District 18 maintains its own financial accounting by and through the statewide Alaska Republican Party and raises its own funds independently from the general statewide Party. District 18 regularly contributes, when it is able, to candidates for public office in Alaska, in Anchorage, and within District 18 in particular.[43] District 18 is often prevented from contributing or limited in its ability to contribute to candidates because under AS 15.13.070(d) and AS 15.13.400(15) all contributions from any subdivision or unit of the Party are aggregated and then limited by an aggregate cap that varies depending upon what public office it is for which a candidate is running. In 2015, District 18 was limited in its ability to make a contribution to the campaign for mayor of Amy Demboski because other subdivisions and units of the Alaska Republican Party had already contributed an aggregated total of $4,750 to Demboski—District 18 could give no more than $250 to Demboski.[44]

## ARGUMENT

### I.  PRIOR LITIGATION REGARDING ALASKA'S CAMPAIGN FINANCE LAWS

---

[43] Jim Crawford Aff. ¶¶ 2-4.

[44] Jim Crawford Aff. ¶ 5.

Memorandum in Support of Motion for Preliminary Injunction            Page 16 of 49
*Thompson, et al. v. Dauphinais, et al.*                            November 11, 2015
Case 3:15-cv-00218-TMB   Document 5   Filed 11/11/15   Page 27 of 60

This case is not the first challenge to Alaska's campaign finance laws.[45] But, it is the first challenge to any portion of Alaska's campaign finance laws brought after and under the controlling authority of the United States Supreme Court's recent decisions reshaping First Amendment jurisprudence regarding campaign finance laws—particularly laws that limit political free speech and association in the form of contributions to candidates running for public office.[46] And, the past cases addressing Alaska's campaign finance laws all predate the Ninth Circuit's September 1, 2015, decision in *Lair* analyzing Montana's campaign contribution limits under current Supreme Court precedent.[47]

## II. PRELIMINARY INJUNCTION STANDARD

The standards applied under Fed. R. Civ. P. 65 for issuing either a temporary restraining order or a preliminary injunction are "substantially identical," if not identical.[48] A plaintiff seeking a preliminary injunction must show: (1) that he is likely to succeed on the

---

[45] *See Alaska Right to Life Comm. v. Miles*, 441 F.3d 773 (9th Cir. 2006); *Jacobus v. Alaska*, 338 F.3d 1095 (9th Cir. 2003); *Libertarian Party of Alaska, Inc. v. State*, 101 P.3d 616 (Alaska 2004); *State v. ACLU*, 978 P.2d 597 (Alaska 1999).

[46] *See McCutcheon*, 134 S. Ct. 1434; *Arizona Free Ent. Club's Freedom Club PAC v. Bennett*, ___ U.S. ___, 131 S. Ct. 2806 (2011); *Citizens United v. FEC, 558 U.S. 310 (2010); Davis v. FEC*, 554 U.S. 724 (2008); *FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449 (2007); *Randall v. Sorrell*, 548 U.S. 230 (2006). The United States Supreme Court's decision in *Randall*, in which the Court struck down several of Vermont's campaign contribution limits for being unconstitutionally "too low," was issued on June 26, 2006, three months after the Ninth Circuit's last consideration of any part of Alaska's campaign finance laws in *Alaska Right* to Life. See *Randall*, 548 U.S. at 230; *Alaska Right to Life*, 441 F.3d at 773 (decided March 22, 2006).

[47] *See Lair*, 798 F.3d 736. In *Lair*, the Ninth Circuit recognized that the United States Supreme Court has changed the rules for analyzing the constitutionality of contribution limits. *Id.* at 740-46.

[48] *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir 2001); *Taylor-Failor v. County of Hawaii*, 90 F. Supp. 3d 1095, 1098 (D. Hawai'i 2015).

Memorandum in Support of Motion for Preliminary Injunction        Page 17 of 49
*Thompson, et al. v. Dauphinais, et al*                                November 11, 2015
Case 3:15-cv-00218-TMB   Document 5   Filed 11/11/15   Page 28 of 60

merits; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest.[49] In First Amendment cases, the likelihood of success on the merits is usually the decisive factor.[50] "[I]f a plaintiff can only show that there are 'serious questions going to the merits'—then a preliminary injunction may still issue if the 'balance of hardships tips *sharply* in the plaintiff's favor,' and the other two . . . factors are satisfied."[51] "The elements . . . must be balanced, so that a stronger showing of one element may offset a weaker showing of another."[52] Regardless, the movant always has the burden of proof on each element of the test.[53] "A preliminary injunction should be granted when the movant, by a clear showing, carries the burden of persuasion."[54]

On the merits questions, "the burdens at the preliminary injunction stage track the burdens at trial."[55] The government bears the burden of justifying the statutory or regulatory scheme: "When the Government restricts speech, the Government bears the burden of

---

[49] *See Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1289 (9th Cir. 2013) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

[50] *ACLU v. Alvarez*, 679 F.3d 583, 590 (7th Cir. 2012).

[51] *Shell Offshore*, 709 F.3d at 1291 (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)) (emphasis added by *Shell Offshore*). The factors referenced in *Shell Offshore* and *Alliance* are those set forth in the United States Supreme Court's decision in *Winter*, 555 U.S. at 20.

[52] *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012).

[53] *L.A. Mem'l Coliseum Comm'n v. National Football League*, 634 F.2d 1197, 1203 (9th Cir. 1980); *Taylor-Failor*, 90 F. Supp. 3d at 1099.

[54] *Lopez*, 680 F.3d at 1072 (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (*per curiam*)).

[55] *Gonzales v. O Centro Espirita Beneficiente Uniao do Vegetal*, 546 U.S. 418, 429 (2006).

proving the constitutionality of its actions."[56]  For preliminary injunctions "[i]n the First

Amendment context, the moving party bears the initial burden of making a colorable claim

that its First Amendment rights have been infringed, or are threatened with infringement, at

which point the burden shifts to the government to justify the restriction."[57]  Unsupported

opinions and hypothetical situations uncorroborated by record evidence or governmental

findings are insufficient to support laws depriving citizens of First Amendment rights.[58]

Rather, government must prove with admissible evidence that its laws are necessary and

satisfy scrutiny.[59]  It is reversible error for a district court to find that government has met its

burden without the government presenting evidence of the interest the state has in its law.[60]

## III.    THE CHALLENGED LAWS UNCONSTITUTIONALLY BURDEN FREE SPEECH AND ASSOCIATION OR EQUAL PROTECTION

"There is no right more basic in our democracy than the right to participate in electing

our political leaders."[61]  One way in which citizens can exercise that right is to "contribute to

a candidate's campaign."[62]  "[T]he First Amendment safeguards an individual's right to

participate in the public debate through political expression and political association."[63]  "The

right to participate in democracy through political contributions is protected by the First

---

[56]  *McCutcheon*, 134 S. Ct. at 1452; *accord Wisconsin Right to Life, Inc. v. Barland*, 751 F.3d 804, 830 (7th Cir. 2014).

[57]  *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1116 (9th Cir. 2011) (citing and quoting *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004); *Klein v. City of San Clemente*, 584 F.3d 1196, 1202 (9th Cir. 2009)).

[58]  *Citizens for Clean Gov't v. City of San Diego*, 474 F.3d 647, 653-54 (9th Cir. 2007).

[59]  *Id.*; *Jacobus*, 338 F.3d at 1109-10.

[60]  *Citizens*, 474 F.3d at 653-54.

[61]  *McCutcheon*, 134 S. Ct. at 1441-41.

[62]  *Id.*

[63]  *Id.* at 1448 (citing *Buckley v. Valeo*, 424 U.S. 1, 15 (1976)).

Memorandum in Support of Motion for Preliminary Injunction          Page 19 of 49
*Thompson et al. v. Dauphinais et al.*                                                          November 11, 2015
Case 3:15-cv-00318-TMB   Document 5   Filed 11/11/15   Page 30 of 60

Amendment. . . ."[64]  "When an individual contributes money to a candidate, he exercises both of those rights: The contribution 'serves as a general expression of support for the candidate and his views' and 'serves to affiliate a person with a candidate.'"[65]  Because contributions, as opposed to expenditures, "lie closer to the edges than to the core of political expression,"[66] the Court has applied an intermediate, but nonetheless rigorous, level of scrutiny to laws that limit contributions.  Under that standard, interference with protected rights of political speech and association may be sustained only if the government demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgement of associational freedoms.[67]

At this time, the only legitimate governmental interest for restricting campaign finances is one in preventing *quid pro quo* corruption or its appearance.[68]  Campaign finance restrictions that pursue other objectives, "impermissibly inject the Government 'into the debate over who should govern.'"[69]  "[T]hose who govern should be the *last* people to help decide who *should* govern."[70]  The Latin phrase, *quid pro quo*, "captures the notion of a

---

[64] *Id.* at 1441.

[65] *Id.* at 1448 (quoting *Buckley*, 424 U.S. at 21-22).

[66] *FEC v. Beaumont*, 539 U.S. 146, 161 (2003).

[67] *McCutcheon*, 134 S. Ct. at 1444 (quoting *Buckley*, 424 U.S. at 25).

[68] *McCutcheon*, 134 S. Ct. at 1450-51; *Lair*, 798 F.3d at 740. *Buckley* held that an interest in preventing corruption or its appearance was a sufficiently important interest to justify campaign contribution limits. *Buckley*, 424 U.S. at 25. *Citizens United*, 558 U.S. at 359, and *McCutcheon*, 134 S. Ct. at 1441, however, hold that the only type of corruption that will justify limits on political free speech in the form of independent campaign expenditures or contributions to candidates is *quid pro quo* corruption—dollars for political favors. *Accord Lair*, 798 F.3d at 740.

[69] *McCutcheon*, 134 S. Ct. at 1441 (quoting *Arizona Free Enterprise*, 131 S. Ct. at 2826).

[70] *McCutcheon*, 134 S. Ct. at 1441-42.

Memorandum in Support of Motion for Preliminary Injunction                Page 20 of 49
*Thompson, et al. v. Dauphinais, et al.*                                                November 11, 2015
Case 3:15-cv-00218-TMB   Document 5   Filed 11/11/15   Page 31 of 60

direct exchange of an official act for money."[71]  Government may not regulate contributions

simply to reduce the amount of money in politics, or to restrict the political participation of

some in order to enhance the relative influence of others.[72]  Government regulation may also

not target the general gratitude a candidate may feel toward those who support him or his

allies, or the political access such support may afford.[73]  Ingratiation and access are not

corruption.[74]  Rather, the ingratiation and access that parallel campaign contributions

"embody a central feature of democracy—that constituents support candidates who share

their beliefs and interests, and candidates who are elected can be expected to be responsive to

those concerns."[75]  The hallmark of corruption, in contrast to contributions, ingratiation and

access, is the financial *quid pro quo*: dollars for political favors.[76]

Spending large sums of money in connection with elections, but not in an effort to

control the exercise of an officeholder's official duties, does not give rise to such *quid pro

quo* corruption.[77]  "Government may not seek to limit the appearance of mere influence over

---

[71]  *Id.* (citing *McCormick v. United States*, 500 U.S. 257, 266 (1991)).

[72]  *Arizona Free Enterprise*, 131 S. Ct. at 2825-26.  "Many people might find those latter objectives attractive: They would be delighted to see fewer television commercials touting a candidate's accomplishments or disparaging an opponent's character.  Money in politics may at times seem repugnant to some, but so too does much of what the First Amendment vigorously protects.  If the First Amendment protects flag burning, funeral protests, and Nazi parades—despite the profound offense such spectacles cause—it surely protects political campaign speech despite popular opposition." *McCutcheon*, 134 S. Ct. at 1441.

[73]  *McCutcheon*, 134 S. Ct. at 1441 (quoting *Citizens United*, 558 U.S. at 360).

[74]  *Id.*

[75]  *Id.*

[76]  *Id.* (quoting *FEC v. National Conservative PAC*, 470 U.S. 480, 497 (1985)).

[77]  *Id.* at 1450-51.

Memorandum in Support of Motion for Preliminary Injunction                Page 21 of 49
*Thompson, et al. v. Dauphinais, et al.*                                                                November 11, 2015
Case 3:15-cv-00218-TMB   Document 5   Filed 11/11/15   Page 32 of 60

or access" to elected officials or political parties.[78] "The line between *quid pro quo* corruption and general influence may seem vague at times, but the distinction must be respected in order to safeguard basic First Amendment rights. . . . [I]n drawing that line, the First Amendment requires us to err on the side of protecting political speech rather than suppressing it."[79]

In *Buckley*, the Court recognized that "contribution limits, like expenditure limits, "implicate fundamental First Amendment interests," namely, the freedoms of "political expression" and "political association."[80] When strict scrutiny is applied, a law must be narrowly tailored to promote a compelling interest and employ the least restrictive means to further the interest.[81] Under intermediate scrutiny, as stated above "contribution limits are permissible as long as the Government demonstrates that the limits are 'closely drawn' to match a 'sufficiently important interest.'"[82] Preventing corruption or its appearance is sufficiently important to justify contribution limits.[83] But, at this time, under the Supreme Court's controlling decisions, the only type of corruption that government may attempt to limit via contribution limits is *quid pro quo* corruption—dollars for political favors.[84] As the Ninth Circuit recognized in *Lair*:

---

[78]  *Id.* at 1451.

[79]  *Id.*

[80]  *Buckley*, 424 U.S. at 15, 23; *see also Randall*, 548 U.S. at 246.

[81]  *Gonzales*, 546 U.S. at 429.

[82]  *Randall*, 548 U.S. at 247 (quoting *Buckley*, 424 U.S. at 25); *accord McCutcheon*, 134 S. Ct. at 1445-46 (the Court did not consider whether strict scrutiny should apply because it found that the law in question failed the "closely drawn" intermediate scrutiny).

[83]  *Buckley*, 424 U.S. at 26; *Randall*, 548 U.S. at 247.

[84]  *McCutcheon*, 134 S. Ct. at 1441; *Citizens United*, 558 U.S. at 359; *Lair*, 798 F.3d at 740.

Memorandum in Support of Motion for Preliminary Injunction                    Page 22 of 49
*Thompson, et al. v. Dauphinais, et al.*                                      November 11, 2015
Case 3:15-cv-00218-TMB   Document 5   Filed 11/11/15   Page 33 of 60

[A]fter *Citizens United*, what constitutes a sufficiently important state interest to justify limits on contributions has changed. Now, the prevention of *quid pro quo* corruption, or its appearance, is the only sufficiently important state interest to justify limits on campaign contributions. Before *Citizens United*, it was enough to show the state's interest was simply to prevent the influence contributors of large sums have on politicians, or the appearance of such influence. No longer so.[85]

In determining whether a particular contribution limit is closely drawn, the amount, or level, of that limit could make a difference—it certainly did make a difference in *Randall*.[86] In *Randall*, the Court struck down Vermont's campaign contribution laws, which at that time—2008—"considered as a whole," were "the lowest in the Nation."[87] As the Court recognized in both *Buckley* and *Randall*, "contribution restrictions could have a severe impact on political dialogue if the limitations prevented candidates and political committees from amassing the resources necessary for effective advocacy."[88] Contribution limits that are too low can "work more harm to protected First Amendment interests than their anticorruption objectives could justify."[89] Too low a limit can "magnify the 'reputation-related or media-related advantages of incumbency and thereby insulat[e] legislators from effective electoral challenge.'"[90] In *Randall*, the Court held that there is "some lower bound" for contribution limits where "constitutional risks to the democratic electoral process become too great."[91]

---

[85] *Lair*, 798 F.3d at 740.

[86] *Randall*, 548 U.S. at 248.

[87] *Id.* at 250.

[88] *Randall*, 548 U.S. at 247; *Buckley*, 424 U.S. at 21.

[89] *Randall*, 548 U.S. at 247-48 (citing *Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377, 395-97 (2000); *Buckley*, 424 U.S. at 21).

[90] *Randall*, 548 U.S. at 248 (citing *Nixon*, 528 U.S. at 403-04 (Breyer, J., joined by Ginsburg, J., concurring)).

[91] *Randall*, 548 U.S. at 248.

Memorandum in Support of Motion for Preliminary Injunction                    Page 23 of 49
*Thompson, et al. v. Dauphinais, et al.*                                         November 11, 2015
Case 3:15-cv-00218-TMB   Document 5   Filed 11/11/15   Page 34 of 60

Although "the interests underlying contribution limits, preventing corruption and the appearance of corruption, 'directly implicate the integrity of our electoral process,'"[92] that does not simply mean "the lower the limit, the better."[93] "[C]ontribution limits that are too low can also harm the electoral process by preventing challengers from mounting effective campaigns against incumbent officeholders, thereby reducing democratic accountability."[94] When contribution limits are too low "a statute that seeks to regulate campaign contributions could itself prove an obstacle to the very electoral fairness it seeks to promote."[95]

"[W]here there is a strong indication in a particular case, *i.e.*, danger signs, that such risks exist . . . courts . . . must review the record independently and carefully with an eye toward assessing the statute's 'tailoring,' that is, toward assessing the proportionality of the restrictions."[96] The danger signs that indicate that a contribution limit is "not closely drawn," *i.e.*, unconstitutionally "too low," are whether the limits are substantially lower than (a) the limits the Supreme Court has previously upheld and (b) comparable limits in other states.[97] In determining whether a law's contribution limits lack proportionality and are not closely drawn, courts are to analyze five factors: (1) will the limit significantly restrict the amount of

---

[92] *Id.*

[93] *Id.* And, today under *Citizens United* and *McCutcheon*, it is only *quid pro quo* corruption that directly implicates the integrity of our electoral process sufficiently so as to justify campaign contribution limits. *McCutcheon*, 134 S. Ct. at 1441; *Citizens United*, 558 U.S. at 359; *Lair*, 798 F.3d at 740.

[94] *Randall*, 548 U.S. at 248-49.

[95] *Id.* at 249.

[96] Id. at 249 (citing *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 499 (1984)).

[97] *Randall* at 249-53.

Memorandum in Support of Motion for Preliminary Injunction    Page 24 of 49
*Thompson, et al. v. Dauphinais, et al.*    November 11, 2015

Case 3:15-cv-00218-TMB   Document 5   Filed 11/11/15   Page 35 of 60

funding available for challengers to run competitive campaigns;[98] (2) does the law threaten harm to association in a political party;[99] (3) does the law treat volunteer services as contributions;[100] (4) does the law adjust the limit for inflation;[101] and (5) is there an absence of any "special justification" that might warrant a contribution limit so low or so restrictive?[102]

Aggregate contribution limits, especially those that are stacked on top of already existing base limits capping what an individual can contribute to a candidate—*i.e.*, a "prophylaxis-upon-prophylaxis," are unconstitutional.[103] "[A]ggregate limits on contributions do not further the only government interest th[e] Court accepted as legitimate in *Buckley*."[104] Instead, they "intrude without justification on a citizen's ability to exercise 'the most fundamental First Amendment activities.'"[105] Also, a law that discriminates between residents and nonresidents of a state, treating nonresidents less favorably than residents with

---

[98] *Id.* at 253.

[99] *Id.* at 256 (whether "political parties [must] abide by *exactly* the same low contribution limits that apply to other contributors"); *accord Lair*, 798 F.3d at 743.

[100] *Randall* at 259-60; *Lair*, 798 F.3d at 743.

[101] *Randall* at 261; *Lair*, 798 F.3d at 743.

[102] *Randall* at 261.    The Ninth Circuit summarized the equivalent of these factors as: "whether the limits (a) focus narrowly on the state's interest, (b) leave the contributor free to affiliate with a candidate, and (c) allow the candidate to amass an effective campaign." *Lair*, 798 F.3d at 748; *accord Montana Right to Life Ass'n v. Eddleman*, 343 F.3d 1085, 1092 (9th Cir. 2003). To the extent *Eddleman* can be interpreted to establish a different "closely drawn" analysis than *Randall*, it is questionable that *Eddleman* remains good authority. *Contra Lair*, 798 F.3d at 747; *Thalheimer*, 645 F.3d at 1127 n.5.

[103] *McCutcheon*, 134 S. Ct. at 1458, 1462.

[104] *Id.* at 1462.

[105] *Id.* (quoting *Buckley*, 424 U.S. at 14)

Memorandum in Support of Motion for Preliminary Injunction                    Page 25 of 49
*Thompson, et al. v. Dauphinais, et al.*                                                          November 11, 2015
Case 3:15-cv-00218-TMB   Document 5   Filed 11/11/15   Page 36 of 60

respect to the exercise of a fundamental right, is subject to strict scrutiny under both the Privileges and Immunities and Equal Protection Clauses of the Fourteenth Amendment.[106]

This Court should strike the challenged laws under strict scrutiny.[107] Although the government interest in preventing *quid pro pro* corruption or its appearance is compelling,[108] the challenged laws fail strict scrutiny because they are not the least restrictive means to further that compelling interest.[109] But, even under intermediate scrutiny, the challenged laws should still be stricken down because they are not "closely drawn to avoid unnecessary abridgement" of free speech and associational freedoms.[110]

---

[106] *See, e.g., City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985) (equal protection strict scrutiny applies when a state law burdens a fundamental right); *Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 626 (1969) (same); *Shapiro v. Thompson*, 394 U.S. 618, 638 (1969) (same); *Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942) (same); *Hicklen v. Orbeck*, 437 U.S. 518, 524 (1978) (privileges and immunities clause of the Fourteenth Amendment gives citizens of each state the right to be "upon the same footing with citizens of other States, so far as the advantages resulting from citizenship in those States are concerned"); *Zobel v. Williams*, 457 U.S. 55, 67 (1982) (same) (Brennan, J. concurring).

[107] The United States Supreme Court has not yet overruled that part of *Buckley* that draws a distinction between contribution and expenditure limits, applying strict scrutiny to the latter but intermediate scrutiny to the former. *See McCutcheon*, 134 S. Ct. at 1445-46 (citing *Buckley*, 424 U.S. at 26-27). The four Justices in the *McCutcheon* plurality acknowledged, but did not address, the question of whether contribution limits should be subjected to strict scrutiny. Justice Thomas has repeatedly expressed his view that the Court should overrule the line *Buckley* drew between contributions and expenditures. *See McCutcheon* at 1462-64 (Thomas, J., concurring); *Randall*, 548 U.S. at 265-67 (Thomas, J., concurring); *Beaumont*, 539 U.S. at 164-65 (Thomas, J., dissenting); *FEC v. Colorado Republican Federal Campaign Comm.*, 533 U.S. 431, 465-66 (2001) (*Colorado II*) (Thomas, J., dissenting); *Nixon*, 528 U.S. at 412-420 (Thomas, J., dissenting); *Colorado Republican Federal Campaign Comm'n. v. FEC*, 518 U.S. 604, 635-40 (1996) (*Colorado I*) (Thomas, J., concurring and dissenting in part).

[108] *See McCutcheon*, 134 S. Ct. at 1445-46 (citing *National Conservative PAC*, 470 U.S. 480 at 496-97).

[109] *See McCutcheon*, 134 S. Ct. at 1444, 1445-46.

[110] *Id.* at 1445-46, 1456.

Memorandum in Support of Motion for Preliminary Injunction          Page 26 of 49
*Thompson, et al. v. Dauphinais, et al.*                                                    November 11, 2015
Case 3:15-cv-00218-TMB   Document 5   Filed 11/11/15   Page 37 of 60

## A. Plaintiffs Demonstrate Likely Merits Success

### 1. The $500 Limits to Candidates and Groups Fail Strict Scrutiny

To survive strict scrutiny contribution limits must be narrowly tailored to a compelling interest and employ the least restrictive means.[111] Only the interest in preventing *quid pro quo* corruption or its appearance will support restrictions on political speech.[112] And, the anticorruption interest is limited to the "large contributions" that might be given for a political *quid pro quo*.[113] But, Alaska's $500 limit does not target only *large* contributions that can

---

[111] *Citizens United*, 558 U.S. at 339-40 ("Speech is an essential mechanism of democracy, for it is the means to hold officials accountable to the people . . . . ('In a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential.') The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it. The First Amendment "'has its fullest and most urgent application" to speech uttered during a campaign for political office.' . . . ('Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution.') . . . For these reasons, political speech must prevail against laws that would suppress it, whether by design or inadvertence. Laws that burden political speech are 'subject to strict scrutiny,' which requires the Government to prove that the restriction 'furthers a compelling interest and is narrowly tailored to achieve that interest.'") (*accord Wisconsin Right to Life, Inc. v. FEC,* 546 U.S. 410, 411-12 (2006); *Eu v. San Francisco County Dem. Central Comm.,* 489 U.S. 214, 223 (1989); *Buckley,* 424 U.S. at 14). *See also McCutcheon,* 134 S. Ct. at 1445-46 ("The parties and *amici curiae* spend significant energy debating whether the line that *Buckley* drew between contributions and expenditures should remain the law. Notwithstanding the robust debate, we see no need in this case to revisit *Buckley's* distinction in the applicable standards of review").

[112] *McCutcheon,* 134 S. Ct. at 1441; *Citizens United,* 558 U.S. at 360-61.

[113] *McCutcheon,* 134 S. Ct. at 1450 ("As *Buckley* explained, Congress may permissibly seek to rein in 'large contributions [that] are given to secure a political *quid pro quo* from the current and potential office holders.'") (quoting *Buckley,* 424 U.S. at 26); *McCutcheon* at 1459; *Citizens United,* 558 U.S. at 345 ("Before addressing the constitutionality of . . . [the] independent expenditure ban, *Buckley* first upheld . . . limits on direct contributions to candidates. The *Buckley* Court recognized a 'sufficiently important' governmental interest in 'the prevention of corruption and the appearance of corruption.' This followed from the

lead to *quid pro quos*, but instead targets small contributions. In 2000, the United States Supreme Court ruled that a $1,075 contribution limit was constitutional because it adequately addressed an anticorruption interest.[114] The $1,075 contribution limit that was upheld in *Nixon* is equivalent to $1,497.21 in today's dollars—conversely, Alaska's $500 limit in 2015 dollars is equivalent to only $361.85 in 2000 dollars.[115] Also, the limit at issue in *Nixon* was a per election limit—thus making Alaska's annual limit more restrictive in comparison.[116] On a per-election basis, Alaska's limit ($250 per-election during the year of the general election) amounts to only 16.6 percent of the value of the limit the United States Supreme Court approved in *Nixon*.[117] Alaska's $500 limit represents only slightly more than one-twentieth in value of the limit that the United States Supreme Court upheld in *Buckley*. Alaska's $500 limit is lower than necessary to curb corruption. It therefore does not employ the least restrictive means and is not narrowly tailored—the limits are thus unconstitutional.

---

Court's concern that large contributions could be given 'to secure a political *quid pro quo*.'") (citing *Buckley*, 424 U.S. at 26); *Citizens United* at 356 ("With regard to large direct contributions, *Buckle*y reasoned that they could be given "to secure a political *quid pro quo*") (citing *Buckley*, 424 U.S. at 26).
[114] *Nixon*, 528 U.S. at 382-83.
[115] Michael Pauley Aff. ¶ 27.
[116] *Nixon*, 528 U.S. at 382.
[117] A fair number of candidates, principally challengers, do not register to run for office until the year of the general election. Michael Pauley Aff. ¶ 7.

Memorandum in Support of Motion for Preliminary Injunction          Page 28 of 49
*Thompson, et al. v. Dauphinais, et al.*                              November 11, 2015
Case 3:15-cv-00218-TMB   Document 5   Filed 11/11/15   Page 39 of 60

2. **The $500 Annual Limit On Individual Contributions to Candidates Fails Even Intermediate Scrutiny.**

(a) **Alaska's $500 Annual Limit Bears the *Randall* "Danger Signs."**

Alaska's $500 annual limit on individual contributions to candidates[118] requires this Court's independent and careful review because it bears the danger signs that the Supreme Court recognized in *Randall*.[119] First, the $500 annual limit is substantially lower than both the limits the Supreme Court has previously upheld and comparable limits in other states. As demonstrated above, the $500 annual limit is well below the limits the Supreme Court upheld in *Buckley* and *Nixon*. In terms of real dollars (*i.e.*, adjusting for inflation), when considered on a per-election basis, Alaska's $500 limit is only slightly more than one-twentieth of the limit on contributions to campaigns for federal office before the Court in *Buckley*. In this respect, Alaska's $500 annual limit is strikingly similar to the $200 Vermont per-election limit that the Court struck down in *Randall*.[120] On a per-election basis, Alaska's limit ($250 per election during the year of the general election) amounts to only 16.6 percent of the value of the limit the Court approved in *Nixon*.[121]

Second, considered as a whole, Alaska's contribution limits are one of the two lowest, if not the lowest, in the nation. And, with respect to statewide gubernatorial races, Alaska's limit is the lowest in the nation. With respect to legislative races, specifically House races, Alaska's limit is one of the five lowest in the nation. Only one state, Montana, has a

---

[118] AS 15.13.070(b)(1).
[119] *Randall*, 548 U.S. at 249 (citing *Bose*, 466 U.S. at 499).
[120] *Randall* at 250.
[121] Michael Pauley Aff. ¶ 27.

Memorandum in Support of Motion for Preliminary Injunction      Page 29 of 49
*Thompson, et al. v. Dauphinais, et al.*    Case 3:15-cv-00218-TMB   Document 5   Filed 11/11/15   Page 40 of 60   November 11, 2015

statewide contribution limit for offices other than governor that is lower than Alaska's. Only four states—Colorado, Connecticut, Maine, and Montana—have contribution limits for legislative offices that are lower than Alaska's, and some of these nonetheless have more contribution value than Alaska's because they are per election rather than annual limits. Only five other states—Colorado, Kansas, Michigan, Montana, and Wisconsin—have contribution limits that are equal or comparable to Alaska's, and some of these (1) nonetheless have more contribution value than Alaska's because they are per election rather than annual limits; or (2) are comparable only with respect to legislative, House, or municipal elections, and permit significantly greater contributions for statewide races. All of the states that have a legislative or municipal office contribution limit equal, comparable, or lower than Alaska's, nonetheless have a higher contribution limit for gubernatorial and statewide races.

> **(b)** **Alaska's $500 Limit Does Not Focus Narrowly on the State's Only Legitimate Interest in Preventing *Quid Pro Quo* Corruption or Its Appearance.**[122]

As an initial matter, it is hard to comprehend how a $500 annual contribution limit—one that amounts to only $250 per election during the year of the general election—focusses narrowly on an interest in preventing *quid pro quo* corruption or its appearance. The Supreme Court has consistently indicated that it is only "large contributions" that create the risk or appearance of *quid pro quo* corruption—"dollars for political favors."[123] A $500 annual contribution, or the equivalent of $250 per election to a candidate who registers during

---

[122] *Lair*, 798 F.3d at 748.

[123] *McCutcheon*, 134 S. Ct. at 1450; *Citizens United*, 558 U.S. at 345, 356; *Buckley*, 424 U.S. at 26.

Memorandum in Support of Motion for Preliminary Injunction                    Page 30 of 49
*Thompson, et al. v. Dauphinais, et al.*                                      November 11, 2015
Case 3:15-cv-00218-TMB   Document 5   Filed 11/11/15   Page 41 of 60

the year of the primary and general elections, is not a "large contribution" by any stretch of the imagination. Nor is this amount anywhere near an amount that might create a risk or appearance of *quid pro quo*.[124]

There is no nexus between preventing *quid pro quo* corruption or its appearance and the establishment of arbitrary low caps on what individuals or other persons may donate to political campaigns. The large majority of candidates running for office, regardless of party or ideology, are persons of integrity. A person of high integrity will not be susceptible to *quid pro quo* corruption as the courts have defined it, *i.e.,* selling votes in exchange for campaign contributions. High-integrity persons will simply be unwilling, as a matter of principle, to entertain a bribe. The dollar amount of the proposed bribe will have no relevance. A person of integrity will regard bribery as being intrinsically evil, whether the amount of the proffered bribe is $200 or $200,000.[125]

In contrast, a person of low integrity may indeed be susceptible to *quid pro quo* corruption, but even in these cases, it is difficult to discern a nexus between a campaign contribution dollar amount, certainly an amount below the federal per-election limit of $2,700 ($5,400 per-election cycle), and the likelihood that it will induce corrupt behavior.[126] Alaska law specifically prohibits the use of campaign contributions for expenses other than those that "reasonably relate to election campaign activities" (AS 15.13.112(a)). Alaska law specifically prohibits the use of campaign contributions for the purpose of providing a

---

[124] Michael Pauley Aff. ¶ 23-26.
[125] Michael Pauley Aff. ¶ 23-26. And, Alaska has laws against bribery and receiving bribes that accomplish the prevention of bribery. *See* AS 11.56.100; AS 11.56.110.
[126] Michael Pauley Aff. ¶ 24-26.

personal income or any other personal benefit to the candidate (AS 15.13.112(b)). Thus, even if a candidate is willing to trade his vote(s) in exchange for a personal financial benefit, accepting a campaign contribution is the least intuitive way to accomplish this *quid pro quo*, given the prohibition on the personal use of campaign contributions, coupled with the requirement that all such contributions must be publicly disclosed. It is far more likely that such a person, if willing to accept a bribe—dollars for political favors—would do so through a mechanism that is completely unrelated to campaign finance—*i.e.*, the bribe would take the form of "cash in a brown paper bag, slipped under the table," which could be used for any purpose. Thus, the only benefit to the candidate from a campaign contribution is its utility in helping fund a campaign. Campaign contributions equal to the federal per-election limit do not create the risk or appearance of corruption and thus a lower limit—especially $500 per year or $250 per election in the year of the general election—can hardly be said to do so.[127]

### (c)   Alaska's $500 Limit Is Not Closely Drawn.

#### (i)   The Limit Significantly Restricts the Amount of Funding Available for Challengers to Run Competitive Campaigns.[128]

Alaska's $500 annual limit on individual contributions has the effect of restricting the amount of funding that is available for challengers to run competitive campaigns against incumbents. Specifically, this is true because the $500 limit is too low, is annual in nature, and is not indexed for inflation. As a result, the current limit has the effect of creating

---

[127] Michael Pauley Aff. ¶ 23-26.

[128] The Ninth Circuit, in *Lair*, describes this factor as being whether the limit allows the candidate to amass sufficient resources to wage an effective campaign. 798 F.3d at 748 (citing *Eddleman*, 343 F.3d at 1092).

Memorandum in Support of Motion for Preliminary Injunction                    Page 32 of 49
*Thompson, et al. v. Dauphinais, et al.*                                      November 11, 2015
Case 3:15-cv-00218-TMB   Document 5   Filed 11/11/15   Page 43 of 60

political "winners and losers." One class of winners is wealthy individuals who can afford to self-finance their campaigns.[129] Prior court rulings have affirmed that the law cannot limit the amount of money an individual is allowed to spend from their own funds to self-finance their campaign.[130] For example, if a candidate for State legislature has a net worth of several million dollars and intends to spend $200,000 of their own funds for campaign purposes, then that candidate is not burdened by contribution limits in the same way as a modest-income or low-income candidate who is 100 percent dependent on contributions from others in order to run an effective campaign.[131]

A second class of winners created by the existing limit is incumbents. The advantages of incumbency are numerous. Incumbents generally have better name familiarity within their political jurisdictions due to the fact that they have government-funded channels for communicating their positions to constituents and for serving constituent needs. Incumbents use public funds to pay for sending out newsletters to voters, for travel to events and functions where they can meet with and speak to voters, for staff members who assist with media relations and serving voters, and many other functions that lend themselves to increasing both name familiarity and positive feelings among voters toward the incumbent.[132] Most challenger candidates start their races with very little name familiarity among the voters they must court, and they obviously have no access to government funds to help overcome this inherent disadvantage. Unless the challenger candidate is independently wealthy and

---

[129] Michael Pauley Aff. ¶ 17.
[130] *See Davis*, 554 U.S. 724.
[131] Michael Pauley Aff. ¶ 17.
[132] Michael Pauley Aff. ¶ 18.

Memorandum in Support of Motion for Preliminary Injunction          Page 33 of 49
*Thompson, et al. v. Dauphinais, et al.*          November 11, 2015

Case 3:15-cv-00218-TMB   Document 5   Filed 11/11/15   Page 44 of 60

able to self-finance the campaign, the only way of overcoming the advantages enjoyed by the incumbent is to raise significant funds from individual contributors, PACs, and other sources, such as political party contributions.[133] These funds are essential for paying for the communications that will raise the candidate's name familiarity and allow him or her to persuade voters. In general, the objective of the challenger candidate is to raise enough funds to in effect "level the playing field" vis-à-vis the incumbent candidate. Alaska's $500 limit on contributions from individuals and other entities is so low that it hampers the challenger's ability to wage an effective campaign, and it thus creates an unlevel playing field for challengers. *Id.*

A third class of winners from the current $500 annual limit is those entities that conduct independent expenditure campaigns for which there are no limits on contributions, and no limits on expenditures. In the wake of the *Citizens United* decision, businesses, unions, and other entities can raise and spend an unlimited sum of money on express advocacy messages that urge the election or the defeat of a particular candidate.[134] In some races, the money spent by groups that are acting independently of the candidates can equal or exceed the amount of money spent by the candidates themselves. This can lead to a seriously unlevel playing field. For example, a business or labor union might choose to target a certain legislative candidate for defeat. The business or union has the freedom under *Citizens United* to raise and spend an unlimited amount of money to apply toward the objective of defeating the candidate. The business or union could lawfully solicit, lawfully receive, and lawfully

---

[133] Michael Pauley Aff. ¶ 18.
[134] Michael Pauley Aff. ¶ 19; *Citizens United*, 558 U.S. 310.

Memorandum in Support of Motion for Preliminary Injunction                Page 34 of 49
*Thompson, et al. v. Dauphinais, et al.*                                November 11, 2015
Case 3:15-cv-00218-TMB   Document 5   Filed 11/11/15   Page 45 of 60

spend a contribution of any amount from an individual—whether $500 or $50,000 or $500,000 – for the purpose of targeting a specific candidate for defeat. Yet the candidate who is targeted for defeat can only lawfully solicit and accept $500 from an individual donor for the purposes of counteracting this independent expenditure campaign. In this circumstance, the candidate is at a distinct disadvantage. The only factor that might "level the playing field" for the targeted candidate is to have another entity wage an independent expenditure campaign on his or her behalf. However, under the law, such independent-expenditure campaigns can never be coordinated with the candidate, so the candidate has no power to direct or design such a campaign.[135]

The lopsided nature of the law—tight contribution limits for candidates and no contribution limits whatsoever for independent expenditures—can lead to a phenomenon where the voices of the candidates are diminished in certain races, if they are heard at all, simply because the candidates lack the financial resources to effectively broadcast their own messages.[136] The messaging of the campaign (as heard by the voters) is often dominated by outside groups, not the candidates themselves. The issues that are important to certain outside groups may be different from the issues that are important to the candidates, and may be different from the issues that are important to most voters. Yet the independent-expenditure campaigns will often dictate what issues are front and center in the race, simply due to their inherent financial advantage.[137]

---

[135] Michael Pauley Aff. ¶ 19.
[136] Michael Pauley Aff. ¶ 20.
[137] Michael Pauley Aff. ¶ 20.

Memorandum in Support of Motion for Preliminary Injunction    Page 35 of 49
Thompson, et al. v. Dan Schwartz, et al.    November 11, 2015
Case 3:15-cv-00218-MMD    Document 5    Filed 11/11/15    Page 46 of 60

The clear winners of the current low Alaska campaign finance contribution limit is: (a) wealthy candidates who can self-finance their campaigns; (b) incumbents who enjoy the use of government-funded mechanisms for communicating with voters; and (c) entities that conduct independent-expenditure campaigns, which are exempt from any sort of limit on what they can raise and spend to achieve their political objectives. The losers under Alaska's low annual limit are modest-income or lower-income challenger candidates who are mostly dependent and sometimes 100 percent dependent on the financial donations of supporters in order to mount an effective campaign. Many prospective Alaska candidates of modest income who, despite being very involved and well-connected in their communities, ultimately decide not to challenge an incumbent-elected official because, given the current campaign contribution limits, they could not discern a viable pathway to raising funds sufficient to wage an effective campaign. This is one major reason why so many Alaska incumbents run unopposed in election and after election.[138] Alaska's low $500 annual limit does not allow challengers to mount effective campaigns against incumbents.

## (ii) Political Party Contribution Limits.[139]

Alaska law imposes annual limits on the amounts that a political party may contribute to candidates and the limits vary, depending upon the office the candidate seeks.[140] The annual limits for party contributions are $100,000 for Governor and Lieutenant Governor, $15,000 for State Senate, $10,000 for State House, and $5,000 for constitutional delegate,

---

[138] Michael Pauley Aff. ¶ 16-22.
[139] The Ninth Circuit does not reference this factor in *Lair*, 798 F.3d at 748, or *Eddleman*, 343 F.3d at 1092.
[140] AS 15.13.070(d).

Memorandum in Support of Motion for Preliminary Injunction        Page 36 of 49
*Thompson v. Dauphinais et al*
Case 3:15-cv-00218-TMB   Document 5   Filed 11/11/15   Page 47 of 60
November 11, 2015

judicial retention, and municipal office. Alaska's limits for political-party contributions are higher than some states, but lower than most states. Eighteen states have no limit on party contributions to candidates.[141] Illinois, Kansas, New Hampshire, and New York also allow state parties to donate unlimited sums, if the candidate meets certain qualifications. The remaining twenty-eight states have some sort of restriction on funds from political parties, falling into two camps. Only Georgia, Hawaii, Maine, Nevada, and West Virginia require parties to follow the same contribution limits established for individuals. The other twenty-three states outline separate limits for political parties, generally these are per-election or per-election-cycle limits. Of these twenty-three, seven states have party contribution limits that are higher than Alaska's for statewide races, and five states have higher contribution limits than Alaska's for legislative offices.[142] Altogether, Alaska is in the bottom half of the states with respect to party contribution limits to candidates.

Alaska's limit on party contributions to candidates is obviously not "exactly the same" as the limit set on individual contributions. But, given the Ninth Circuit's current rendition of

---

[141] *See* http://www.ncsl.org/research/elections-and-campaigns/campaign-contribution-limits-overview.aspx#individual; Michael Pauley Affidavit ¶ 28.

[142] These states are Colorado—Colo. Const. art. XXVIII ($569,530 governor); Florida—Fla. Stat. § 106.08 ($250,000 statewide, $150,000 legislative office from various components of the state and national party); Illinois—10 ILCS 5/9-8.5 ($215,800 statewide, $134,900 Senate, $80,900 House); Michigan—M.C.L. §§ 169.246, 169.252, 169.254 ($750,000 governor and lieutenant governor with public funding); Ohio—O.R.C. §§ 3517.102, 3517.104, 3599.03 ($706,823.95 statewide, $140,988.82 Senate, $70,181.10 House—all per election); Tennessee—Tenn. Code § 2-10-302 ($374,300 statewide, $59,900 Senate, $30,000 House); Wisconsin—Wis. Stat. §11.01 ($700,830 governor, $22,425 Senate, $11,213 House). Michael Pauley Aff. ¶ 28.

the "closely drawn" analysis, it is questionable whether this is significant.[143] By limiting

individual contributions to candidates to such a low level ($500 per year or $250 per election

during the year of the general election), then also placing a limit on what an individual can

contribute to a party ($5,000 per year), and then also placing a limit on what the party can

contribute to a candidate (limits that are in the lower one-half of all states), Alaska has chosen

to heap prophylaxis upon prophylaxis. A prophylaxis-upon-prophylaxis approach requires

the Court to "be particularly diligent in scrutinizing the law's fit."[144]

### (iii)    Volunteer Services or Costs Treated as Contributions.

Alaska's law, like the Vermont law that was struck down in *Randall*, defines

contribution so as to include expenses incurred by volunteers.[145] Like Vermont, the Alaska

law defines contribution to exclude "services provided without compensation by individuals

volunteering,"[146] but to include "a purchase, payment . . . that is made for the purpose of

---

[143] *See Lair*, 798 F.3d at 747-48. The Ninth Circuit appears to not view *Randall* as being a controlling authority because it is a "plurality" decision. *Id.* But, the majority opinion in *Randall* was adopted by a plurality of four justices only because Justice Thomas wanted to go further and strike down the Vermont limits after overruling *Buckley* altogether. *Randall*, 548 U.S. at 265-73 (Thomas, J., concurring). Although it meets the definition of a "plurality" opinion, *Randall* hardly seems to be a United States Supreme Court decision that lower courts should ignore. When a fragmented United States Supreme Court decides a case, and no single rationale explaining the result enjoys the assent of five justices, the holding of the Court is viewed as that position taken by those members who concurred in the judgment on the narrowest grounds. *See Marks v. United States*, 430 U.S. 188, 193 (1977). In the case of *Randall*, it is Justice Breyer's opinion for the four in the plurality that represents the position taken by those members who concurred in the judgment on the narrowest grounds—Justice Thomas preferred to go even further than his fellow brethren. *Randall*, 548 U.S. at 265-73 (Thomas, J., concurring).

[144] *McCutcheon*, 134 S. Ct. at 1458.

[145] *See Randall*, 548 U.S. at 259.

[146] AS 15.13.400(B)(i).

Case 3:15-cv-00218-TMB   Document 5   Filed 11/11/15   Page 49 of 60

influencing the nomination or election of a candidate."[147]  Moreover, the Alaska law defines contribution to include volunteer services from individuals who ordinarily charge for their services.[148]  Because Alaska's limit is so low, it, like the limits struck down in Vermont, "may well impede a campaign's ability effectively to use volunteers, thereby making it more difficult for individuals to associate in this way."[149]

### (iv)    The Limit Is Not Indexed for Inflation.

Alaska's limit, like the Vermont limit that was struck down in *Randall* and unlike the Missouri limit that was upheld in *Nixon*, is not indexed for inflation and thus declines in real value each year.[150]  "A failure to index limits means that limits which are already suspiciously low . . . will almost inevitably become too low over time.  It means that future legislation will be necessary to stop that almost inevitable decline, and it thereby imposes the burden of preventing the decline upon incumbent legislators who may not diligently police the need for changes in limit levels to ensure the adequate financing of electoral challenges."[151]

### (v)    Alaska Has No Special Justification that Can Support the Low Individual-Contribution Limit.

Alaska has no justification that can support such low limits on individual campaign contributions.  There is nothing about Alaska that justifies an individual-contribution limit being set at an amount that is just a fraction of the lowest amount the Supreme Court has

---

[147] AS 15.13.400(4)(A).
[148] AS 15.13.400(A) (*e.g.*, professionals, skilled tradesmen, or business persons who perform a service for which they would ordinarily charge a fee).
[149] *Randall*, 548 U.S. at 260.
[150] *Randall*, 548 U.S. at 261; *Nixon*, 528 U.S. at 380.
[151] *Randall*, 548 U.S. at 261.

approved in the past. An individual-contribution limit of $2,700 per election does not threaten *quid pro quo* corruption or its appearance at the federal election level,[152] and there is no reason that it or any amount below it and above $500 would. Alaska's federal congressional representatives are elected by the exact same voting populace as Alaska's statewide officials. There is nothing about Alaska that justifies the exceptionally low—with respect to gubernatorial races, the lowest in the Nation—individual contribution limit. Alaska actually maintained unlimited or substantially higher individual-contribution limits for most of its existence, and most recently from 2003-2005. From 2003 to 2005, Alaska's limit was actually twice what it is now ($1,000 per year). The political scandals that Alaska endured in 2006-2007 did not involve campaign contributions, but rather out-and-out bribes. Moreover, these scandals occurred while Alaska's campaign contribution limits were set at their current levels (reflecting that there is no correlation between low contribution limits and deterring bribery). Finally, for the most part those who accepted bribes were prosecuted and punished under existing anti-bribery laws.

### (d) Summary.

Even under more complaisant, intermediate scrutiny, Alaska's $500 annual individual contribution limit is not closely drawn to the anticorruption interest of preventing *quid pro quo* corruption or its appearance. The limit does not target the large contributions that can lead to *quid pro quo* corruption, but instead sweeps too broadly, reaching contributions that

---

[152] *McCutcheon*, 134 S. Ct. at 1452 ("Congress's selection of a $5,200 [in 2014] base limit indicates its belief that contributions of that amount or less do not create a cognizable risk of corruption").

Case 3:15-cv-00218-TMB   Document 5   Filed 11/11/15   Page 51 of 60

are well below the level at which pay-to-play might occur. Alaska's limit therefore fails to "avoid unnecessary abridgement" of First Amendment freedoms as required under intermediate-scrutiny analysis.[153] Alaska's limit is overbroad, restricting more First Amendment activity than is justified by the anticorruption interest. Thus, even under intermediate scrutiny, Alaska's limit on individual contributions to candidates is unconstitutional.

### 3. The $500 Limit On Individual Contributions to Groups Fails Both Strict and Intermediate Scrutiny.

The State does not have a valid interest at setting a $500 annual limit on what an individual can contribute to a group that is not a political party. This limit therefore fails both strict and intermediate scrutiny under the free-speech-and-equal-protection analysis. The only valid interest for limiting political contributions is the prevention of *quid pro quo* corruption or its appearance.[154] Contributions to groups are not contributions to candidates, and unlike political parties, groups may have little to no actual connection to any candidate. Contributions to groups thus can at most work an indirect benefit to a candidate—the individual's contribution is filtered through the group and its control structure and there is no guarantee to most contributors that the group will simply pass money through to the contributor's preferred candidate. "[T]here is not the same risk of *quid pro* quo corruption or its appearance when money flows through independent actors to a candidate, as when a donor

---

[153] *See Jacobus*, 338 F.3d at 1115; *accord Buckley*, 424 U.S. at 25.
[154] *McCutcheon*, 134 S. Ct. at 1450-51; *Citizens United*, 558 U.S. at 359; *Lair*, 798 F.3d at 740.

Memorandum in Support of Motion for Preliminary Injunction       Page 41 of 49
*Thompson, et al. v. Dauphinais, et al.*                                                November 11, 2015
Case 3:15-cv-00218-TMB   Document 5   Filed 11/11/15   Page 52 of 60

contributes to a candidate directly."[155] When an individual contributes to a candidate, a party committee, or a PAC, they cede control over the funds. If funds are subsequently re-routed to a particular candidate, such action occurs at the group's direction—not the donor's. "[T]he risk of *quid pro quo* corruption is generally applicable only to 'the narrow category of money gifts that are directed, in some manner, to a candidate or officeholder.'"[156]

Because a group by definition can consist of any two individuals,[157] there is some possibility that contributors could use groups simply as a means of circumventing the base individual contribution limit. But, "circumvention" is no longer a valid government interest for justifying contribution limits, unless it is possible for "massive amounts of money" to be traced from a contributor to a candidate.[158] This is not possible in Alaska because a group is limited to contributing no more than $1,000 per year to a candidate and to another group.[159] Plaintiffs are not challenging in this case the $1,000 limit on group contributions to candidates and to other groups. Whatever marginal "circumvention" an individual contributor might accomplish through a group is nowhere near the amounts that would trigger the risk or appearance of *quid pro quo* corruption—"massive amounts of money."[160] This

---

[155] *McCutcheon*, 134 S. Ct. at 1452, 1456.

[156] *Id.* at 1452 (quoting *McConnell v. FEC*, 540 U.S. 93, 310 (2003) (opinion of Kennedy, J.).

[157] AS 15.13.400(8)(B).

[158] *McCutcheon*, 134 S. Ct. at 1452-53 (the Court questioned the continuing viability of the circumvention interest first recognized in *Buckley*, 424 U.S. at 38, which found that it was not implicated unless a "massive amount[] of money" "could be traced back to a particular contributor.") (brackets in original).

[159] AS 15.13.070(c)(1), (2).

[160] *McCutcheon*, 134 S. Ct. at 1452-53; *Buckley*, 424 U.S. at 38.

Memorandum in Support of Motion for Preliminary Injunction     Page 42 of 49
Thompson et al. v. Dauphinais et al.     November 11, 2015
Case 3:15-cv-00218-TMB    Document 5    Filed 11/11/15    Page 53 of 60

"prophylaxis-upon-prophylaxis approach" requires the Court to "be particularly diligent in scrutinizing the law's fit."[161]

Moreover, groups have less natural ties to, and persuasion with, candidates than does a political party.[162] Yet, Alaska permits an individual to contribute $5,000 annually to a political party and then permits the party to contribute substantially greater sums to candidates.[163] In contrast to the nominal $1,000 per year that a group can contribute to a candidate, parties can annually contribute $100,000 to candidates for Governor and Lieutenant Governor, $15,000 to candidates for State Senate, $10,000 to candidates for State House, and $5,000 to candidates for other offices.[164] And, as the United States Supreme Court recognized in both *McCutcheon* and *Randall,* it is the basic nature of the party system that party members join together to further common political beliefs.[165] It is the function of a political party to select and promote candidates who espouse the political views of the party members.[166] Political parties cannot corrupt their candidates—they exercise constitutionally permissible influence over their candidates.[167]

If an individual is permitted to contribute $5,000 per year to the party—an entity whose very function is to influence the candidate, an entity that can turn around and donate much larger sums to the candidate without fear of corruption—then it is inconceivable how

---

[161] *McCutcheon*, 134 S. Ct. at 1458.

[162] *McCutcheon*, 134 S. Ct. at 1461.

[163] AS 15.13.070(b)(2).

[164] AS 15.13.070(d)(1)-(4).

[165] *McCutcheon*, 134 S. Ct. at 1461; *Randall*, 548 U.S. at 257-58.

[166] *See California Democratic Party v. Jones*, 530 U.S. 567, 574 (2000).

[167] *McCutcheon*, 134 S. Ct. at 1460, 1461 (the general broad-based support of a political party is not *quid pro quo* corruption); *Randall*, 548 U.S. at 257-58.

Memorandum in Support of Motion for Preliminary Injunction          Page 43 of 49
*Thompson et al. v. Dauphinais et al.*          November 11, 2015
Case 3:15-cv-00218-TMB   Document 5   Filed 11/11/15   Page 54 of 60

that same amount would risk *quid pro quo* corruption when it is given to a group that has considerably less influence and control over the candidate and that can donate considerably less money to the candidate. The $500 limit on an individual's contributions to a group does not even appreciably advance, let alone stand "closely drawn" to, the State's interest in prohibiting *quid pro quo* corruption.

### 4. The Aggregate Cap on Nonresident Contributions Violates Free Speech and Association as Well as Equal Protection.

Aggregate caps on an individual's campaign contributions are unconstitutional.[168] Aggregate limits do little, if anything, to address the concern over *quid pro quo* corruption while seriously restricting participation in the democratic process.[169] Here, Alaska literally bans all individuals in other states from contributing even one cent to an Alaska candidate once a nominal annual aggregate cap is reached—the cap varies by the office the candidate seeks: $20,000 (Governor and Lieutenant Governor), $5,000 (Senate), and $3,000 (House).[170] And, the aggregate caps serve no legitimate government purpose. Nonresidents are limited to the exact same base contribution limits as residents.[171] If the base-contribution limit does not risk corruption or the appearance of corruption when it is given to a candidate by an Alaska resident, it is inconceivable how it could do so simply because it is a nonresident who donates the base amount. In fact, quite apparently, the risk of *quid pro quo* corruption or its appearance is greater when contributions to Alaska candidates come from

---

[168] *McCutcheon*, 134 S. Ct. at 1441-62.
[169] *Id.* at 1442.
[170] AS 15.13.072(e).
[171] AS 15.13.070(a) and (b)(1).

Memorandum in Support of Motion for Preliminary Injunction     Page 44 of 49
*Thompson, et al. v. Dauphinais, et al.*     November 11, 2015
Case 3:15-cv-00218-TMB   Document 5   Filed 11/11/15   Page 55 of 60

residents of Alaska, those for whom the candidates will most directly act if they are elected, than when the contribution comes from nonresidents. No matter how politically correct it might be in Alaskan circles to desire to maintain any and all interest in Alaska's politics and elections exclusively to Alaska residents, that interest is not legitimate, let alone important, from a First Amendment perspective. Because nonresident status alone does not implicate *quid pro quo* corruption or its appearance, let alone implicate it to a greater degree than resident status, the aggregate cap on nonresident contributions is unconstitutional.

Further, because the nonresident cap burdens fundamental constitutional rights, it must pass strict scrutiny under equal-protection or privileges-and-immunities analysis[172]—this it cannot do. There is no interest, let alone a compelling interest, for Alaska to discriminate against nonresidents in the way that it does in curtailing a nonresident's First Amendment right to take an interest in Alaska's politics and elections. There is no interest, let alone a compelling interest, for Alaska to discriminate against nonresidents in the way that it does in curtailing a nonresident's right to speak and associate in the form of a campaign contribution to an Alaska candidate. Nonresidents may not have a right to vote in Alaska's elections, but the First Amendment applies to all United States citizens and guarantees them the right to take an interest in and to speak and associate about any issue they choose. Nonresidents of Alaska certainly have fundamental rights of free speech and association, and these interests are constitutionally protected with respect to any interest they may take in Alaska's politics

---

[172] *See, e.g., Cleburne,* 473 U.S. at 440; *Kramer,* 395 U.S. at 620-29; *Shapiro,* 394 U.S. at 638; *Skinner,* 316 U.S. at 541; *Hicklen,* 437 U.S. at 524; *Zobel,* 457 U.S. at 67 (Brennan, J., concurring).

Memorandum in Support of Motion for Preliminary Injunction          Page 45 of 49
*Thompson et al. v. Dauphinais et al.*                                        November 11, 2015
Case 3:15-cv-00218-TMB   Document 5   Filed 11/11/15   Page 56 of 60

and elections. In the specific facts of this case, Alaska has literally denied a lower-48 family member from making a simple base contribution, within the permitted limit, to another family member who is running for legislative office in Alaska.

### 5. The Aggregation of Party Subdivisions and Units Is Unconstitutional.

As demonstrated, aggregate limits are unconstitutional under *McCutcheon*. By aggregating the various subdivisions and units of the political parties for purposes of the contributions that parties can make to candidates, Alaska has violated the First Amendment. If contributions from political parties to candidates do not risk *quid pro quo* corruption or its appearance—but instead simply reflect constitutionally permissible party support and influence—then contributions from subdivisions and units within the party also do not risk such corruption or its appearance either.[173] Again, preventing circumvention of the base contribution limit—in this case, a party contribution limit and/or an individual contribution limit—is no longer a legitimate government interest.[174] For all of the reasons stated above, the aggregation of party subdivisions and units for purposes of calculating the contributions of the party to a candidate is unconstitutional.

### B. Plaintiffs Will Suffer Irreparable Harm.

The irreparable-harm requirement of the preliminary-injunction standard is satisfied where, as here, First Amendment freedoms are impermissibly burdened. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes

---

[173] *McCutcheon*, 134 S. Ct. at 1460-61.
[174] *McCutcheon*, 134 S. Ct. at 1452-53.

Memorandum in Support of Motion for Preliminary Injunction        Page 46 of 49
*Thompson et al. v. Dauphinais et al.*        November 11, 2015
Case 3:15-cv-00218-TMB    Document 5    Filed 11/11/15    Page 57 of 60

irreparable injury."[175]  The risk of irreparable harm is magnified when *political* speech and

association are suppressed. "[T]iming is of the essence in politics . . . . [W]hen an event

occurs, it is often necessary to have one's voice heard promptly, if it is to be considered at

all."[176]  "A delay 'of even a day or two' may be intolerable when applied to 'political speech

in which the element of timeliness may be important.'"[177]  Each of the Plaintiffs wants to

engage in constitutionally protected political speech and association *right now*, and would do

so, except the law prevents them.  Because the Plaintiffs have likely merits success,

irreparable injury follows.[178]

### C.  The Balance of Hardships Favors the Plaintiffs.

"[T]he fact that a case raises serious First Amendment questions compels a finding

that . . . the balance of hardships tips sharply in [the plaintiffs'] favor."[179]  The only time

balance of hardships should not be presumed to tip toward plaintiffs raising First Amendment

questions is when the plaintiffs cannot establish likely merits success.[180]  Government cannot

---

[175] *Yahoo!, Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1234 (9th Cir. 2006) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

[176] *NAACP, Western Region v. City of Richmond*, 743 F.2d 1346, 1356 (9th Cir. 1984) (quoting *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 163 (1969) (Harlan, J., concurring)).

[177] *NAACP*, 743 F.2d at 1356 (quoting *Carroll v. Commissioners of Princess Anne*, 393 U.S. 175, 182 (1968)).

[178] *Sammartano v. First Judicial District Court, in and for County of Carson City*, 303 F.3d 959, 973-74 (9th Cir. 2002); *see also Brown v. California Dep't. of Transp.*, 321 F.3d 1217, 1226 (9th Cir. 2003) (holding that when plaintiffs state a colorable First Amendment claim, the risk of irreparable injury is to be presumed).

[179] *Sammartano*, 303 F.3d at 973 (internal quotations and citations omitted); *see also Community House, Inc. v. City of Boise*, 490 F.3d 1041, 1059 (9th Cir. 2007).

[180] *Paramount Land Co. LP v. California Pistachio Comm'n*, 491 F.3d 1003, 1012 (9th Cir. 2007).

claim it is harmed simply because an unconstitutional law is enjoined.[181]   Because the Plaintiffs have demonstrated likely merits success, the balance of hardships favors Plaintiffs.

### D.     The Public Interest Favors an Injunction.

"[I]t is always in the public interest to prevent the violation of a party's constitutional rights."[182]   Indeed, "[c]ourts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles."[183]   Thus, when plaintiffs demonstrate likely merits success on First Amendment claims, it is in the public interest to enjoin the offending statute.[184]   There is no interest in enforcing an unconstitutional law.[185]   Because Plaintiffs have established a likelihood of success on the merits of their First Amendment claims, an injunction is in the public interest.

### CONCLUSION

As demonstrated above, the Plaintiffs meet the requirements for preliminary injunctive relief.  They are likely to succeed on the merits as to all of their claims.  They will suffer irreparable harm absent an injunction.  The balance of hardships favors the Plaintiffs.  The public interest favors an injunction.  The Court should therefore grant the motion to preliminarily enjoin each of the challenged laws.

---

[181] *Joelner v. Village of Washington Park, Illinois*, 378 F.3d 613, 620 (7th Cir. 2004).
[182] *Sammartano*, 303 F.3d at 974 (quoting *G & V Lounge, Inc. v. Michigan Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994)).
[183] *Sammartano*, 303 F.3d at 974.
[184] *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009).
[185] *ACLU of Nevada v. Heller*, 378 F.3d 979, 997 (9th Cir. 2004); *see also KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006) (ruling that neither the City nor the public have "an interest in enforcing an unconstitutional" law); *Hyde Partners, LP v. Connolly*, 839 F.2d 837, 854 (1st Cir. 1988).

Memorandum in Support of Motion for Preliminary Injunction                    Page 48 of 49
*Thompson, et al. v. Dauphinais, et al.*                                        November 11, 2015
Case 3:15-cv-00218-TMB   Document 5   Filed 11/11/15   Page 59 of 60

DATED this 11th day of November, 2015.

BRENA, BELL & CLARKSON, P.C.
Attorneys for Plaintiffs

By_____
    Kevin G. Clarkson, ABA No. 8511149
    Matthew C. Clarkson, ABA No.1111077

Memorandum in Support of Motion for Preliminary Injunction          Page 49 of 49
*Thompson et al. v. Dunleavy et al.*                                November 11, 2015
Case 3:15-cv-00218-TMB   Document 5   Filed 11/11/15   Page 60 of 60