**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ALASKA**

DAVID THOMPSON; AARON DOWNING;
JIM CRAWFORD; and DISTRICT 18 of the
ALASKA REPUBLICAN PARTY,

                  Plaintiffs,

    vs.

PAUL DAUPHINAIS, in His Official
Capacity as the Executive Director of the
Alaska Public Offices Commission; and
MARK FISH, IRENE CATALONE, RON
KING, KENNETH KIRK, and VANCE
SANDERS, in Their Official Capacities as
Members of the Alaska Public Offices
Commission,

                  Defendants.

Case No. 3:15-cv-00218-TMB

MEMORANDUM OF DECISION

## I.      INTRODUCTION

Plaintiffs David Thompson, Aaron Downing, Jim Crawford, and District 18 of the Alaska

Republican Party ("District 18") bring this lawsuit against Defendants Paul Dauphinais, Mark

Fish, Irene Catalone, Ron King, Kenneth Kirk, and Vance Sanders (collectively, "Defendants" or

"the State") to challenge the constitutionality of four provisions of Alaska's campaign finance

laws under the First and Fourteenth Amendments.[1]  The Court called this matter for bench trial

on April 25, 2016.  The parties concluded their arguments and presentations of evidence on May

---

[1] Dkt. 1 (Compl.); Dkt. 46 (First Am. Compl.).

3, 2016,[2] and subsequently submitted post-trial briefs.[3]  Having carefully considered the pleadings, exhibits, trial testimony, arguments of counsel, and the applicable law, the Court makes the following findings of fact and conclusions of law.[4]

## II.    BACKGROUND

In 1996, the Alaska Legislature enacted Chapter 48 SLA 1996 for the purpose of "substantially revis[ing] Alaska's campaign finance laws in order to restore the public's trust in the electoral process and to foster good government."  Chapter 48 SLA 1996 was based on a ballot initiative drafted by Michael Frank and certified by Lieutenant Governor Fran Ulmer, and established, among other things, $500 annual limits on the amount an individual could contribute to a candidate for state office or to a group that was not a political party, as well as aggregate limits on the dollar amount a candidate could accept from political parties or individuals who were not residents of Alaska.  None of the contribution limits were indexed for inflation. Chapter 48 SLA 1996 became effective January 1, 1997.

In 2003, the Alaska Legislature modified Alaska's campaign finance laws by enacting Chapter 108 SLA 2003.  Chapter 108 SLA 2003 relaxed some of the campaign contribution limits set by Chapter 48 SLA 1996, including by raising the amount an individual could contribute to a political candidate or group that was not a political party from $500 to $1,000, annually.  Chapter 108 SLA 2003 became effective September 14, 2003.

---

[2] Dkt. 125.

[3] Dkt. 129 (re-filed at Dkt. 139 with working hyperlinks); Dkt. 131; Dkt. 140; Dkt. 143.  The parties have also submitted notices of supplemental authorities, in accordance with D.Ak. L.R. 7.1(i)(1)[B].  *See* Dkt. 145; Dkt. 147.

[4] *See* Fed. R. Civ. P. 52(a).

Three years later, 73 percent of Alaska voters voted in favor of Ballot Measure 1, which proposed revising Alaska's campaign finance laws to lower the amount an individual could contribute to a political candidate or group that was not a political party back to $500 per year. The $500 base limits became effective December 17, 2006.

Plaintiffs in this case are individuals and a subdivision of a political party who contributed or attempted to contribute the maximum dollar amount permitted under Alaska's current campaign finance laws, as established by the above session laws and initiatives. Downing is an Alaska resident who, in 2015, contributed $500 to the campaign of mayoral candidate Larry DeVilbiss and to the campaign of state house candidate George Rauscher, the maximum contribution amounts permitted under Alaska Stat. 15.13.070(b). Crawford is an Alaska resident who, in 2015, contributed $500 to the campaign of mayoral candidate Amy Demboski and to the Alaska Miners' Association Political Action Committee, the maximum contribution amounts permitted under Alaska Stat. 15.13.070(b). Thompson is a Wisconsin resident and brother-in-law to Alaska State Representative Wes Keller who, in 2015, attempted to make a $500 contribution to Keller's campaign, but was unable to do so because the campaign had already received the maximum dollar amount it could accept from nonresidents under Alaska Stat. 15.13.072(e)(3). And District 18 is a subdivision of the Alaska Republican Party that was limited to a $250 contribution to Amy Demboski's mayoral campaign, the maximum amount that it was permitted to contribute under the aggregate limit on the dollar amount a campaign can accept from a political party set forth in Alaska Stat. 15.13.070(d)(4).

By this suit, Plaintiffs challenge four distinct parts of Alaska's campaign finance laws under the First and Fourteenth Amendments. Each challenged provision is discussed individually below. In relief, Plaintiffs seek a declaratory judgment that each of the challenged

provisions are unconstitutional, a permanent injunction prohibiting the State from enforcing the challenged provisions, and full reasonable costs and attorney's fees under 42 U.S.C. § 1983.

The Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1343. This civil action arises under the First and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983.

### III.    ANALYSIS

It is well established that the First Amendment protects political association as well as political expression.[5] It is equally well established that laws which limit the amount of money a person may give to a candidate or campaign organization intrude upon both of those First Amendment interests,[6] as a contribution serves both "as a general expression of support for the candidate and his views" and "to affiliate a person with a candidate."[7] But because "contributions lie closer to the edges than to the core of political expression,"[8] laws which regulate political contributions, as opposed to political expenditures, are subject to "a lesser but still 'rigorous standard of review.'"[9] Under that standard of review, "state contribution limits

---

[5] *Buckley v. Valeo*, 424 U.S. 1, 15 (1976) (per curiam); *accord McCutcheon v. FEC*, 134 S. Ct. 1434, 1441 (2014); *see also Mills v. Alabama*, 384 U.S. 214, 218 (1966) ("[T]here is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs.").

[6] *Buckley*, 424 U.S. at 23; *Lair v. Bullock*, 798 F.3d 736, 741–42 (9th Cir. 2015).

[7] *Buckley*, 424 U.S. at 20–21.

[8] *FEC v. Beaumont*, 539 U.S. 146, 161 (2003); *see also Buckley*, 424 U.S. at 20 ("A limitation upon the amount that any one person or group may contribute to a candidate or political committee entails only a marginal restriction upon the contributor's ability to engage in free communication.").

[9] *McCutcheon*, 134 S.Ct. at 1444 (quoting *Buckley*, 424 U.S. at 29); *accord Thalheimer v. City of San Diego*, 645 F.3d 1109, 1125 (9th Cir. 2011) ("While expenditures and contributions are

will be upheld if (1) there is adequate evidence that the limitation furthers a sufficiently important state interest, and (2) if the limits are 'closely drawn.'"[10] The State bears the burden of establishing both prongs of the constitutional inquiry.[11]

After *Citizens United*, what constitutes a sufficiently important state interest to support limits on campaign contributions has narrowed. Now, the prevention of quid pro quo corruption, or its appearance, is the only state interest that can support limits on campaign contributions.[12] "That Latin phrase captures the notion of a direct exchange of an official act for money,"[13] or "'dollars for political favors.'"[14] Campaign finance laws that pursue other objectives, such as reducing the amount of money in politics, restricting the political participation of some in order to enhance the relative influence of others, or targeting the general gratitude a candidate may feel toward those who support him or his allies, "impermissibly injects the Government 'into the debate over who should govern'" and thus cannot survive constitutional scrutiny.[15]

---

different modes of political speech, it is the distinct nature of contributions that lessens the First Amendment rights of donors, and strengthens the government's regulatory power.").

[10] *Lair*, 798 F.3d at 742 (quoting *Montana Right to Life Ass'n v. Eddleman*, 343 F.3d 1085, 1092 (9th Cir. 2003), *abrogated on other grounds by Citizens United v. FEC*, 558 U.S. 310 (2010)).

[11] *McCutcheon v. FEC*, 134 S. Ct. 1434, 1452 (2014) (quoting *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816 (2000)).

[12] 558 U.S. at 359; *see also McCutcheon*, 134 S. Ct. at 1441; *Lair*, 798 F.3d at 746–47 n.7 ("But to the extent *Citizens United* left that question open, *McCutcheon* confirmed that quid pro quo corruption of its appearance are the only interests that can support contribution restrictions.").

[13] *McCutcheon*, 134 S. Ct. at 1441 (citing *Citizens United*, 558 U.S. at 359).

[14] *Id.* (quoting *FEC v. Nat'l Conservative Political Action Comm.*, 470 U.S. 480, 497 (1985)).

[15] *McCutcheon*, 134 S. Ct. at 1441 (quoting *Arizona Free Enter. Club's Freedom Club PAC v. Bennett*, 131 S. Ct. 2806, 2826 (2011)); *see also Thalheimer*, 645 F.3d at 1119 (recognizing that *Citizens United* "narrowed the scope of the anti-corruption rationale to cover quid pro quo

### a. Counts One and Two: Individual-to-Candidate and Individual-to-Group Base Limits

Plaintiffs first challenge the provisions of Alaska's campaign finance laws that prohibit an individual from contributing more than $500 per year to a candidate for political office and to a group that is not a political party.[16] They argue that the $500 individual-to-candidate and individual-to-group base limits set forth in Alaska Stat. 15.13.070(b) are not closely drawn to further the sufficiently important state interest of combating quid pro quo corruption or its appearance.

### i. Sufficiently important state interest

As part of that argument, Plaintiffs contend that Defendants did not present adequate evidence at trial to establish that Alaska's $500 base limits further the sufficiently important state interest of combating quid pro quo corruption or its appearance. The Court disagrees.

At trial, the State put forward evidence that the risk of quid pro quo corruption or its appearance in Alaska politics and government is both actual and considerable. To start, Dr. Gerald McBeath, a Professor Emeritus of Political Science at the University of Alaska Fairbanks who was qualified as an expert in this case on the topic of Alaska state and local politics and government, identified several factors that make Alaska highly, if not uniquely, vulnerable to corruption in politics and government. The first of these factors is legislative size. Alaska has the second smallest legislature in the United States and the smallest senate, with only twenty senators. As Dr. McBeath explained at trial, that means that just ten votes can stop a legislative action such as an oil or gas tax increase from becoming law. Consequently, the incentive to buy

---

corruption only, as opposed to money spent to obtain influence over or access to elected officials" (quoting another source)).

[16] Alaska Stat. 15.13.070(b)(1).

a vote, and the chances of successfully doing so, are therefore higher in Alaska than in states with larger legislative bodies. A second factor is Alaska's almost complete reliance on one industry for a majority of its revenues. The percentage of Alaska's budget generated by royalties, taxes, and revenues from oil and gas is the highest among all of the oil and gas producing states in the United States. In fact, it is exponentially greater: typically 85 to 92 percent in Alaska compared to less than 50 percent for every other state. Another factor making Alaska susceptible to corruption in politics and government is its small population coupled with its vast size. According to Dr. McBeath, these characteristics make enforcement of campaign finance laws much more challenging, as it limits both the number and abilities of watchdog organizations.

In addition to Dr. McBeath's testimony, the public officials who appeared at trial, regardless of whether they were called by Plaintiffs or the State, uniformly testified that they experienced and observed pressure to vote in a particular way or support a certain cause in exchange for past or future campaign contributions while in office. Defense witness David Finkelstein, a former Alaska state representative who served from 1989 to 1996 testified that "there was an inordinate influence from contributions on the actions of the legislature," and that legislators would often mention which interest groups had contributed large amounts to their campaigns or to their party during closed-door caucus meetings over whether particular bills would move forward. He further testified that "it inevitably would affect [his] vote if [he'd] received a thousand dollars or stacks of thousand dollar[ ] checks, from one side and not the other." Defense witness Charles Wohlforth, who served two terms as a member of the Anchorage Assembly from 1993 to 1999, similarly testified that "the system was rigged by money[ed] interests and that too frequently the decisions of the assembly were controlled by

those interests and their desires, based on the kind of contributions they would make." And Eric Croft, who is currently a member of the Anchorage Assembly and who previously served in the state legislature for ten years, testified at trial that although he has never been directly asked for a political favor in exchange for a contribution, he has experienced situations where "it [was] clear that if you don't vote the way somebody wants, you're not going to get their continued contribution."

Witnesses for the Plaintiffs also provided evidence that some large contributors expect political favors in exchange for their contribution.[17] Senator John Coghill testified that on one occasion during the legislative session, he was approached in the hallway of the State Capitol by a lobbyist demanding that Senator Coghill vote a certain way, saying "This is why we gave to you. Now we need your help." Senator Coghill refused, and those represented by that lobbyist never made a contribution to Senator Coghill again. Bob Bell testified that during his tenure on the Anchorage Assembly in the 1990s, an oil executive offered to hold a fundraiser for him if he would publicly support a private prison project in South Anchorage. When Bell refused to support the project, the oil executive held a fundraiser for his opponent instead.

Beyond this testimony, the State presented evidence about the widely publicized VECO public corruption scandal, in which approximately ten percent of the Alaska Legislature, including state representatives Vic Kohring, Pete Kott, and Beverly Masek, were directly implicated for accepting money from Bill Allen and VECO, Allen's oilfield services firm, in

---

[17] *See McCutcheon*, 134 S. Ct. at 1450 ("Spending large sums of money in connection with elections, but not in connection with an effort to control the exercise of an officeholder's official duties, does not give rise to such *quid pro quo* corruption.").

exchange for votes and other political favors.[18]  A surveillance video from the VECO

investigation introduced at trial showed Kohring in a Juneau hotel room asking Allen and Rick

Smith, another VECO official, for help with his (Kohring's) $17,000 debt.  In the video, Kohring

accepts a relatively small cash payment from them in response to his request, and then, in the

same exchange, asks Allen and Smith what he can do for them on oil tax legislation that was

then pending before the Alaska Legislature.  After being criminally charged, Kohring wrote a

newspaper column in which he stated that other legislators were no better than he was and were

unfairly critical of him because he got caught.

      The State also introduced at trial a Government Ethics Center study commissioned by the

Alaska State Senate in 1990 in which the Government Ethics Center surveyed Alaska legislators,

public officials, and lobbyists as to the image of and the public trust in the Alaska Legislature.

The study concluded that "that things are not what they should be" and that "[t]he reputation and

image of the legislature is unacceptably low."  Of particular relevance to this case, the survey

results showed that 24 percent of lobbyists surveyed believed that "about half" or more of

Alaska's legislators could "be influenced to take or withhold some significant legislative action .

. . by campaign contributions or other financial benefits provided by lobbyists and their

employers," and that 40 percent of legislators surveyed believe that very few members of the

public had a sufficiently high degree of trust and confidence in legislators' integrity.[19]

---

[18] Kohring, Kott, and Masek were all part of a larger group of Alaska legislators who referred to themselves as the "Corrupt Bastards Club" after a patron at a Juneau bar called some of the legislators who received large VECO contributions "corrupt bastards."

[19] *See Buckley*, 424 U.S. at 27 ("Of almost equal concern as the danger of actual quid pro quo arrangements is the impact of the appearance of corruption stemming from public awareness of the opportunities inherent in a regime of large individual financial contributions.").

Taking all of the testimony and other evidence together, the Court finds that Defendants have made an adequate showing that the risk of quid pro quo corruption or its appearance in Alaska politics and government from large campaign contributions is pervasive and persistent.[20] Quid pro quo corruption, or even its appearance, undermines public trust in the electoral process and government. Having concluded that the $500 base limits set forth in 15.13.070(b) further Alaska's sufficiently important interest in preventing quid pro quo corruption or its appearance, the Court turns to the question of whether those $500 limits are "closely drawn" to further that interest.

### ii. Closely drawn

In determining the constitutionality of Alaska's $500 base limits, Plaintiffs contend that the Court should apply the two-part, multi-factor "closely drawn" test articulated by the Supreme Court in *Randall v. Sorrell*[21] rather than the test laid out by the Ninth Circuit Court of Appeals in *Eddleman*.[22] Plaintiffs' position, however, is foreclosed by the Ninth Circuit's opinion in *Lair*.[23] In *Lair*, the Ninth Circuit considered whether and to what extent *Randall* abrogated *Eddleman*'s

---

[20] *See Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377, 395 (2000) ("[T]here is little reason to doubt that sometimes large contributions will work actual corruption of our political system, and no reason to question the existence of a corresponding suspicion among voters."); *see also Zimmerman v. City of Austin*, Findings of Fact and Conclusions of Law, No. 1:15-CV-628-LY (W.D. Tex. July 20, 2016) (finding base limit furthered the City of Austin's interest in preventing quid pro quo corruption or its appearance where the City of Austin presented evidence that there was a "widespread" perception that economic interests had "inordinate influence" over the Austin City Council).

[21] 548 U.S. 230 (2006) (plurality opinion).

[22] 343 F.3d 1085 (9th Cir. 2003).

[23] 798 F.3d at 747.

"closely drawn" analysis.[24]  Applying *Miller v. Gammie*,[25] it found that "there simply was no

binding *Randall* decision on that point,"[26] and that the district court's decision to apply *Randall*'s

"closely drawn" analysis to the contribution limits at issue in that case was therefore legal

error.[27]  The Court will therefore determine the constitutionality of Alaska's campaign

contribution laws using *Eddleman*'s "closely drawn" test.

Under *Eddleman*'s "closely drawn" test, limits on contributions are "closely drawn" if

they "(a) focus narrowly on the state's interest, (b) leave the contributor free to affiliate with a

candidate, and (c) allow the candidate to amass sufficient resources to wage an effective

campaign."[28]  In conducting that tailoring analysis, a court must be "mindful that the dollar

amounts employed to prevent corruption should be upheld unless they are 'so radical in effect as

to render political association ineffective, drive the sound of a candidate's voice beyond the level

of notice, and render contributions pointless.'"[29]

Here, Plaintiffs do not dispute and the Court agrees with Defendants that the base limits

set forth in Alaska Stat. 15.13.070(b) leave an individual free to affiliate with a candidate.

Plaintiffs do, however, dispute that Alaska's $500 base limits focus narrowly on Alaska's

---

[24] *Id.* at 745–48; *see also Lair v. Bullock*, 697 F.3d 1200, 1204–06 (9th Cir. 2012).

[25] 335 F.3d 889 (9th Cir. 2003) (en banc).

[26] *Lair*, 798 F.3d at 747; *accord Lair*, 697 F.3d at 1204 ("*Randall* is not binding authority because there was no opinion of the Court.").

[27] *Lair*, 798 F.3d at 748; *accord Lair v. Motl*, No. CV 12-12-H-CCL, 2016 WL 2894861, at *4 (May 17, 2016) (noting *Eddleman* "provides the overall analytical framework" for evaluating the constitutionality of a contribution limit).

[28] *Lair*, 798 F.3d at 742 (quoting *Eddleman*, 343 F.3d at 1092).

[29] *Eddleman*, 343 F.3d at 1094 (quoting *Shrink Missouri*, 528 U.S. at 397).

interest in the prevention of quid pro quo corruption or its appearance. They further claim that the State has failed to prove that the $500 base limits allow candidates, particularly challengers in competitive races, to amass sufficient resources to run effective campaigns. The Court addresses each claim in turn.

### 1. Focus narrowly

Citing Frank's testimony as to why and how he selected $500 as the individual-to-candidate and individual-to-group contribution limit amounts for his ballot initiative back in the 1990s, Plaintiffs contend that the $500 individual-to-candidate and individual-to-group contribution limits were put in place for impermissible purposes other than preventing quid pro quo corruption or its appearance, and that the State therefore cannot show that those limits satisfy the first part of *Eddleman*'s "closely drawn" test. But Plaintiffs' argument forgets that Ballot Measure 1, which established the current $500 base limits and which was approved by a 73 percent margin of Alaska voters, explicitly contemplated an anticorruption purpose. [30] Indeed, the statement in support of the successful initiative included in the Alaska Division of Elections voter information packet stated as follows:

> Corruption is not limited to one party or individual. Ethics should be not only bi-partisan but also universal. From the Abramoff and Jefferson scandals in Washington D.C. to side deals in Juneau, special interests are becoming bolder every day. They used to try to buy elections. Now they are trying to buy the legislators themselves.

Plaintiffs also argue that the $500 base limits impermissibly restrict their free speech and associational rights because Defendants have not shown that a higher contribution limit, such as

---

[30] *Contra Motl*, 2016 WL 2894861, at *7 (holding base limits at issue in that case "could never be said to focus narrowly on a constitutionally-permissible anti-corruption interest because they were expressly enacted to combat the *impermissible* interests of reducing influence and leveling the playing field").

a $750 or $1,000 limit (or even a $500 limit indexed for inflation), would be ineffective at preventing quid pro quo corruption or its appearance. That argument, however, misunderstands both the Court's role in assessing and the State's task in proving the constitutionality of a contribution limit. In *Buckley*, the Supreme Court rejected an overbreadth claim that the $1,000 contribution limit at issue in that case was "unrealistically low" because "much more than that amount would still not be enough to enable an unscrupulous contributor to exercise improper influence over a candidate or officeholder."[31] In rejecting the claim, the *Buckley* Court adopted the Court of Appeals for the District of Columbia's observation that "[i]f it is satisfied that some limit on contributions is necessary, a court has no scalpel to probe whether, say, a $2,000 ceiling might not serve as well as $1,000."[32] The law instead requires "a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served."[33] In the context of this case, that means that the State need not prove that $500 is the highest possible contribution limit that still serves to prevent quid pro quo corruption or its appearance, but rather that the challenged $500 contribution limits further that interest and also permit candidates to "amas[s] the resources necessary for effective advocacy."[34]

---

[31] 424 U.S. at 30.

[32] *Id.* ("Such distinctions in degree become significant only when they can be said to amount to differences in kind."); *see also Randall*, 548 U.S. at 248 (explaining a court "cannot determine with any degree of exactitude the precise restriction necessary to carry out the statute's legitimate objectives").

[33] *McCutcheon*, 134 S. Ct. at 1456.

[34] *Buckley*, 424 U.S. at 21.

What is more, the State did elicit testimony at trial indicating that the $500 individual-to-candidate and individual-to-group limits are, in fact, likely more effective at furthering the State's interest in preventing quid pro quo corruption or its appearance than a hypothetical $750 or $1,000 limit. Professor Richard Painter, whom the Court qualified as an expert in government ethics and institutional corruption with an emphasis on campaign finance reform, explained that lower contribution limits are often more effective at decreasing the risk of quid pro quo arrangements or their appearance because they make a candidate less dependent upon an individual or group of individuals for financial support, especially in a state like Alaska where the cost of campaigns for state or municipal office are relatively low. Lower limits often increase the donor base and decrease the impact of an individual contribution, thus making it easier for a candidate to decline a contribution contingent upon the performance of a political favor. Consistent with Professor Painter's expert testimony, Croft testified that the higher the contribution limit, "it's harder and harder to turn that down."

Finally, with respect to the individual-to-group contribution limit, the Court finds that Defendants have made the appropriate showing that Alaska Stat. 15.13.070(b)'s individual-to-group limit focuses narrowly on the State's interest in reducing the risk of quid pro quo corruption or its appearance, as it works to keep contributors from circumventing the $500 individual-to-candidate base limit. The Supreme Court in *McCutcheon* affirmed that the anti-circumvention interest originally recognized in *Federal Election Commission v. Beaumont*[35] remains valid after *Citizens United*.[36] Alaska's campaign finance laws define a "group" as "two

---

[35] 539 U.S. 146 (2003), *overruled on other grounds by Citizens United*, 558 U.S. 310.

[36] *McCutcheon*, 134 S. Ct. at 1456; *accord Thalheimer*, 645 F.3d at 1125 ("[T]here is nothing in the explicit holdings or broad reasoning of *Citizens United* that invalidates the anti-circumvention interest in the context of limitations on direct candidate contributions.").

or more individuals acting jointly who organize for the principal purpose of influencing the outcome of one or more elections and who take action the major purpose of which is to influence the outcome of an election."[37] Under Alaska Stat. 15.13.070(c), a group that is not a political party may contribute up to $1,000 per year to a candidate. Without the $500 individual-to-group limit, an individual could make unlimited donations to a group, $1,000 of which could then be passed on to the candidate—double the individual-to-candidate limit.

**2. Amassing sufficient resources to effectively campaign**

In addition to their argument that the $500 base limits set forth in Alaska Stat. 15.13.070(b) do not focus narrowly on the State's interest in avoiding actual or apparent quid pro quo corruption, Plaintiffs argue that those limits are unconstitutionally low under the third prong of *Eddleman*'s "closely drawn" test. While it is certainly true that a contribution limit that is too low "could itself prove an obstacle to the very electoral fairness it seeks to promote,"[38] the Supreme Court in *Buckley* specifically rejected the contention that $1,000, or any other amount, was a constitutional minimum below which legislatures could not regulate.[39] It instead held that courts should determine "the outer limits of contribution regulation by asking whether there was any showing that the limits were so low as to impede the ability of candidates to 'amas[s] the resources necessary for effective advocacy.'"[40] In making that determination, the Ninth Circuit has instructed courts to "look at all dollars likely to be forthcoming in a campaign, rather than the

[37] Alaska Stat. 15.13.400(8)(A).

[38] *Randall*, 548 U.S. at 248–49 ("[C]ontribution limits that are too low can also harm the electoral process by preventing challengers from mounting effective campaigns against incumbent officeholders, thereby reducing democratic accountability.").

[39] *Shrink Missouri*, 528 U.S. at 397 (citing *Buckley*, 424 U.S. at 21).

[40] *Id.* (quoting *Buckley*, 424 U.S. at 21).

isolated contribution" and to "consider factors such as whether the candidate can look elsewhere for money, the percentage of contributions that are affected, the total cost of a campaign, and how much money each candidate would lose."[41]

In this case, Plaintiffs claim that the $500 base limits set forth in Alaska Stat. 15.13.070(b) are not closely drawn because they do not allow candidates in Alaska, and in particular challengers in competitive races, to amass the resources necessary for effective advocacy. But Plaintiffs' evidence does not show that Alaska's $500 base limits are "'so radical in effect as to render political association ineffective, drive the sound of a candidate's voice beyond the level of notice, and render contributions pointless.'"[42] Michael Gene Pauley, a campaign manager and consultant whom the Court qualified as an expert in Alaska political campaigns, testified that he considers Alaska's $500 base limits to be too low because they are not indexed for inflation, because the cost of campaigns is generally increasing, and because the limits are annual in nature. Pauley further testified that most challengers in Alaska do not enter political races in the off year. Plaintiffs also offered the testimony of Senator Coghill, who testified that he has always been able to raise sufficient funds to run an effective campaign, but that it was "just harder" under the current $500 limits than under the $1,000 limits because "the lower limits do cause you to have to go broad." In other words, it requires more work.

Plaintiffs also called Clark Bensen, a consultant and a former director of political analysis for the Republican National Committee whom the Court qualified as an expert "in the area of analyzing campaign finance data for the purpose of determining whether contribution limits permit candidates to amass the resources that they need to mount effective campaigns," to testify

---

[41] *Lair*, 798 F.3d at 742 (quoting *Eddleman*, 343 F.3d at 1094 (internal citations omitted)).

[42] *Eddleman*, 343 F.3d at 1094 (quoting *Shrink Missouri*, 528 U.S. at 397).

at trial.  Based on his analysis of campaign finance data for the State of Alaska, Bensen opined

that the $500 base limits set forth in Alaska Stat. 15.13.070(b) are unconstitutionally low because

candidates in competitive campaigns often spend more than they raise and because those

candidates would be able to raise more money if the $500 limits were instead $750 or $1,000.

The Court, however, does not find Bensen's testimony to be credible.  At trial, Mr. Bensen

acknowledged that his analysis was based on exaggerated estimates and therefore flawed.  He

stated, "I didn't do a very sophisticated analysis . . . .  It's not like I didn't do it, but I didn't do it

well, shall we say, or completely."

In support of the $500 base limits set forth in Alaska Stat. 15.13.070(b), Defendants

called expert witnesses Thomas Begich and John-Henry Heckendorn to provide their opinions as

to whether Alaska's current contribution limits interfere with a candidate's ability to amass the

resources necessary for effective advocacy.[43]  Begich is a political consultant with extensive

experience working, consulting, and volunteering for Alaska campaigns.   Heckendorn is also a

political consultant who served as the political director for the Alaska Democratic Party in 2014

and now co-owns a political and commercial communications firm with offices in Anchorage

and Juneau.  Begich and Heckendorn both testified that candidates, whether challengers or

incumbents, can run effective campaigns under the current limits and, to use Begich's words,

"have done so."  As an example, Begich cited Matt Claman's campaign for state house in 2014

in which Claman was able to raise upwards of $110,000 under the current contribution limits.

Begich and Heckendorn also testified that the candidate who raises the most money does

not necessarily win the election.  Heckendorn explained at trial that in 2012, three of the eight

competitive state senate races and seven of the fourteen competitive state house races were won

---

[43] The Court qualified both Begich and Heckendorn as experts on political campaigns in Alaska.

by the candidate who raised less money than his opponent—"almost a 50/50 split in terms of campaigns that raise more money being successful and campaigns that raised less money being successful." According to Begich, this is because a number of factors other than the amount of money available to a candidate influence a candidate's success and ability to run an effective campaign, including demographics, the quality of the candidate, and the cost of the candidate's campaign.

To this end, Begich and Heckendorn took issue with Plaintiffs' testimony that the cost of campaigns is increasing. Begich testified that while the cost of certain parts of a campaign may be increasing, it is not, in fact, getting more expensive to run campaigns: "[T]he cost of a campaign depends on the technology you apply, and those costs change. So you can't use a direct period of inflation to reflect that." Heckendorn testified that evolution in fundraising techniques and in social media and digital advertising has significantly improved both the cost-efficiency and effectiveness of campaigns, particularly at the local level. Consistent with this testimony, defense witness Croft testified that the production and dissemination of video advertising has "gotten much simpler and cheaper" since his first campaign back in 1996.

Finally, Begich and Heckendorn testified that Alaska's campaign contribution limits do not, as Plaintiffs claim, favor incumbents over challengers, nor do the limits prevent challengers from running effective campaigns. Their opinions are bolstered by the results of the most recent Alaska primary elections, in which Alaska voters dispatched seven incumbents from the Alaska Legislature.[44]

---

[44] Nathaniel Herz & Devin Kelly, Incumbents Feel Sting of Voters in Alaska Primary Election (Aug. 24, 2016), *available at* https://www.adn.com/slideshow/visual/photos/2016/08/16/alaska-votes-in-2016-primary-election/.

In light of the above evidence, the Court finds that in the period since the current $500 base limits became effective, candidates for state elected office, including challengers in competitive races, have been able to raise funds sufficient to run effective campaigns. The Court therefore holds that the $500 base limits set forth in Alaska Stat. 15.13.070(b) further the sufficiently important interest in reducing the risk of quid pro quo corruption or its appearance, and are neither "too low" nor "too strict"[45] so as to run afoul of the First Amendment.

### b. Count Three: Nonresident Aggregate Limit

Plaintiffs next challenge the provision of Alaska's campaign finance laws that prohibits an individual seeking the office of state representative, municipal office, or office other than governor, lieutenant governor, or state senator from accepting more than $3,000 per year from an individual who is not a resident of Alaska.[46] Plaintiffs challenge the nonresident aggregate limit set forth in Alaska Stat. 15.13.072(e)(3) under both the First Amendment and the equal protection and privileges or immunities clauses of the Fourteenth Amendment.

In evaluating the constitutionality of Alaska's aggregate nonresident limit, Plaintiffs claim the Court should apply strict scrutiny because the aggregate limit, once reached for a candidate, prevents all other nonresidents from contributing any amount to that particular candidate. Alternatively, Plaintiffs argue strict scrutiny applies in light of their equal protection challenge. Plaintiffs' first argument for strict scrutiny fails under the Supreme Court's opinion in *Beaumont*.[47] In *Beaumont*, the Supreme Court rejected the plaintiff's argument that a strict level of scrutiny should apply to a statute banning political contributions from certain sources,

---

[45] *Randall*, 548 U.S. at 248.

[46] Alaska Stat. 15.13.072(a); Alaska Stat. 15.13.072(e)(3).

[47] 539 U.S. at 161–62.

explaining that "the level of scrutiny is based on the importance of the political activity at issue to effective speech or political association" and that "restrictions on political contributions have been treated as merely 'marginal' speech restrictions subject to a rather complaisant review under the First Amendment."[48]

Nor can Plaintiffs obtain strict scrutiny of the nonresident limit set forth in Alaska Stat. 15.13.072(e)(3) by invoking equal protection. Indeed, the Court of Appeals for the District of Columbia in *Wagner v. Federal Election Commission* rejected this "doctrinal gambit" in clear and uncertain terms:

> Although the Court has on occasion applied strict scrutiny in examining equal protection challenges in cases involving First Amendment rights, it has done so only when a First Amendment analysis would itself have required such scrutiny. There is consequently no case in which the Supreme Court has employed strict scrutiny to analyze a contribution restriction under equal protection principles.[49]

---

[48] *Id.* (explaining that "degree of scrutiny turns on the nature of the activity regulated"); *see also Family PAC v. McKenna*, 685 F.3d 800, 811 (9th Cir. 2012) (holding contribution limits, even those that operate as a ban, not subject to strict scrutiny); *Vannatta v. Keisling*, 151 F.3d 1215, 1220 (9th Cir. 1998) (nothing the Ninth Circuit "has applied less-than-strict, rigorous scrutiny to total restrictions on contributions").

[49] 793 F.3d 1, 32 (D.C. Cir. 2015), *cert. denied sub nom. Miller v. FEC*, 136 S. Ct. 895 (2016); *see also Wagner v. FEC*, 854 F. Supp. 2d 83, 95 (D.D.C. 2012), *vacated on other grounds*, 717 F.3d 1007 (D.C. Cir. 2013) ("If strict scrutiny were to apply to equal-protection claims in the area of campaign contributions, it would lead to the anomalous result that a statutory provision could survive closely drawn scrutiny under the First Amendment, but nevertheless be found to violate equal-protection guarantees because of its impingement upon the very same rights."); *Orin v. Barclay*, 272 F.3d 1207, 1213 (9th Cir. 2001) (holding that an equal protection claim was "no more than a First Amendment claim dressed in equal protection clothing" and was thus "subsumed by, and co-extensive with" the First Amendment claim); John E. Nowak, Ronald D. Rotunda & J. Nelson Young, Handbook on Constitutional Law (1978) ("It is generally unnecessary to analyze laws which burden the exercise of First Amendment rights by a class of persons under the equal protection guarantee, because the substantive guarantees of the Amendment serve as the strongest protection against the limitations of these rights.").

Moreover, to the extent Plaintiffs' Fourteenth Amendment claims are not subsumed by their First Amendment claim,[50] their equal protection claim fails because Alaska residents and nonresidents are not similarly situated with respect to state elections.[51] Plaintiffs' privileges and immunities claim fails for a similar reason; the right to make a contribution to a candidate running of office in another state does not "bear[ ] upon the vitality of the Nation as a single entity."[52]

Turning to the First Amendment challenge, Plaintiffs stated in their summary judgment papers and at oral argument on the parties' summary judgment motions that they are challenging the "common unconstitutional denominator of the discriminatory aggregation of nonresident contributions" that Alaska Stat. 15.13.072(a) and (e)(3) impose upon nonresident contributors, but not the $3,000 aggregate limit amount itself. They argue that Defendants "presented no evidence of a nexus between residency and *quid pro quo* corruption or its appearance," and that Alaska's nonresident aggregate contribution limit is unconstitutional under *McCutcheon* and *Vannatta*.[53] The Court disagrees.

In *McCutcheon*, the Supreme Court considered the constitutionality of a provision of the Federal Election Campaign Act of 1971, as amended by the Bipartisan Campaign Reform Act of

---

[50] *Wagner*, 793 F.3d at 33 ("But in a case like this one, in which there is no doubt that the interests invoked in support of the challenged legislation classification are legitimate, and no doubt that the classification was designed to vindicate those interests rather than disfavor a particular speaker or viewpoint, the challengers 'can fare no better under the Equal Protection Clause than under the First Amendment itself.'").

[51] *See Wright v. Incline Vill. Gen. Improvement Dist.*, 665 F.3d 1128, 1140 (9th Cir. 2011) (stating an equal protection claim "fails ab initio" without evidence that similarly situated persons are treated differently).

[52] *Council of Ins. Agents & Brokers v. Molasky-Arman*, 522 F.3d 925, 934 (9th Cir. 2008).

[53] Plaintiffs argue that the nonresident limit is also unconstitutional under *Whitmore v. FEC*, 68 F.3d 1212, 1216 (9th Cir. 1996). The Court, however, does not consider *Whitmore* on point.

2002, that limited how much money a contributor could contribute in total to all political candidates or committees under the First Amendment. Noting that a court must be "particularly diligent in scrutinizing the law's fit" in the context of an aggregate limit,[54] the Court found "a substantial mismatch between the Government's stated objective and the means selected to achieve it"[55] and consequently struck down the aggregate limit at issue in that case. But even as it struck down the provision, the plurality opinion recognized that aggregate limits, when appropriately tailored, can further an anticorruption interest.[56]

In *Vannatta*, the Ninth Circuit considered the constitutionality of an Oregon ballot measure which prohibited state candidates from using or directing any contributions from out-of-district residents and penalized candidates when more than ten percent of their total "funding" came from such individuals.[57] It held that the measure "fail[ed] to pass muster under the First Amendment," in large part because the measure "ban[ned] all out-of-district donations, regardless of size or any other factor that would tend to indicate corruption" and because the appellants were "unable to point to any evidence which demonstrates that all out-of-district contributions lead to the sort of corruption discussed in *Buckley*."[58] The decision does not

---

[54] *McCutcheon*, 134 S. Ct. at 1458.

[55] *Id.* at 1446.

[56] *Id.* at 1450 ("[W]e do not doubt the compelling nature of the 'collective' interest in preventing corruption in the electoral process. But we permit Congress to pursue that interest only so long as it does not unnecessarily infringe an individual's right to freedom of speech; we do not truncate this tailoring test at the outset.").

[57] 151 F.3d at 1218.

[58] *Id.* at 1221.

suggest, as Plaintiffs claim, that any campaign finance law that limits the dollar amount a candidate may accept from nonresidents runs afoul of the First Amendment as a matter of law.

Moreover, Alaska Stat. 15.13.072 is distinguishable from the provisions at issue in *McCutcheon* and *Vannatta*. In particular, unlike the provision at issue in *McCutcheon*, Alaska Stat. 15.13.072(a) and (e)(3) do not limit the total amount of money an individual can contribute during an election cycle. Rather, Alaska Stat. 15.13.072 is directed at the amount of out-of-state money a candidate for state or municipal office may accept;[59] once the nonresident aggregate limit is reached, a nonresident retains the ability to contribute to a political party or other group that supports the candidate. And unlike the measure at issue in *Vannatta*, Alaska Stat. 15.13.072 does not ban all nonresident contributions.[60]

More importantly, and unlike the defendants in those cases, Defendants in this case did produce evidence at trial establishing a nexus between the prevention of quid pro quo corruption or its appearance and the nonresident aggregate limit set forth in Alaska Stat. 15.13.072. At trial, Dr. McBeath testified that the unique combination of Alaska's small population, geographic isolation, and great natural resources make it extremely dependent on outside industry and interests. He explained that because it is enormously expensive to develop Alaska's natural resources and because that amount of capital is not available locally, Alaska is dependent on outside firms to invest in the infrastructure and provide the labor necessary to extract its natural resources. He further testified that such dependency makes Alaska especially vulnerable to

---

[59] *Contra McCutcheon*, 134 S. Ct. at 1461 ("For our purposes here, it is enough that the aggregate limits at issue are not directed specifically to candidate behavior.").

[60] *See Vannatta*, 151 F.3d at 1221 (noting challenged measure "bans all out-of-district donations, regardless of size or any other factor that would tend to indicate corruption").

exploitation by outside industry and interests, citing the Alaska Syndicate as an early example of such exploitation.[61]

In addition to Dr. McBeath's testimony, Professor Painter opined that Alaska's nonresident aggregate limit furthers the State's interest in avoiding actual or apparent quid pro quo relationships. Citing the number of foreign and out-of-state corporations involved in natural resource extraction in Alaska and the fact that profits from that extraction are often sent out of state, Professor Painter explained that the interests of those corporations are frequently in conflict with the interests of Alaska residents who absorb the externalities of extraction while only getting some of the monetary benefits. He further testified that natural resource extraction rarely can be accomplished without the cooperation of government, and that natural resource extraction firms can and do exert pressure on their employees to make contributions to state and municipal candidates.

Based on that evidence, the Court concludes that the State has presented adequate evidence that the nonresident aggregate limit set forth in Alaska Stat. 15.13.072(a) and (e)(3) furthers Alaska's sufficiently important interest in preventing quid pro quo corruption or its appearance in two ways. First, the nonresident aggregate limit furthers the State's anticorruption interest directly by avoiding large amounts of out-of-state money from being contributed to a single candidate, thus reducing the appearance that the candidate feels obligated to outside interests over those of his constituents. Second, the nonresident aggregate limit discourages circumvention of the $500 base limit and other game-playing by outside interests, particularly

---

[61] The Alaska Syndicate was formed in 1906 by J.P. Morgan and the Guggenheim Family and came to control vast amounts of Alaska's natural resources, including the Kennecott Copper Mine. Between 1906 and 1938, it is estimated that the Syndicate, as put by Dr. McBeath, "pulled out of Alaska a couple of hundred million dollars . . . and left precious little behind them."

given APOC's limited ability and jurisdiction to investigate and prosecute out-of-state violations of Alaska's campaign finance laws.

Whether Alaska's nonresident aggregate limit is closely drawn to further the State's anticorruption interest remains an open question. As explained above, Plaintiffs' challenge to Alaska Stat. 15.13.072(a) and (e)(3) does not raise that issue, and the Court has not evaluated, and has no opinion on, the provision's fit.

### c. Count Four: Political Party Aggregate Limit

Finally, Plaintiffs challenge the provision of Alaska's campaign finance laws that prohibits a political party, including any subordinate unit of that group, from contributing more than $5,000 per year to a candidate seeking municipal office. As with Count III, Plaintiffs clarified in their summary judgment papers and at oral argument that they are not claiming that the $5,000 limit is unconstitutionally low, but rather are challenging the "unconstitutional concept of discriminatory aggregation of party components" that Alaska Stat. 15.13.070(d)(4), together with Alaska Stat. 15.13.400(15), imposes on political parties. Plaintiffs, however, have not explained how Alaska's political party aggregate limit interferes with First Amendment free speech and associational freedoms. A subordinate unit of a political party chooses to affiliate with the party, and Alaska's campaign finance laws treat political parties more favorably, not less favorably, than individuals or groups that are not a political party.[62]

### IV.     CONCLUSION

When this case was first filed, the Court was skeptical that Defendants would be able to defend any of the provisions of Alaska's campaign finance laws at issue in this case. But, for the

---

[62] *Compare* Alaska Stat. 15.13.070(d), *with* Alaska Stat. 15.13.070(b) *and* Alaska Stat. 15.13.070(c).

reasons stated above, the Court finds that Defendants have presented adequate evidence that the $500 base limits set forth in Alaska Stat. 15.13.070(b) further the sufficiently important state interest of preventing quid pro quo corruption or its appearance and that those limitations are closely drawn to that end; that the $3,000 nonresident aggregate limit set forth in Alaska Stat. 15.13.072 furthers the sufficiently important state interest of preventing quid pro quo corruption or its appearance; and that the political party aggregate limit does not trigger First Amendment concerns, at least under Plaintiffs' theory of the case. Accordingly, the challenged provisions of Alaska's campaign finance laws are upheld as constitutional.

IT IS SO ORDERED.

Dated at Anchorage, Alaska, this 7th day of November, 2016.

/s/ Timothy M. Burgess
TIMOTHY M. BURGESS
UNITED STATES DISTRICT JUDGE