**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| DAVID THOMPSON; AARON DOWNING; JIM CRAWFORD; DISTRICT 18 OF THE ALASKA REPUBLICAN PARTY, | No. 17-35019 |
| *Plaintiffs-Appellants*, | D.C. No. 3:15-cv-00218-TMB |
| v. | |
| HEATHER HEBDON, in Her Official Capacity as the Executive Director of the Alaska Public Offices Commission; TOM TEMPLE; IRENE CATALONE; RON KING; ROBERT CLIFT; ADAM SCHWEMLEY, in Their Official Capacities as Members of the Alaska Public Offices Commission, | OPINION |
| *Defendants-Appellees*. | |

Appeal from the United States District Court
for the District of Alaska
Timothy M. Burgess, Chief Judge, Presiding

Argued and Submitted June 11, 2018
Anchorage, Alaska

Filed November 27, 2018

Before: Sidney R. Thomas, Chief Judge, and Consuelo M. Callahan and Carlos T. Bea, Circuit Judges.

Opinion by Judge Callahan;
Partial Concurrence and Partial Dissent by
Chief Judge Thomas

---

## SUMMARY[*]

---

## Civil Rights

The panel affirmed in part and reversed in part the district court's bench trial judgment and remanded for entry of a judgment consistent with the panel's opinion in an action alleging that Alaska law regulating campaign contributions violates the First Amendment.

Plaintiffs, three individuals and a subdivision of the Alaska Republican Party, challenged: (1) the $500 annual limit on an individual contribution to a political candidate, (2) the $500 limit on an individual contribution to a non-political party group, (3) annual limits on what a political party—including its subdivisions—may contribute to a candidate, and (4) the annual aggregate limit on contributions a candidate may accept from nonresidents of Alaska.

The panel held that affirmance on the individual-to-candidate and individual-to-group limits was compelled by

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

*Lair v. Motl*, 873 F.3d 1170 (9th Cir. 2017) (*Lair III*), *reh'g en banc denied*, 889 F.3d 571 (9th Cir. 2018), and *California Medical Ass'n v. FEC*, 453 U.S. 182 (1981), respectively. The panel also upheld the political party-to-candidate limit. However, it reversed as to the nonresident limit. The panel held that the first three restrictions were narrowly tailored to prevent quid pro quo corruption or its appearance and thus did not impermissibly infringe constitutional rights. The nonresident limit, which at most, targeted contributors' influence over Alaska politics, did not target an "important state interest" and therefore violated the First Amendment.

Concurring in part and dissenting in part, Chief Judge Thomas agreed with the majority that Alaska's limitations on individual contributions to candidates and election-related groups and on political party contributions to individual candidates did not violate the First Amendment. However, he would hold that the nonresident aggregate contribution limit, which furthers Alaska's important state interests in preventing quid pro quo corruption or its appearance and in preserving self-governance, also did not violate the First Amendment. Thus, Judge Thomas respectfully dissented from Section III(B)(iv) of the majority opinion.

## COUNSEL

Kevin G. Clarkson (argued) and Matthew C. Clarkson, Brena Bell & Clarkson P.C., Anchorage, Alaska, for Plaintiffs-Appellants.

Laura Fox (argued), Assistant Attorney General, Department of Law, Anchorage, Alaska, for Defendants-Appellees.

Brian A. Sutherland, Reed Smith LLP, San Francisco, California; M. Patrick Yingling, Reed Smith LLP, Chicago, Illinois; Brent Ferguson and Daniel I. Weiner, Brennan Center for Justice, New York, New York; for Amicus Curiae Brennan Center for Justice at NYU School of Law.

Ronald A. Fein and John C. Bonifaz, Free Speech for People, Newton, Massachusetts, for Amici Curiae Free Speech for People and Professor David Fontana.

Tara Malloy, Noah B. Lindell, Megan P. McAllen, and Mark P. Gaber, Campaign Legal Center, Washington, D.C., for Amicus Curiae Campaign Legal Center.

## OPINION

CALLAHAN, Circuit Judge:

We must decide whether an Alaska law regulating campaign contributions violates the First Amendment. At issue are Alaska's limit on contributions made by individuals to candidates, its limit on contributions made by individuals to election-related groups, its limit on political party-to-candidate contributions, and its limit on the total funds a candidate may receive from out-of-state residents. The district court upheld all four provisions against a constitutional challenge by three individuals and a subdivision of the Alaska Republican Party. Affirmance on the individual-to-candidate and individual-to-group limits is compelled by *Lair v. Motl*, 873 F.3d 1170 (9th Cir. 2017) (*Lair III*), *reh'g en banc denied*, 889 F.3d 571 (9th Cir. 2018), and *California Medical Ass'n v. FEC*, 453 U.S. 182 (1981), respectively, and we also uphold the political party-

to-candidate limit. However, we reverse as to the nonresident limit. While the first three restrictions are narrowly tailored to prevent quid pro quo corruption or its appearance and thus do not impermissibly infringe constitutional rights, the nonresident limit does not target an "important state interest" and therefore violates the First Amendment.

## I.

### A.

Alaska has long regulated campaign contributions to political candidates. In 1974, Alaska enacted a statute prohibiting individuals from contributing more than $1,000 annually to a candidate. *See Alaska v. Alaska Civil Liberties Union*, 978 P.2d 597, 601 (Alaska 1991). One former Alaska state representative testified in the bench trial in this case that, even under this $1,000 limit, "there was an inordinate influence from contributions on the actions of the legislature." *Thompson v. Dauphinais*, 217 F. Supp. 3d 1023, 1029 (D. Alaska 2016). A former member of the Anchorage Assembly, Charles Wohlforth, testified that "the system was rigged by money[ed] interests and that too frequently the decisions of the assembly were controlled by those interests and their desires, based on the kind of contributions they would make." *Id*. at 1030 (alteration in original).

In 1996, the Alaska Legislature enacted a revised campaign finance law "to restore the public's trust in the electoral process and to foster good government." 1996 Alaska Sess. Laws ch. 48 § 1(b). Among other things, the law lowered the annual limit on contributions by individuals to a candidate from $1,000 to $500 and set a $500 limit on annual contributions by individuals to a group that is not a

political party. *Id*. §§ 10–11. The law also set aggregate limits on the amount candidates could accept from nonresidents of Alaska. In 2003, the Alaska legislature revised the 1996 law by raising the individual-to-candidate and individual-to-group limits from $500 to $1,000. 2003 Alaska Sess. Laws ch. 108, §§ 8–10.

In 2006, a ballot initiative—Ballot Measure 1 (the "2006 Initiative")—proposed a further revision of the limits. 2006 Alaska Laws Initiative Meas. 1, § 1. The 2006 Initiative is the law at issue here. The 2006 Initiative returned the individual-to-candidate and individual-to-group limits to their pre-2003 levels of $500 per year. Alaska Stat. § 15.13.070(b)(1). It also capped the amount a non-political party group could contribute to a candidate at $1,000, restricted the amount candidates could receive from nonresidents to $3,000 per year, and limited the amount a political party—including its subdivisions—could contribute to a candidate. Alaska Stat. §§ 15.13.070(c) & (d), 15.13.072(a)(2) & (e)(3), 15.13.400(15). The voter information packet included the following statement of the 2006 Initiative's purpose:

> Corruption is not limited to one party or individual. Ethics should be not only bipartisan but also universal. From the Abramoff and Jefferson scandals in Washington D.C. to side deals in Juneau, special interests are becoming bolder every day. They used to try to buy elections. Now they are trying to buy the legislators themselves.

The 2006 Initiative passed with 73% of the popular vote.

## B.

Plaintiffs are three individuals and a subdivision of the Alaska Republican Party.  In 2015, Plaintiffs brought a First Amendment challenge against Defendants, Alaska public officials, targeting, as relevant to this appeal, (1) the $500 annual limit on an individual contribution to a political candidate, (2) the $500 limit on an individual contribution to a non-political party group, (3) annual limits on what a political party—including its subdivisions—may contribute to a candidate, and (4) the annual aggregate limit on contributions a candidate may accept from nonresidents of Alaska.  Plaintiffs sought a declaratory judgment that each of the challenged provisions is unconstitutional, a permanent injunction prohibiting enforcement of the challenged provisions, and costs and attorney's fees under 42 U.S.C. § 1983.  *Thompson*, 217 F. Supp. 3d at 1027.

Two of the Plaintiffs, Aaron Downing and Jim Crawford, are Alaska residents who wanted to, but legally could not, contribute more than $500 to individual candidates running for state or municipal office.  Crawford would also like to give more than $500 to a non-political party group.  David Thompson is a Wisconsin resident whose brother-in-law is Alaska State Representative Wes Keller.  Thompson sent Keller a $100 check for his campaign in 2015, but Keller returned the check because the campaign had already hit the $3,000 nonresident limit.  Finally, District 18 is a subdivision of the Alaska Republican Party that was limited in the amount it could give to Amy Demboski's mayoral campaign due to Alaska's aggregate limit on the amount a campaign can accept from a political party.

After granting Alaska's motion for partial summary judgment for lack of standing on certain of Plaintiffs'

claims,[1] the district court held a seven-day bench trial. In November 2016, the district court issued a decision rejecting all of Thompson's remaining claims. *Thompson*, 217 F. Supp. 3d at 1027–40. Applying the intermediate scrutiny standard for evaluating contribution limitations set forth in *Montana Right to Life Ass'n v. Eddleman*, 343 F.3d 1085 (9th Cir. 2003), the district court determined that each of the four challenged provisions was aimed at the "important state interest" of combating quid pro quo corruption or its appearance, and was "closely drawn" to meet that interest. *Thompson*, 217 F. Supp. 3d at 1040. Plaintiffs (collectively, "Thompson") timely appealed.

## II.

"We review a district court's legal determinations, including constitutional rulings, *de novo.*" *Berger v. City of Seattle*, 569 F.3d 1029, 1035 (9th Cir. 2009) (en banc). "When the issue presented involves the First Amendment . . . [h]istorical questions of fact (such as credibility determinations or ordinary weighing of conflicting evidence) are reviewed for clear error, while constitutional questions of fact (such as whether certain restrictions create a 'severe burden' on an individual's First Amendment rights) are reviewed *de novo.*" *Prete v. Bradbury*, 438 F.3d 949, 960 (9th Cir. 2006).

## III.

"The starting place in the analysis of the constitutionality of campaign finance reform legislation is *Buckley v. Valeo*, 424 U.S. 1 (1976) [(per curiam)]." *Eddleman*, 343 F.3d at

---

[1] The district court's partial summary judgment determination is not at issue in this appeal.

1090.  The Court in *Buckley* explained that limitations on campaign contributions implicate the contributor's First Amendment rights.  *Buckley*, 424 U.S. at 20–21.  But it distinguished limits on expenditures made *by* candidates from limits on contributions made *to* candidates.  *Id.*  The Court reasoned that the former amounts to a direct affront to the regulated entity's free speech rights, while the latter "entails only a marginal restriction upon the contributor's ability to engage in free communication."  *Id.* at 19–21.  *Buckley* further explained that

> [a] contribution serves as a general expression of support for the candidate and his views, but does not communicate the underlying basis for the support.  The quantity of communication by the contributor does not increase perceptibly with the size of his contribution, since the expression rests solely on the undifferentiated, symbolic act of contributing. . . .  A limitation on the amount of money a person may give to a candidate or campaign organization thus involves little direct restraint on his political communication, for it permits the symbolic expression of support evidenced by a contribution but does not in any way infringe the contributor's freedom to discuss candidates and issues.

*Id.* at 21.  Put another way, unlike expenditure limitations, "limiting contributions [leaves] communication significantly unimpaired."  *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 387 (2000).  Accordingly, while expenditure limitations must survive exacting scrutiny, limits on contributions are "subject to [a] relatively complaisant

review under the First Amendment." *FEC v. Beaumont*, 539 U.S. 146, 161 (2003); *see also Shrink Mo.*, 528 U.S. at 387–88. The question is whether the law targets an "important state interest," and, if so, "whether 'the contribution limitation is so radical in effect as to render political association ineffective, drive the sound of the candidate's voice below the level of notice, and render contributions pointless.'" *Eddleman*, 343 F.3d at 1091–92 (quoting *Shrink Mo.*, 528 U.S. at 397).

> The bottom line is this: After *Buckley* and *Shrink Missouri*, state campaign contribution limits will be upheld if (1) there is adequate evidence that the limitation furthers a sufficiently important state interest, and (2) if the limits are "closely drawn"—i.e., if they (a) focus narrowly on the state's interest, (b) leave the contributor free to affiliate with a candidate, and (c) allow the candidate to amass sufficient resources to wage an effective campaign.

*Id.* at 1092. The State bears the burden of satisfying both prongs of this inquiry. *McCutcheon v. FEC*, 572 U.S. 185, 210 (2014). We recently reaffirmed this test in *Lair III*, 873 F.3d at 1178–80.

## A.

In recent years, the Supreme Court has limited the type of state interest that justifies a First Amendment intrusion on political contributions. After *Citizens United* and *McCutcheon*, states must show that any such limitation serves to combat actual quid pro quo corruption or its appearance. *McCutcheon*, 572 U.S. at 206–07; *Citizens United v. FEC*, 558 U.S. 310, 359–60 (2010). It no longer

suffices to show that the limitation targets "undue influence" in politics. *McCutcheon*, 572 U.S. at 208 (holding that "the possibility that an individual who spends large sums may garner 'influence over or access to' elected officials or political parties" is not a sufficient state interest for limiting campaign contributions (quoting *Citizens United*, 558 U.S. at 359)); *see also Lair III*, 873 F.3d at 1188 (Bea, J., dissenting) ("*Citizens United* . . . narrowed what can constitute a valid important state interest . . . to only the state's interest in eliminating or reducing quid pro quo corruption or its appearance.").

The Court's limitation on what constitutes an "important state interest" does not necessarily undermine the government's ability to cap contributions made directly to a candidate. *See McCutcheon*, 572 U.S. at 192–93 ("[W]e have previously upheld [limits on direct contributions to a candidate] as serving the permissible objective of combatting corruption."); *Citizens United*, 558 U.S. at 356–57. That is because the appearance of such corruption is "'inherent in a regime of large individual financial contributions' to particular candidates." *See McCutcheon*, 572 U.S. at 207. To address that risk, states may implement prophylactic limits because individual-to-candidate contributions *could* compel "elected officials [to be] influenced to act contrary to their obligations of office by the prospect of financial gain to themselves or infusions of money into their campaigns." *Id.* at 225 (emphasis omitted) (quoting *FEC v. Nat'l Conservative Political Action Comm.*, 470 U.S. 480, 497 (1985)). Indeed, "restrictions on direct contributions are preventative, because few if any contributions to candidates will involve [actual] *quid pro quo* arrangements." *Citizens United*, 558 U.S. at 357.

In *Eddleman*, we held that the quantum of evidence necessary to justify a legitimate state interest is low: the perceived threat must be merely more than "mere conjecture" and "not . . . 'illusory.'" *Eddleman*, 343 F.3d at 1092.[2]

**B.**

We turn to assessing the four challenged provisions of the 2006 Initiative. For each, we consider whether it is (1) targeted at an "important state interest," and, if so, (2) whether it is "closely drawn" to meet that interest. *Eddleman*, 343 F.3d at 1092.

**i.**

We begin with the $500 individual-to-candidate contribution limit. Thompson challenges both Alaska's power to impose the limit at all and its intent in halving the prior $1,000 limit with the challenged $500 limit.

Thompson first argues that Alaska's evidence amounts to showing only an "undue influence" by contributors on candidates for office. In light of *Lair III*, we reject this argument. Alaska proffered substantial evidence of attempts to secure votes for contributions. For example, Senator Coghill testified that he was approached by a lobbyist

---

[2] *McCutcheon* and *Citizens United* created some doubt as to the continuing vitality of the standard for the evidentiary burden we announced in *Eddleman*. *See Lair v. Motl*, 889 F.3d 571, 575 (9th Cir. 2018) (Ikuta, J., dissenting from denial of rehearing en banc) ("This highly attenuated standard is two steps removed from the standard explained by *Citizens United* and *McCutcheon*."). However, in *Lair III* we reaffirmed this evidentiary standard, 873 F.3d at 1178, and we denied a petition for rehearing en banc, 889 F.3d at 572.

demanding his vote, saying: "This is why we gave to you. Now we need your help."  Similarly, Anchorage Assembly member Bob Bell testified that an executive offered to hold a fundraiser for him if he would support a private prison project.  When he refused, the executive held a fundraiser for his opponent instead.  These examples demonstrate attempts by individuals to affect public officials' voting behavior through the prospect of financial gain, thereby giving rise to a risk of quid pro quo corruption.  Finally, there is Alaska's VECO public corruption scandal, which came to light shortly after the 2006 Initiative was passed.  That scandal snared roughly 10% of Alaska's legislature in a scheme of accepting money from VECO, an oil services firm, in return for votes and other political favors.[3]  Under *Lair III*, we are compelled to conclude that the State's evidence suffices to show that the individual-to-candidate limit "further[s] the important state interest of preventing quid pro quo corruption or its appearance."  873 F.3d at 1179–80.

Thompson next argues that Alaska fails to show that the legislative purpose for cutting the individual contribution limit in half was to prevent quid pro quo corruption or its

---

[3] Thompson dismisses the VECO scandal as irrelevant because Alaska fails to show that it was the impetus for the 2006 Initiative.  As noted, however, the legislative purpose of the initiative is beside the point.  But Thompson's argument fails for an additional reason.  He reasons that prosecuting violators under bribery laws—as occurred with the VECO scandal—is the only legitimate means of preventing corruption.  Not so.  By allowing limits on contributions directly to candidates as a prophylactic measure, the Supreme Court has made clear that the state interest of preventing corruption is not limited to prosecuting instances of *past* corruption.  *See McCutcheon*, 572 U.S. at 196–98 (citing *Buckley*, 424 U.S. at 26–29); *Shrink Mo.*, 528 U.S. at 389 ("Congress [can] constitutionally address the power of money 'to influence governmental action' in ways less 'blatant and specific' than bribery." (quoting *Buckley*, 424 U.S. at 28)).

appearance. According to Thompson, Alaska needed to but failed to explain why $500 is better suited to combating corruption than the prior $1,000 limit. Absent such a showing, Thompson asserts, the $500 limit targets at most the "influence" and "pressure" that contributors can have on elected officials.

We are unpersuaded. First, the State must demonstrate only that when the 2006 Initiative was approved by the voters "the risk of actual or perceived quid pro quo corruption is more than 'mere conjecture.'" *Lair III*, 873 F.3d at 1178 (quoting *Eddleman*, 343 F.3d at 1092). We have rejected—albeit *sub silentio*—such purpose-based arguments in the past. In *Yamada v. Snipes*, 786 F.3d 1182, 1205–06 (9th Cir. 2015), we held that a limit on contributions by government contractors withstood scrutiny because it "target[ed] . . . the contributions most closely linked to actual and perceived quid pro quo corruption." This was notwithstanding the fact that the ban's proponents in the legislature articulated other goals, including an intent to create a "level playing field." *Yamada v. Weaver*, 872 F. Supp. 2d 1023, 1058 n.26 (D. Haw. 2012). Thompson's proposed rule—requiring Alaska to show that reducing the limit from $1,000 to $500 is necessary to combat corruption—would significantly restrict the deference the Supreme Court has given to states to determine how precisely to advance the important state interest of combating corruption.

Second, Thompson's argument about the exact amount of the limit misses the mark because the first step of *Eddleman* "is divorced from the actual amount of the limits—it is a threshold question whether *any* level of limitation is justified." *Lair III*, 873 F.3d at 1178.

Concluding, as we must, that the individual-to-candidate contribution limit targets an "important state interest," we turn to the second *Eddleman* factor: whether the limit is "closely drawn." *Lair III*, 873 F.3d at 1180; *Eddleman*, 343 F.3d at 1092. To pass scrutiny, Alaska must show that the limit "focus[es] narrowly on the state's interest," "leave[s] the contributor free to affiliate with a candidate," and "allow[s] the candidate to amass sufficient resources to wage an effective campaign." *Eddleman*, 343 F.3d at 1092. "In making this determination, we look at all dollars likely to be forthcoming in a campaign, rather than the isolated contribution, and we also consider factors such as whether the candidate can look elsewhere for money, the percentage of contributions that are affected, the total cost of a campaign, and how much money each candidate would lose." *Id.* at 1094 (internal citations omitted).

***Narrow Focus***.  Whether a contribution limit has a narrow focus requires us to "assess the 'fit between the stated governmental objective and the means selected to achieve that objective,' looking at whether the limit[] target[s] 'the narrow aspect of political association where the actuality and potential for corruption have been identified.'" *Lair III*, 873 F.3d at 1180 (internal citations omitted) (quoting *McCutcheon*, 572 U.S. at 199 and *Buckley*, 424 U.S. at 28). Consistent with the intermediate scrutiny we apply to contribution limits, the fit need not be "perfect, but reasonable." *McCutcheon*, 572 U.S. at 218 (quoting *Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989)).  Thus, while the 2006 Initiative need not employ "the least restrictive means," it should be "narrowly tailored to achieve the desired objective." *Id.* (quoting *Fox*, 492 U.S. at 480).

Thompson argues that the individual-to-candidate limit lacks a narrow focus because, he asserts, Alaska fails to show that reducing the limit from $1,000 to $500 was necessary, and because the limit is among the lowest in the nation. We have already explained that Alaska need not show that it was necessary to reduce the contribution limit to $500, only that the new limit targets quid pro quo corruption or its appearance. *See Buckley*, 424 U.S. at 30. On the question of whether the $500 limit is "narrowly focused" on that interest, we must uphold the dollar amount unless it is "so radical in effect as to render political association ineffective, drive the sound of a candidate's voice below the level of notice, and render contributions pointless." *Shrink Mo.*, 528 U.S. at 397.

Although the $500 limit is low compared to the laws of most other states, whether it is unreasonably low requires a deeper dive. The $500 limit affects only the top 12.6% of contributions that all candidates received in elections occurring after the initiative passed in 2006. This is on par with the Montana law's limit, which we upheld in *Eddleman* and *Lair III*. That limit targeted the top 10% of contributions—i.e., "the high-end contributions most likely to result in actual or perceived corruption." *Lair III*, 873 F.3d at 1181; *Eddleman*, 343 F.3d at 1094.[4] Moreover, although the $500 limit is on the low-end of the range of limits adopted by various states, it is not an outlier. At least

---

[4] Thompson relies on a different metric: the percentage of campaign dollars that came from contributors giving the $500 maximum, which he asserts amounted to nearly 40%. Regardless of the accuracy of Thompson's statistic, it is not well-suited to determining "the percentage of contributions that are affected." *Eddleman*, 343 F.3d at 1094. It merely reflects that large contributions will command a relatively outsize share of a candidate's campaign war chest.

four other states (Colorado, Kansas, Maine, and Montana) have the same or lower limit for state house candidates, as do at least five comparably sized cities (Austin, Portland, San Francisco, Santa Cruz, and Seattle).  We recently upheld a comparable limit.  *Lair III*, 873 F.3d at 1174 tbls.2 & 3.

***Contributors' Ability to Affiliate With Candidates.*** Thompson does not argue that the $500 individual-to-candidate limit prevents supporters from affiliating with candidates.  His tacit acknowledgment that Alaska has met its burden on this factor is well taken.  As with Montana's limit upheld in *Eddleman* and *Lair III*, Alaska "not only permits such affiliation through direct monetary contributions, but also 'in ways other than direct contributions, such as donating money to a candidate's political party, volunteering . . . , sending direct mail . . . , or taking out independent newspaper, radio, or television ads to convey . . . support.'"  *Lair III*, 873 F.3d at 1184 (alterations in original) (quoting *Eddleman*, 343 F.3d at 1094).  Accordingly, we conclude that the $500 limit does not hobble contributors' ability to affiliate with candidates.

***Candidates' Ability to Campaign Effectively.*** Thompson argues the $500 individual-to-candidate limit is impermissibly low because, he asserts, it favors incumbents at the expense of challengers, causes campaigns in competitive races to run deficits, and is not indexed for inflation.  Each of these contentions misses its mark, however, because none directly addresses the dispositive question:  whether the individual-to-candidate limit "impede[s] a candidate's ability to 'amass the resources necessary for effective advocacy.'"  *Eddleman*, 343 F.3d at 1091 (quoting *Shrink Mo.*, 528 U.S. at 397).  A limit does so if it is "so radical in effect as to render political association ineffective, drive the sound of a candidate's voice below the

level of notice, and render contributions pointless." *Shrink Mo.*, 528 U.S. at 397.[5]

The district court weighed expert testimony from both sides in concluding that the $500 limits allow candidates to "amass" the necessary funds.[6] *Thompson*, 217 F. Supp. 3d at 1035. Thompson submitted the testimony of Michael Gene Pauley, a campaign manager and consultant, who stated his belief that the $500 limits are too low because they are not indexed for inflation and because the limits are annual in nature. *Id*. at 1034–35. Thompson also offered the testimony of Senator John Coghill, who stated that "he has always been able to raise sufficient funds to run an effective campaign, but that it was 'just harder' under the current $500 limits than under the $1,000 limits because 'the lower limits do cause you to have to go broad.'" *Id*. at 1035.

Thompson also called Clark Bensen, a consultant and former director of political analysis for the Republican National Committee, who testified that, under the $500 limits, candidates often spend more than they raise. *Id*. The district court did not credit Bensen's testimony, however, because he acknowledged that his analysis was based on

---

[5] Thompson relies heavily on *Randall v. Sorrell*, 548 U.S. 230 (2006). It appears that Justice Breyer's plurality opinion in *Randall*, if binding, may aid Thompson's position because at least one of the "warning signs" identified in *Randall* is present here. However, as we recognized in *Lair v. Bullock*, 697 F.3d 1200, 1204 (9th Cir. 2012) (*Lair I*), and reiterated in *Lair v. Bullock*, 798 F.3d 736, 747 (9th Cir. 2015) (*Lair II*), *Randall* is not binding authority because no opinion commanded a majority of the Court.

[6] The testimony and the district court's decision addressed together the relevant inquiry of both the $500 individual-to-candidate limit and the $500 individual-to-group limit. The individual-to-group limit is discussed in more detail in Part III.B.ii of our opinion.

exaggerated estimates. *Id*. Moreover, Bensen's determination that campaigns run deficits under current law is also unpersuasive because it is analytically unsound. By simply comparing total contributions to total expenditures, Bensen did not control for certain expenditures that have little or nothing to do with running an effective campaign—e.g., charitable contributions, loan repayments, and payment transfers to future campaign accounts. Campaigns often must make such non-campaign-related expenditures because they are required to run a zero balance at the end of the campaign. Considering the analytical flaws in Bensen's analysis and his own admission that "I didn't do a very sophisticated analysis . . . . It's not like I didn't do it, but I didn't do it well, shall we say, or completely," *id.*, we hold that the district court's credibility determination was not clearly erroneous. *See Prete*, 438 F.3d at 960. Accordingly, we, like the district court, discount Bensen's testimony.

Defendants relied on the expert testimony of Thomas Begich and John-Henry Heckendorn, both of whom are political consultants. *Thompson*, 217 F. Supp. 3d at 1035. Both testified that candidates—challengers and incumbents alike—can run effective campaigns under the $500 limits and "have done so." *Id.* They explained that the candidate who raises the most money does not necessarily win the election, that it is not—contrary to Thompson's experts' testimony—getting more expensive to run campaigns, and that the limits do not favor incumbents over challengers, also contrary to Thompson's claim. *Id.* at 1035–36. For example, they testified that while the cost of some campaign elements have gone up, others have gotten cheaper, such as advertising and outreach to voters through new technologies. *Id.*

Additional record evidence supports Defendants' position. For example, in the 2012 and 2014 election cycles, several successful non-incumbent candidates raised in excess of $100,000 from individual contributions alone. While different races will require varying levels of fundraising, witness testimony established that amassing $100,000 allows a candidate to mount an effective campaign. For example, TV spending by a state legislative candidate generally would not exceed $40,000; radio advertising could cost $20,000; consultant services could cost another $20,000; a mailer might cost up to $3,000; and signs could cost up to $10,000. Thus, even if a candidate spent the maximum estimated expenditure in each of these categories, she would still spend less than $100,000. And that sum does not include the candidate's total campaign war chest. Candidates also receive contributions from political action committees ("PACs") and political parties.

Viewing the evidence as a whole, we agree with the district court that the $500 individual-to-candidate limit allows candidates to amass sufficient funds to run an effective campaign.[7]  And because Defendants also show

---

[7] It is unclear whether a district court's determination that a contribution limit allows candidates to amass sufficient funds to run an effective campaign is owed any deference. Arguably, such a finding is a "constitutional question of fact," which we review de novo. *Prete*, 438 F.3d at 960. In reversing the district court in *Lair III*, we implicitly applied de novo review. *Lair III*, 873 F.3d at 1184–86 (holding that "Montana's limits do not prevent candidates from amassing sufficient resources to campaign effectively" without giving any deference to the district court and without identifying any clear error); *see id.* at 1178 ("In the First Amendment context . . . 'our review [of the district court's fact finding] is more rigorous than other cases.'" (second alteration in original) (quoting *Lair II*, 798 F.3d at 748 n.8)). In other First Amendment contexts, we have suggested some level of deference is

that the limit is narrowly focused on Alaska's interest in combating quid pro quo corruption or its appearance and does not impede an individual's ability to associate with a candidate, we affirm the district court's determination that the $500 individual-to-candidate limit is "closely drawn." *Eddleman*, 343 F.3d at 1092.

### ii.

At first glance, the individual-to-group contribution limit of $500 appears to present a closer question because that limit reflects a more attenuated risk of quid pro quo corruption or its appearance than does the individual-to-candidate limit. In *McCutcheon*, the Supreme Court rejected a limitation that capped aggregate contributions to PACs. 572 U.S. at 210–18. Because money was not transacted directly between contributor and candidate, "there [wa]s not the same risk of *quid pro quo* corruption or its appearance." *Id.* at 210. While the government articulated an important interest in preventing circumvention of the base limits, the Court held that the "Government ha[d] not carried its burden of demonstrating that the aggregate limits further[ed] its anticircumvention interest." *Id.* at 211. The Court did not, however, call into doubt anticircumvention as an important state interest; the government simply failed to meet its evidentiary burden.

*McCutcheon*'s tacit embrace of anticircumvention as an important state interest in combating quid pro quo corruption

---

appropriate. *See, e.g.*, *Newton v. Nat'l Broad. Co.*, 930 F.2d 662, 670 (9th Cir. 1990) ("[W]e must simultaneously ensure the appropriate appellate protection of First Amendment values and still defer to the findings of the trier of fact."). We need not resolve this question because we agree with the district court's conclusion based on our own independent view of the evidence.

or its appearance means that another Supreme Court case, *California Medical Ass'n*, 453 U.S. 182, remains good law. In that case, applying intermediate scrutiny to limits on individual contributions to PACs, the Court upheld the limits as "further[ing] the governmental interest in preventing the actual or apparent corruption of the political process" because they prevent contributors from "evad[ing] the . . . limit on contributions to candidates . . . by channeling funds through a multicandidate political committee." *Cal. Med. Ass'n*, 453 U.S. at 197–98; *see also FEC v. Colo. Republican Fed. Campaign Comm'n*, 533 U.S. 431, 456 (2001) ("[A]ll Members of the Court agree that circumvention is a valid theory of corruption . . . ."); *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1125 (9th Cir. 2011) ("[T]here is nothing in the explicit holdings or broad reasoning of *Citizens United* that invalidates the anti-circumvention interest in the context of limitations on direct candidate contributions."). We conclude that Alaska has demonstrated the same interest here where the risk of circumvention of the individual-to-candidate limit is apparent: under Alaska law, any two individuals could form a "group," which could then funnel money to a candidate. Alaska Stat. § 15.13.400(8)(B). Such groups could easily become pass-through entities for, say, a couple that wants to contribute more than the $500 individual-to-candidate limit.

If, as we hold, the individual-to-candidate limit is constitutional, then under *California Medical Ass'n* so too is Alaska's law that prevents evasion of that limit.

### iii.

Alaska law limits the amount a political party may contribute to a municipal candidate to $5,000. Alaska Stat. §§ 15.13.070(d), 15.13.400(15). Thompson does not challenge the dollar amount; he instead argues that the law's

aggregation of political party sub-units is unconstitutional. He reasons that limiting party sub-units to the $5,000 limit but not limiting multiple labor-union PACs to the same limit is discriminatory.

Thompson's discriminatory treatment argument fails because independent labor union PACs are not analogous to political party sub-units. Party sub-units, by definition, are subsidiaries of a parent entity—the umbrella political party. As such, they share the objectives and rules of the party. In the past, we have observed without remark that at least one other state similarly aggregates party sub-units for purposes of campaign contribution limits. *See, e.g.*, *Lair II*, 798 F.3d at 740 ("Montana treats all committees that are affiliated with a political party as one entity."). Different labor unions, by contrast, are entirely different entities. Moreover, political parties may donate more than labor union PACs ($5,000 versus $1,000), which undercuts the basis for a direct comparison between the two disparate sets of organizations. Alaska Stat. § 15.13.070(c), (d). We therefore reject Thompson's inchoate disparate treatment argument and uphold the political party-to-candidate limit.[8]

### iv.

Finally, we address Thompson's challenge to Alaska's nonresident aggregate limit, which bars a candidate from accepting more than $3,000 per year from individuals who are not residents of Alaska. Alaska Stat. § 15.13.072(a)(2), (e). This particular provision prevented Thompson from making a desired $100 contribution to a candidate for the

---

[8] Our holding should not be construed as foreclosing a constitutional challenge to the dollar amount of Alaska's (or some other state's) limit on political party-to-candidate contributions.

Alaska House of Representatives—his brother-in-law—because his brother-in-law had already received $3,000 in out-of-state contributions.

The district court held that the nonresident aggregate limit serves an anti-corruption purpose. The court cited Alaska's unique vulnerability to "exploitation by outside industry and interests," and referenced trial testimony that those entities "can and do exert pressure on their employees to make contributions to state and municipal candidates." *Thompson*, 217 F. Supp. 3d at 1039. The court determined that the nonresident limit therefore

> furthers Alaska's sufficiently important interest in preventing quid pro quo corruption or its appearance in two ways. First, [it] furthers the State's anticorruption interest directly by avoiding large amounts of out-of-state money from being contributed to a single candidate, thus reducing the appearance that the candidate feels obligated to outside interests over those of his constituents. Second, the nonresident aggregate limit discourages circumvention of the $500 base limit and other game-playing by outside interests, particularly given [the Alaska Public Offices Commission's] limited ability and jurisdiction to investigate and prosecute out-of-state violations of Alaska's campaign finance laws.

*Id*.

Taking the district court's evidentiary findings as true, on de novo review we cannot agree that the nonresident limit targets quid pro quo corruption or its appearance. At most,

the law aims to curb perceived "undue influence" of out-of-state contributors—an interest that is no longer sound after *Citizens United* and *McCutcheon*.  *McCutcheon*, 572 U.S. at 206–08.  Indeed, Alaska's argument that the nonresident limit "reduces the appearance that a candidate will be obligated to outside interests rather than constituents" says nothing about *corruption*.[9]  It is not enough to show that out-of-state firms—and particularly those wishing to exploit Alaska's natural resources—"can and do exert pressure on their employees to make contributions to state and municipal candidates."  *Thompson*, 217 F. Supp. 3d at 1039.

Moreover, even if we agreed with Alaska that limiting the inflow of contributions from out-of-state extractive industries served an anti-corruption interest, the nonresident aggregate limit is a poor fit.  Out-of-state interests can still maximize their influence across a large number of candidates—they just need to be early players so that they can contribute the maximum $500 donation before each of those candidates reaches the $3,000 limit.

*McCutcheon* is instructive on this point.  There, the Court invalidated aggregate contribution limits that allowed an individual to contribute the maximum to multiple candidates but not to any additional candidates once the contributor hit the aggregate limit.  572 U.S. at 210–18.  The Court held that the law was a poor fit for combating quid pro quo corruption or its appearance because contributions to a candidate before a contributor has reached the aggregate

---

[9] In *Landell v. Sorrell*, the Second Circuit opined that the Alaska Supreme Court's upholding of the nonresident limit "is a sharp departure from the corruption analysis adopted by the Supreme Court in *Buckley* and *Shrink*."  382 F.3d 91, 148 (2d Cir. 2004), *rev'd on other grounds sub nom. Randall*, 548 U.S. 230.

limit are not somehow less corrupting than contributions to another candidate after the aggregate limit is reached.  *See id.*

Alaska's showing as to its nonresident limit is analogous. Alaska fails to show why an out-of-state individual's early contribution is not corrupting, whereas a later individual's contribution—i.e., a contribution made after the candidate has already amassed $3,000 in out-of-state funds—is corrupting.  Nor does Alaska show that an out-of-state contribution of $500 is inherently more corrupting than a like in-state contribution—only the former of which is curbed under Alaska's nonresident limit.  Alaska fails to demonstrate that the risk of quid pro quo corruption turns on a particular donor's geography.  Accordingly, while we do not foreclose the possibility that a state could limit out-of-state contributions in furtherance of an anti-corruption interest, Alaska's aggregate limit on what a candidate may receive is a poor fit.

As an alternative defense of the law, Alaska argues that the nonresident limit targets the important state interest of protecting its system of self-governance.  We reject Alaska's proffered state interest for three reasons.

First, what Alaska calls "self-governance" is really a re-branding of the interest of combating influence and access that the Supreme Court has squarely rejected.  To understand Alaska's proffered state interest, it is important to be clear on what the State does *not* mean by "self-governance."  In the distinct context of a law restricting "who may exercise official, legislative powers," we recognized "self-governance" as a legitimate state interest.  *Chula Vista Citizens for Jobs & Fair Competition v. Norris*, 782 F.3d 520, 531 (9th Cir. 2015) (en banc).  In *Norris*, we used the

term "self-governance" to mean a state's interest in controlling who governs.

Alaska's (and the dissent's) proffered state interest is materially different from what we called self-governance in *Norris*. Alaska's version of "self-governance" is concerned with limiting not who governs (as in *Norris*) but who is allowed to contribute to the campaigns of those who would govern. Indeed, the dissent correctly characterizes Alaska's proffered interest as seeking "to ensure that its legislators are responsive to the individuals that they represent, not to out-of-state interests." Dissent at 37. The premise of Alaska's concern with "outside control" is that Alaska state officials will feel pressure to kowtow to out-of-state entities because of nonresident contributions.

The dissent makes a cogent case for the view that states should be able to limit who may "directly influence the outcome of an election" by making financial contributions. *See* Dissent at 37. But that debate is over. The Supreme Court has expressly considered and rejected those arguments. *See McCutcheon*, 572 U.S. at 206–08 (holding that states do not have a legitimate interest in curbing "'influence over or access to' elected officials" by individuals "spend[ing] large sums" (quoting *Citizens United*, 558 U.S. at 359)). In short, Alaska's proffered interest in "self-governance" is indistinguishable from the disavowed state interest in combating "influence over or access to" public officials.[10]

---

[10] The Supreme Court has given no indication that the First Amendment interest in protecting political access waxes or wanes depending on the representative relationship between contributor and

Second, even if Alaska's "self-governance" interest could be construed as distinct from the interest in combating influence and access, the Supreme Court's recent campaign finance decisions leave no room for us to accept the State's proffered interest. The Supreme Court's opinions articulate "only one" narrowly defined legitimate state interest in capping campaign contributions: "preventing quid pro quo corruption or its appearance." *McCutcheon*, 572 U.S. at 206–07. In *McCutcheon*, its banner campaign contribution case, the Court explains that it has "consistently rejected attempts to suppress campaign speech based on other legislative objectives." *Id.* at 207. *McCutcheon* resolved that "[a]ny regulation *must instead target* what we have called '*quid pro quo*' corruption or its appearance." *Id.* at 192 (emphasis added) (citing *Citizens United*, 558 U.S. at 359). Indeed, "[c]ampaign finance restrictions that pursue other objectives . . . impermissibly inject the Government 'into the debate over who should govern.'" *Id.* (quoting *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 750 (2011)); *see also VanNatta v. Keisling*, 151 F.3d

---

candidate. *See Buckley*, 424 U.S. at 48–49. In fact, *Buckley*'s language arguably compels the opposite conclusion:

> [T]he concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment, which was designed to secure the widest possible dissemination of information from diverse and antagonistic sources, and to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.

*Id.* (internal quotation marks omitted). Far from serving the goal of "secur[ing] the widest possible dissemination of information from diverse and antagonistic sources," the nonresident limit artificially suppresses the free exchange of political ideas.

1215, 1217 (9th Cir. 1998) (noting "the lack of support for any claim based on the right to a republican form of government"). That unqualified directive leaves no room for Alaska's averred self-governance interest. Campaign contribution limits rise or fall on whether they target quid pro quo corruption or its appearance.

The dissent suggests we are free to accept "self-governance" as an important state interest in justifying limits on campaign contributions because the Supreme Court has not expressly considered and rejected that specific interest. Although a prior three-judge opinion of our court does not bind a later panel on an issue that was not before the prior panel, when it comes to Supreme Court precedent, our court is bound by more than just the express holding of a case. Our decisions must comport with the "reasoning or theory," not just the holding, of Supreme Court decisions (even in the face of prior contrary Ninth Circuit precedent). *Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc) (adopting the view that lower courts are "bound not only by the holdings of higher courts' decisions but also by their 'mode of analysis'" (quoting Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi. L. Rev. 1175, 1177 (1989))); *see id.* at 900 ("[T]he issues decided by the higher court need not be identical in order to be controlling."). The dissent's conclusion that self-governance is an important state interest in this context is "clearly irreconcilable" with the Supreme Court's reasoning in *McCutcheon*. *See id.*

Third, even if *McCutcheon* did not shutter the possibility of alternative state interests, self-governance is not an important state interest in light of countervailing First Amendment concerns. Indeed, Alaska fails to prove that nonresident participation in a state's election infringes state sovereignty. Instead, it alleges in conclusory fashion that the

"nonresident limit also furthers the important state interest in protecting Alaska's system of self-government from outside control."

Accordingly, we hold that Alaska's aggregate nonresident contribution limit violates the First Amendment, and we reverse the district court's judgment on this issue.[11]

## CONCLUSION

States have an important interest in preserving the integrity of their political institutions. A vital method of doing so is by curbing large monetary contributions, which can corrode the public's faith in its government's responsiveness to the popular will. Thus, while campaign contributions implicate a contributor's First Amendment right to express a particular political viewpoint, the State has an important interest in combating quid pro quo corruption or its appearance.

---

[11] The dissent relies on *Bluman v. FEC*, 800 F. Supp. 2d 281 (D.D.C. 2011), but that case is inapplicable. The plaintiffs in *Bluman* were foreign citizens who sought the right to participate in the United States campaign process by, among other things, making financial contributions to candidates. *Id.* at 282–83. They argued they should be treated the same as American citizens (such as minors and American corporations) who, though unable to vote, are permitted to make campaign contributions. *Id.* at 290. The court rejected that argument and based its holding on the conclusion that the plaintiffs, in contrast to American citizens who are unable to vote, were, by definition, outside "the American political community." *Id.* Thus, contrary to the dissent's statement that *Bluman* cannot "be distinguished on the grounds that it involved a distinction between United States citizens and foreign nationals," Dissent at 39, that distinction was the very basis for the *Bluman* court's holding.

Under existing precedent, the district court correctly held that three of the four challenged provisions of Alaska's 2006 campaign finance law are closely drawn to serve this interest. But the court erred in upholding the nonresident aggregate contribution limit because it, at most, targets contributors' influence over Alaska politics. Since *Citizens United* and *McCutcheon*, preventing "undue influence" is no longer a legitimate basis for restricting contributions under the First Amendment. Accordingly, we reverse the district court on that provision and remand for entry of judgment consistent with this opinion.

**AFFIRMED in part, REVERSED in part, and REMANDED.**

The parties shall bear their own costs.

THOMAS, Chief Judge, concurring in part and dissenting in part:

I agree with the majority that Alaska's limitations on individual contributions to candidates and election-related groups and on political party contributions to individual candidates do not violate the First Amendment. However, I would hold that the nonresident aggregate contribution limit, which furthers Alaska's important state interests in preventing quid pro quo corruption or its appearance and in preserving self-governance, also does not violate the First Amendment. Thus, I respectfully dissent from Section III(B)(iv) of the majority opinion. I would affirm the district court's well-reasoned decision in its entirety.

I

To survive First Amendment scrutiny in this case, Alaska must establish that the limits are justified by the risk of quid pro quo corruption or its appearance. And its burden is light.[1] Alaska need only show that "the risk of actual or perceived quid pro quo corruption" by out-of-state actors is neither "illusory" nor "mere conjecture." *Lair v. Motl*, 873 F.3d 1170, 1188 (9th Cir. 2017) ("*Lair III*") (quoting *Eddleman*, 343 F.3d at 1092). After a seven-day bench trial, the district court concluded that Alaska had satisfied its burden. Its factual findings were not clearly erroneous, *see Prete v. Bradbury*, 438 F.3d 949, 960 (9th Cir. 2006) (describing standard), and its conclusions were amply supported by the record. Alaska demonstrated that nonresident contributions present a particular risk of quid pro quo corruption or its appearance.[2]

---

[1] Because Thompson raised no challenge to the amount of the aggregate limit, the only question is whether "there is adequate evidence that the limitation furthers" Alaska's anti-corruption interest. *Lair v. Bullock*, 798 F.3d 736, 742 (9th Cir. 2015) ("*Lair II*") (quoting *Mont. Right to Life Ass'n v. Eddleman*, 343 F.3d 1085, 1092 (9th Cir. 2003)).

[2] The Supreme Court has specifically rejected Thompson's argument that a ban is treated differently than a limit when it comes to connecting the regulation to the state's important interest. *Fed. Elections Comm'n v. Beaumont*, 539 U.S. 146, 162 (2003) ("It is not that the difference between a ban and a limit is to be ignored; it is just that the time to consider it is when applying scrutiny at the level selected[.]"). And there is no question that Alaska may limit campaign contributions to prevent quid pro quo corruption or its appearance. *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 390 (9th Cir. 2000). Thus, the issue here is essentially whether the state may draw a line between residents and non-residents.

Alaska is uniquely vulnerable to exploitation by out-of-state actors. The district court found that this is so, in part, because of "Alaska's almost complete reliance on one industry for a majority of its revenues." *Thompson v. Dauphinais*, 217 F. Supp. 3d 1023, 1029 (D. Alaska 2016). Indeed, while 85 to 92% of Alaska's budget derives from the oil and gas industry, that industry is not responsible for more than 50% of any other state's budget. *Id.* As one pro-oil and gas organization proclaims on its website, "Alaska is the only state in the Union that is so dependent on one industry to fund its government services." ALASKA OIL & GAS ASS'N, *State Revenue*, https://www.aoga.org/facts-and-figures/state-revenue (last visited Nov. 9, 2018). Today, not only does the State depend on the industry to fund its services, but boom-and-bust cycles have a more immediate impact on Alaskans' daily lives, too: "the petroleum industry supports one-third of all Alaska jobs." ALASKA OIL & GAS ASS'N, *Facts and Figures*, https://www.aoga.org/facts-and-figures (last visited Nov. 9, 2018).

The economic benefits of natural resource extraction do not come without a cost. The interests of out-of-state oil companies are often at odds with the interests of some Alaska residents. Today, "[a]bout 17 percent of Alaskans—or 120,000 people—live in rural areas, where 95 percent of households use fish and 86 percent use game for subsistence purposes[.]" Azmat Khan, *Living off the Land in Rural Alaska*, PBS, https://www.pbs.org/wgbh/frontline/article/living-off-the-land-in-rural-alaska (last visited Nov. 9, 2018). Resource extraction has the potential to cause irremediable damage to Alaskan lands and culture: "any change that depletes wild resources, reduces access to wild areas and resources, or increases competition between user groups can create problems for subsistence[,]" which is "among the most highly valued parts of [Alaska] culture"

and "essential . . . to rural economies." Alaska Dep't of Fish & Game, *Subsistence in Alaska: FAQs*, http://www.adfg.alaska.gov/index.cfm?adfg=subsistence.faqs#QA14 (last visited Nov 9, 2018).

Given the oil and gas industry's outsized impact on Alaska's economy, it is not difficult to see why, as the district court found, Alaska is dependent upon and therefore particularly vulnerable to corruption by out-of-state corporations, whose interests are likely to be indifferent to those of Alaska's residents. Alaska is vulnerable for another reason, too—with "the second smallest legislature in the United States and the smallest senate," it takes only "ten votes [to] stop a legislative action such as an oil or gas tax increase from becoming law." *Dauphinais*, 217 F. Supp. 3d at 1029. "Consequently, the incentive to buy a vote, and the chances of successfully doing so, are therefore higher in Alaska than in states with larger legislative bodies." *Id.* The district court was persuaded by trial testimony that "the unique combination of Alaska's small population, geographic isolation, and great natural resources make it extremely dependent on outside industry and interests." *Id.* at 1039. Alaska cannot afford to extract its natural resources without out-of-state corporations. *Id.* And because out-of-state corporations cannot extract without the cooperation of government, these corporations do all they can to influence state politics. *Id.*

As the Supreme Court has recognized, "the dangers of large, corrupt contributions and the suspicion that large contributions are corrupt are neither novel nor implausible." *Shrink Mo.*, 528 U.S. at 391 (citing *Buckley v. Valeo*, 424 U.S. 1, 27 (1976)). Thus, it is enough to demonstrate that out-of-state contributors are particularly interested in

corrupting the political process in Alaska, as the State has easily done.

But the proof at trial was more than theoretical. The district court found that "natural resource extraction firms can and do exert pressure on their employees" to contribute to political campaigns in Alaska. *Dauphinais*, 217 F. Supp. 3d at 1039. In other words, these out-of-state interests have found a way to circumvent the generally applicable contribution limits.

And, as the trial evidence demonstrated, Alaska's history of corruption is, in fact, storied. As the majority has aptly noted, in the mid-2000s, a highly publicized scandal implicated ten percent of Alaska's legislators for improperly taking money from VECO, a corporation that provided support services to out-of-state oil and gas corporations. *Id.* at 1030.

Unsurprisingly, the VECO scandal did not go unnoticed by the public. News outlets played an FBI surveillance video showing one member of the legislature, Representative Vic Kohring, accepting cash from VECO in exchange for his vote on pending oil tax legislation. Representative Kohring went on to pen a newspaper column claiming that the only thing separating him from other Alaska lawmakers was that he got caught. *Id.* at 1030. As the district court determined, the publicity surrounding the VECO scandal supports Alaska's interest in limiting the appearance of quid pro quo corruption by out-of-state interests in order to preserve Alaskans' belief in the integrity of their political system. *Id.* at 1031.

In sum, I would hold that Alaska's important anti-corruption interest justifies a limit on nonresident speech. Nonresident contributions present a special risk of quid pro

quo corruption that is neither "illusory" nor "mere conjecture." *Lair III*, 873 F.3d at 1188 (quoting *Eddleman*, 343 F.3d at 1092). Particularly in the aftermath of the VECO scandal, the nonresident aggregate contribution furthers Alaska's interest in preventing the appearance of corruption, thereby increasing "[c]onfidence in the integrity of [Alaska's] electoral processes," a value "essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 7 (2006) (per curiam). The district court was entirely correct, and the record supports its conclusion.

## II

The nonresident aggregate cap is also justified by a second important state interest: self-governance. I would hold that self-governance is a sufficiently important interest to justify the nonresident aggregate cap.

### A

"[T]he right to govern is reserved to citizens." *Foley v. Connelie*, 435 U.S. 291, 297 (1978). There is no question that Alaska may bar nonresidents from voting, no matter how tangible their interest in a state election, *Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60, 68–69 (1978), even though "[n]o right is more precious" than the right to vote, *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). Because of the need for responsiveness to local interests, states may also closely guard from nonresident interference those "functions that go to the heart of representative government," such as "state elective or important nonelective executive, legislative, and judicial positions[.]" *Sugarman v. Dougall*, 413 U.S. 634, 647 (1973).

States should be able to prevent out-of-state interests from advancing candidates for whom the contributor cannot even vote. Campaign contributions are made primarily to directly influence the outcome of an election rather than to broadcast one's one political opinion. *Beaumont*, 539 U.S. at 161 ("[C]ontributions lie closer to the edges than to the core of political expression."). Thus, they are "subject to relatively complaisant review." *Id.*

The nonresident aggregate limit furthers Alaska's important state interest in protecting state sovereignty in governance. It is "the choice, and right, of the people to be governed by their citizen peers." *Foley*, 435 U.S. at 296. When out-of-state interests fund political campaigns, they place an obstacle between the people and their representatives. Alaska must be able to take measures to ensure that its legislators are responsive to the individuals that they represent, not to out-of-state interests.

Alaska's interest in protecting self-government is "important," as required under *Eddleman*'s first prong. *Lair II*, 798 F.3d at 742 (quoting *Eddleman*, 343 F.3d at 1092). Indeed, on en banc review, we held that a state's interest in "securing the people's right to self-government" was "compelling" in the face of a First Amendment challenge to a law requiring municipal initiative proponents to be bonafide electors. *Chula Vista Citizens for Jobs & Fair Competition v. Norris*, 782 F.3d 520, 531 (9th Cir. 2015) (en banc). The Supreme Court reached a similar conclusion regarding residence requirements under an Equal Protection analysis. *Dunn v. Blumstein*, 405 U.S. 330, 343–44 (1972) (recognizing as "substantial" the government's interest in "preserv[ing] the basic conception of a political community").

B

*Bluman v. Federal Election Commission*, 800 F. Supp. 2d 281 (D.D.C. 2011), *summarily aff'd*, 132 S. Ct. 1087 (2012) (mem.), decided by a three-judge panel of the D.C. District Court, is analogous. There, the court considered a federal law preventing foreign nationals from making not only contributions but also independent expenditures to influence federal elections. *Id.* at 283. Because spending money to influence an election is not only "speech" but also "participation in democratic self-government," foreign nationals may be subject to restrictions targeted at protecting sovereignty. *Id.* at 289.

In *Bluman*, the court recognized that "[p]olitical contributions and express-advocacy expenditures are an integral aspect of the process by which Americans elect officials to federal, state, and local government offices." *Id.* at 288. "[I]t is undisputed that the government may bar foreign citizens from voting and serving as elected officers"; "[i]t follows that the government may bar foreign citizens . . . from participating in the campaign process that seeks to influence how voters will cast their ballots in the elections." *Id.*

Alaska presents an even stronger case than did the federal government in *Bluman*. There, the challenged law restricted individual expenditures as well as campaign contributions, and the court therefore applied strict scrutiny. *Id.* at 285 (citing *McConnell v. FEC*, 540 U.S. 93, 134–37 (2003) and *Buckley*, 424 U.S. at 20–23). Here, on the other hand, we need not identify a compelling government interest but only a "sufficiently important" one. *Lair II*, 798 F.3d at 742 (quoting *Eddleman*, 343 F.3d at 1092).

Nor can *Bluman* be distinguished on the grounds that it involved a distinction between United States citizens and foreign nationals. "It has long been recognized that resident aliens enjoy the protections of the First Amendment." *Price v. I.N.S.*, 962 F.2d 836, 841 (9th Cir. 1991) (internal citations omitted). The line drawn in *Bluman* separates citizens with the right to participate in government from foreign nationals subject to federal law but with no corollary right of participation. Alaska draws its line even more carefully by applying the aggregate contribution limit only to nonresidents.[3]

C

I respectfully disagree that the Supreme Court has foreclosed this issue because it rejected other purported interests. Op. at 29–30. Foundational to the judicial role is a recognition that "[w]ithout jurisdiction the court cannot proceed at all in any cause." *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 94 (1998) (quoting *Ex parte McCardle*, 74 U.S. 506, 514 (7 Wall.) (1868)). Jurisdiction extends only to "Cases" and "Controversies." U.S. Const. art. III, § 2. It emphatically does not extend to issues that are not before a court. No court can reject a self-governance theory

---

[3] This, too, is why *VanNatta v. Keisling*, 151 F.3d 1215 (9th Cir. 1998), is immediately distinguishable, even if it remains good law and speaks to this precise issue, both of which propositions are questionable. *VanNatta* is distinguishable because it limited out-of-district contributions to candidates for state office. *Id.* at 1217. Further, as we noted in *Eddleman*, reliance on the Court's approach in *VanNatta* "fails to recognize the impact of the Supreme Court's . . . decision in *Shrink Missouri*." 343 F.3d at 1091 n.2. And the majority opinion in *VanNatta* is framed as a rejection of the state's evidence and legal argument rather than as setting forth a hard-and-fast rule regarding the constitutionality of all limits on out-of-district contributions. 151 F.3d at 1217–18.

unless it is asked to do so.  The Supreme Court has yet to take up this question; in resolving this controversy, it is not our role to apply a holding that does not exist.

### D

"The Constitution limited but did not abolish the sovereign powers of the States, which retained 'a residuary and inviolable sovereignty.'"  *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1475 (2018) (quoting The Federalist No. 39, at 245 (James Madison) (Clinton Rossiter ed., 1961)).  This basic principle arises from "a fundamental structural decision incorporated into the Constitution." *Id.*

Our federalist system is not binary; it does not simply pit the states—as a single entity—against federal power. Rather, it recognizes the sovereignty of each individual state. In the words of Justice Marshall, "[n]o political dreamer was ever wild enough to think of breaking down the lines which separate the States, and of compounding the American people into one common mass." *McCulloch v. Maryland*, 17 U.S. 316, 403 (4 Wheat.) (1819).  Under our Constitution, "the people of each state compose a State, having its own government, and endowed with all the functions essential to separate and independent existence." *Lane Cty. v. Oregon*, 74 U.S. 71, 76 (7 Wall.) (1868).  "Not only, therefore, can there be no loss of separate and independent autonomy to the States, through their union under the Constitution, but . . . the preservation of the States, and the maintenance of their governments, are as much within the design and care of the Constitution as the preservation of the Union and the maintenance of the National government." *Texas v. White*, 74 U.S. 700, 725 (7 Wall.) (1869).

In the current, highly partisan political climate, regional differences may be obscured by contentious national issues.

Jessica Bulman-Pozen, *Executive Federalism Comes to America*, 102 VA. L. REV. 953, 962–63 (2016).  However, "[e]ven at the level of national politics, . . . there always remains a meaningful distinction between someone who is a citizen of the United States and of Georgia and someone who is a citizen of the United States and of Massachusetts." *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 859 (1995) (Thomas, J., dissenting).

Here, of course, we are not dealing with politics at a national level, but only with Alaska's ability to take measures to "represent and remain accountable to its own citizens." *Printz v. United States*, 521 U.S. 898, 920 (1997) (internal citations omitted).  State governments can and should be "more sensitive to the diverse needs" of their populations. *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991). Alaska must have the right to prevent non-resident interests from taking hold of their elections.  *See* Anthony Johnstone, *Outside Influence*, 13 ELECTION L.J. 117, 122–23 (2014) ("No form of federalism, and therefore no form of government under the Constitution, works without limits on outside influence in the states.").  Therefore, I disagree that Alaska's self-governance interest is not "sufficiently important" for purposes of limiting campaign contributions. *Lair II*, 798 F.3d at 742 (quoting *Eddleman*, 343 F.3d at 1092).

### III

For these reasons, I respectfully dissent, in part.  I agree that Alaska's limitations on individual contributions to candidates and election-related groups and on political party contributions to individual candidates do not violate the First Amendment.  However, I also would hold that Alaska's nonresident aggregate contribution limit is constitutional. Alaska has shown that the risk of quid pro quo corruption or

its appearance by out-of-state campaign contributions is neither "illusory" nor "mere conjecture." *Lair III*, 873 F.3d at 1188 (quoting *Eddleman*, 343 F.3d at 1092). Further, it has demonstrated its important interest in self-governance, which justifies the nonresident aggregate limit. Thus, I would affirm the judgment of the district court in its entirety.